**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ MAR 2 2 2011 ★

BROOKLYN OFFICE

Ronald D. Coleman (RC 3875)
GOETZ FITZPATRICK LLP
One Penn Plaza—Suite 4401
New York, NY 10119
Tel: (212) 695-8100
rcoleman@goetzfitz.com
*Attorneys for Plaintiffs*



SUMMONS ISSUED

---

203 17TH REALTY LLC, SAKELE
BROTHERS, LLC  *and* ONE MAIDEN
LANE REALTY, LLC, *all New York limited
liability companies,* 848 FULTON REALTY
CORP. *and* MING SHENG INC., *New York
corporations,* GOTHAM BROAD, LLC, *a
Delaware limited liability company,* FOTINI
THEOHARIDU, *and* PHILLIPE JOCELINE,
*natural persons,*

*Plaintiffs,*

v.

THE CITY OF NEW YORK, THE NEW
YORK CITY DEPARTMENT OF
BUILDINGS, THE NEW YORK CITY
OFFICE OF ADMINISTRATIVE TRIALS
AND HEARINGS, THE NEW YORK CITY
ENVIRONMENTAL CONTROL BOARD,
THE NEW YORK CITY DEPARTMENT OF
CITY PLANNING, *all municipal entities,*
ROBERT LIMANDRI, EDWARD J.
FORTIER, ALEX BERGER, ROBERTO
VELEZ,SUZANNE BEDDOE, *and*
AMANDA M. BURDEN *(all individuals who
are named herein in their individual and
official capacities),*

*Defendants.*

CIVIL ACTION NO.

# CV11 - 1392

**COMPLAINT AND
JURY DEMAND**

AMON, J.

CARTER, M.J.

---

Plaintiffs, by and through their undersigned counsel, hereby complain and say regarding

their allegations in the herein action against the defendants:

## NATURE OF THE ACTION

1.     Plaintiffs are owners of buildings located in the City of New York (the "City") and are parties to contracts whereby they allow third-party outdoor advertising companies ("OAC's") to place outdoor advertising displays on their properties in return for compensation.

2.     Rather than a modest income stream from advertising, however, these leases have, due to defendants' unlawful actions under color of enforcement of outdoor advertising regulations, resulted in the imposition of gargantuan liens, abusive stop-work orders and financial assessments so high that they fundamentally threaten plaintiffs' economic survival.

3.     As set out below, while the violations and penalties imposed on plaintiffs purport to be the result of routine enforcement of the City's outdoor advertising regulations, they are in fact arbitrary and capricious punishment for the "crime" of granting leases to blacklisted OAC's targeted for discriminatory and lawless "special enforcement" by defendants, as detailed below.

4.     This "special enforcement" is, in turn, enforced by a captive, in-house private administrative "court" staffed by per diem administrative law judges who not only routinely rubber-stamp appeals involving cumulative penalties for half a million dollars or more, but whose ongoing employment depends on their continuing to affirm such penalties.

5.     One purpose of defendants' actions against plaintiffs is, on information and belief, by way of indirect retribution to targeted OAC's for mounting legal challenges to defendants' actions set out in detail herein.

6.     Moreover, upon information and belief defendants' scheme has its origins in the repaying of political favors to larger, dominant and older OAC's who, by means such as substantial campaign contributions to influential politicians, pushed for the establishment of and

2

continue to participate in defendants' program to eliminate new entrants into the market for outdoor advertising in the City.

7.      Notwithstanding defendants' supposed policy of aggressively policing outdoor sign regulation in New York City, in fact, these established OAC's have been given virtual free passes on enforcement of regulations against their own signs as part of defendants' unlawful scheme.

8.      Plaintiffs have thus been victimized, shorn of their property rights and deprived of their civil rights by defendants' unlawful imposition of devastating and unlawful "collateral damage" on them as part of defendants' efforts to destroy the targeted OAC's.

9.      Part of defendants' scheme is the wrongful, arbitrary and capricious designation of plaintiffs, mere landlords who have entered into contracts with the targeted OAC's, as OAC's themselves.

10.     No other area of commerce or activity regulated by New York City imposes penalties on landlords for activities undertaken by lessees or tenants in the manner by which defendants have imposed penalties on defendants arising out of activities conducted by their OAC lessees.

11.     The particular significance of this determination is that while non-OAC's found to have violated sign provisions are fined in the range of $800 to $1,200 for violations, plaintiffs are subject to and have been penalized by defendants with "enhanced" OAC fines ranging from $10,000 to $25,000 per day for identical alleged violations.

12.     Defendants have imposed this harm on plaintiffs to strike at certain targeted OAC's despite the fact, and with the full knowledge, that the enhanced penalties and other

3

enforcement measures under whose color they are acting were enacted not to penalize typical landlords such as plaintiffs but rather to affect the behavior of OAC's.

13.    By focusing "enforcement" efforts only on targeted OAC's and levying confiscatory fines on two parties for the same alleged violations – on both the OAC's and landlords who rent them space – defendants seek to ensure that no landlord in New York City will risk doing business with the blacklisted OAC's being targeted by defendants, ensuring their financial destruction.

14.    These fines and penalties, converted into liens and judgments against plaintiffs, or when made a matter of record prior to any execution and enforcement, unlawfully deprive plaintiffs of equity in their properties, denude them of benefits to which they are constitutionally entitled by virtue of their ownership, and expose them to crippling financial liabilities.

15.    Additionally, plaintiffs are entitled by contract to defense and indemnification by the OAC's that actually erect the signs.

16.    Defendants have admitted to imposing "twin" OAC penalties on landlords as a way of indirectly fining such OAC's twice for the same alleged violations.

17.    As a result, however, of the accumulated unlawful assessments and fines imposed on or pending against plaintiffs – amounting to millions of dollars – it is unknown if the affected OAC's could even provide this indemnification.

18.    Thus the burden of these punitive financial penalties, including the encumbrance of plaintiffs' properties, is likely therefore to fall squarely on plaintiffs themselves, who are essentially innocent of anything other than authorizing OAC's to erect signs on the condition that they do so in compliance with the law.

19.     In fact, while these violations purport to be part of the defendants' proper and lawful regulatory enforcement, defendants in this action have, acting under color of state law as officials of an unlawful conspiracy or arrangement, engaged in a course of discriminatory, irrational and arbitrary conduct which has deprived plaintiffs of equal protection of the law and due process of law and which has effectuated a taking of their property without the payment of just compensation, all in violation of the Fifth and Fourteenth Amendments to the United States Constitution and actionable under 42 U.S.C. § 1983.

20.     Defendants have also abused the law and their official powers to enforce an unconstitutional regime of grossly disproportionate fines without affording plaintiffs due process of law.   Instead, defendants have established a "captive" private court whose judges are employed at will by the agency that issues the fines, and who are vested with none of traditional safeguards of judicial independence or accountability, thus depriving plaintiffs of their constitutional rights.

## PARTIES

21.     Plaintiff 203 17TH Realty LLC is a limited liability company formed under the laws of the State of New York with an address of 1303 53rd Street, Brooklyn, New York, and which owns the property located at 203 17th Street in Brooklyn in connection with which it has been fined, as of the date hereof, total civil penalties for alleged outdoor sign violations as set out herein in the amount of **$155,000**.

22.     Plaintiff Sakele Brothers, LLC is a limited liability company formed under the laws of the State of New York with an address of 7 Dey Street, New York, New York, and which owns the property located at 187 Broadway in Manhattan in connection with which it has been

5

fined, as of the date hereof, total civil penalties for alleged outdoor sign violations as set out herein in the amount of **$145,000**.

23.     Plaintiff One Maiden Lane Realty, LLC is a limited liability company formed under the laws of the State of New York with an address of 176 Broadway, New York, New York and which owns the property located at 1 Maiden Lane in Manhattan which has been fined, as of January 4, 2011, total civil penalties, including interest, for alleged outdoor sign violations in the amount of **$757,438**.

24.     Plaintiff 848 Fulton Realty Corp. is a domestic business corporation formed under the laws of the State of New York with an address of 211 Avenue U, Brooklyn, New York, and which owns or controls the property located at 848 Fulton St. in the County of Kings, which has been cited for alleged outdoor sign violations as set out herein and against whom fines, penalties or assessments have as yet been only threatened but not yet made.

25.     Plaintiff Ming Sheng Inc. is a domestic business corporation formed under the laws of the state of New York with an address of 280 Kings Highway, Brooklyn, New York and which owns or controls the property at 280 Kings Highway, which has been cited for alleged outdoor sign violations as set out herein and against whom fines, penalties or assessments have as yet been only threatened but not yet made.

26.     Plaintiff Gotham Broad, LLC is a limited liability company formed under the laws of the State of Delaware and authorized to do business in the State of New York with an address at 30 Broad Street, New York, New York and which owns the property located at 30 Broad Street in Manhattan in connection with which it has been fined, as of the date hereof, total civil penalties for alleged outdoor sign violations as set out herein in the amount of **$295,000**.

27.     Plaintiff Fotini Theoharidu is a natural person with a business address at 35-40 32nd Street, Long Island City, New York who owns or controls the property at 13 Carmine Street in Manhattan which has been cited for alleged outdoor sign violations as set out herein and against whom fines, penalties or assessments have as yet been only threatened but not yet made.

28.     Plaintiff Philippe Joceline is a natural person with a business address at address of 1070 East 103rd Street, Brooklyn New York who owns or controls the property at 841 / 843 Franklin Avenue in the County of Kings which has been cited for alleged outdoor sign violations as set out herein and against whom fines, penalties or assessments have as yet been only threatened but not yet made.

29.     Defendant the City of New York is a municipal entity of the State of New York ("the City").

30.     Defendant the New York City Department of Buildings is a department of the City government charged with enforcing the City's Building Code, Electrical Code, Zoning Resolution and other regulations (the "DOB").  The DOB performs plan examinations, issues construction permits, and inspects properties.

31.     Defendant the New York City Office of Administrative Trials and Hearings is a City agency that conducts administrative hearings for other City agencies, boards or commissions ("OATH").  OATH supervises the operation of defendant the Environmental Control Board.

32.     Defendant the New York City Environmental Control Board is an administrative tribunal that hears cases in which the City has charged a person or business with violating City regulations and, since 2008, has been part of OATH (the "ECB").

7

33.     Defendant the New York City Department of City Planning is a department of the City government with authority over land use and environmental review, preparing plans and policies, and providing information to and advising City officials (the "DCB").

34.     Defendant Robert LiMandri is the Commissioner of defendant DOB. He is sued both in his individual capacity and as a policymaking official of the City.

35.     Defendant Edward J. Fortier is the Director, Padlock/Sign Enforcement Units of defendant DOB. He is sued both in his individual capacity and as a policymaking official of the City.

36.     Defendant Alex Berger is the Deputy Director, Padlock/Sign Enforcement Units of defendant DOB. He is sued both in his individual capacity and as a policymaking official of the City.

37.     Defendant Roberto Velez is the Chief Administrative Law Judge of defendant OATH. He is sued both in his individual capacity and as a policymaking official of the City.

38.     Defendant Suzanne Bedoe is the Executive Director of defendant ECB. She is sued both in her individual capacity and as a policymaking official of the City.

39.     Defendant Amanda M. Burden is the Director of defendant DCP. She is sued both in her individual capacity and as a policymaking official of the City.

## JURISDICTION AND VENUE

40.     The jurisdiction of this Court is invoked pursuant to 42 U.S.C. § 1983, 28 U.S.C. §1331, and supplemental jurisdiction as provided in 28 U.S.C. § 1367 (a).

41.     This case also presents a federal question of deprivation of Due Process and Equal Protection rights guaranteed by the federal and state constitutions, providing this Court with independent jurisdiction under 28 U.S.C. § 1331.

42.     Venue in the Eastern District of New York is proper for the foregoing reasons: (1) A substantial part of the acts complained of have occurred, and the property and persons affected are located in the Eastern District of New York; (2) some or all of plaintiffs' respective business operations or the properties that are the subject matter of this action, or both, are located in the District; and (3) defendants transact business and are found in the Eastern District of New York.

## FACTS COMMON TO ALL COUNTS

43.     Plaintiffs are all owners of real estate located in the City.

44.     Plaintiffs have entered into contracts with OAC's to erect outdoor advertising displays including "billboards" and "wallscapes" on their property in exchange for rental income.

45.     While plaintiffs were aware at the time of the acquisition of their respective rights in their properties of the possibility of generating revenue from their properties via outdoor advertising, plaintiffs are not in the business of outdoor advertising and did not and do not systematically market outdoor advertising opportunities or solicit outdoor advertising on their properties.

46.     Plaintiffs generally lack sophistication regarding the legal, regulatory or technical aspects of outdoor advertising.

47.     At various times plaintiffs agreed respectively to lease the right to erect outdoor advertising displays in return for compensation ranging from $3000 - $5000 per year for signs under 300 square feet up to a maximum of ten times that as rental income per property.

48.     Beginning in March, 2001 and continuing on an ongoing basis, the City enacted and has continued to enact and promulgate a series of regulations and policies that radically changed the landscape of outdoor advertising regulation in the City.

49.     These provisions include the New York City Administrative Code ("NYCAC") Article 28, Chapter 5, Rules of the City of New York ("RCNY") Title 1, Sections 49 and 102, and various provisions of the New York City Zoning Resolution.

50.     Notwithstanding New York City's worldwide fame for its outdoor advertising and the generally benign nature of outdoor advertising as regards risk to the public of harm from its use, the rationale for adoption of the Sign Scheme was the protection and enhancement of both public safety and aesthetics.

51.     In fact, however, these new regulations and policies, as well as an extensively detailed "roadmap" detailing a methodology of discriminatory enforcement meant to eliminate smaller, upstart OAC's (the "Sign Scheme") were adopted in part at the behest of, and to benefit, the two dominant OAC's in the City, namely CBS Outdoor Group Inc. and Van Wagner Communications LLC (the "Big Two OAC's").

52.     The underlying purpose of the Big Two OAC's in seeking adoption of the Sign Scheme was and is to eliminate competition from smaller but rapidly growing OAC's that threatened the dominance of the Big Two OAC's, which they described in their campaign as "renegades."

53.     The Big Two OAC's not only lobbied public officials to put the Sign Scheme into effect, but influenced them to do so by making substantial campaign contributions to influential politicians and by other improper methods.

54.     The City was encouraged by the Big Two OAC's to launch the Sign Scheme in order to "reward" large advertisers for their "legitimate" activities – "legitimate" as defined *post facto* under the Sign Scheme.

10

55.     Moreover, the Big Two OAC's and the City conspired to utilize the Sign Scheme to drive revenue away from small OAC's, which it would turn into "renegades," but toward both the City's and the Big Two OAC's.

56.     One of the explicit goals of the plan was that tens of millions of advertising dollars being spent on "renegade" signage would, once competition from the small OAC's was cut off, flow into the City's bus shelter, and telephone kiosk and urban panel franchises" – as well as the now ironclad outdoor advertising franchises of the Big Two OAC's.

57.     To this end, while narrowly restricting the range of permissible activities engaged in primarily by small OAC's, the Big Two OAC's urged the City, for example, to change the definition of an outdoor sign to exempt from regulation all advertising signs on public pay phones and MTA and Department of Transportation properties – markets which the Big Two OAC's dominate – notwithstanding any aesthetic or other concerns as may have otherwise obtained.

58.     Along similar lines, one of the key policies to be implemented by the Sign Scheme was to legislatively "bless" the oldest and most valuable outdoor signs – i.e., "grandfather" them – and to outlaw, in many cases retroactively, "newer" signs and techniques utilized by smaller competitors.

59.     This grandfathering process benefited the Big Two OAC's because they control a disproportionate number of outdoor displays that would be given grandfather status.

60.     Moreover, as applied via the Sign Scheme, the regulations providing for grandfather status of older signs are, for all intents and purposes, systematically never deemed by defendants to apply to the outdoor displays of defendants here or to other displays controlled by the disfavored OAC's targeted by the Sign Scheme.

11

61.     Defendants also arranged, upon information and belief in consultation with the Big Two OAC's, to create gerrymandered zoning, which affects the application of outdoor advertising regulations, specifically designed to favor the Big Two OAC's.

62.     As a result, the duopoly formed by the Big Two OAC's has been, through the Sign Scheme, rendered in large part the "only game in town" in terms of private outdoor advertising companies.

63.     The grandfathering of Big Two OAC's signs in turn has made the Big Two OAC's "legacy" approved outdoor signs even more valuable than they already were, because it reduced the number of alternative locations for outdoor advertising.

64.     In general, the overall result of the new regulations underlying the Sign Scheme was to vastly expand the scope of outdoor advertising regulations, narrow the range of permissible outdoor displays, withdraw avenues of appeal, cure and negotiation regarding violations, ratchet fines and penalties to phenomenally high levels, give unprecedented sweeping powers to defendants over outdoor advertising and to give virtually unchecked powers to defendants to make random, arbitrary and unjustified distinctions in the application of the new laws as they saw fit.

65.     All the foregoing was calculated, not to protect a legitimate public goal such as safety or aesthetics, but to destroy so-called "renegade" outdoor advertisers and secure the duopoly of the Big Two OAC's.

66.     As the facts alleged herein demonstrate, the arbitrary, capricious and discriminatory manner in which the Sign Scheme was intended to and does operate is, by virtue both of its design and of the highly selective nature of its operation, essentially unrelated to either the improvement of public safety or aesthetics in the City.

67.     To the contrary, the Sign Scheme operates essentially as a program to eliminate competition from targeted OAC's in favor of their main competitors for advertising dollars – the Big Two OAC's and various public entities, discussed more fully below, whose outdoor advertising activities are routinely, systematically and, in discriminatory fashion, exempted from inspection or any practical application of the Sign Scheme to them.

68.     Specifically, in 2008 defendant the ECB classified virtually all violations of regulations in the Sign Scheme by OAC's as "Class 1" violations carrying daily penalties of up to $25,000 and no less than $10,000 per violation.

69.     Defendants can and do assess more than one $10,000-$25,000 penalty for each "violation" on a given sign, and such penalties can and are assessed and accrued as against defendants each and every day an alleged violation or cluster of violations regarding the same sign is deemed to exist, along with penalties for late payment and interest.

70.     In contrast, non-OAC's are assessed penalties for identical violations pursuant to the Class 2 schedule, carrying a standard penalty in the range of $800 to $1,200.

71.     The supposed distinction between the two classes and their respective penalties is that Class 1 violations which, like those encompassed by the Sign Scheme, are not part of the New York City Construction Codes, are defined as "those where the violating condition poses a threat that severely affects life, health, safety, property, the public interest, or a significant number of persons so as to warrant immediate corrective action, or, with respect to outdoor advertising, those where the violation and penalty are necessary as an economic disincentive to the continuation or repetition of the violating condition."

13

72.  The distinction between OAC's and non-OAC's in the Sign Scheme and in particular in the Penalty Scheme, however, bears no relationship to the City's public-safety rationale for either scheme.

73.  Similarly, the distinction between OAC's and non-OAC's in the Sign Scheme and in particular in the Penalty Scheme bears no relationship to the City's aesthetics rationale for either scheme.

74.  Under this classification scheme, "economic disincentive" – shorthand for economic destruction of selected OAC's and those such as plaintiffs unfortunate enough to do lawful business with them – is the sole criterion under which defendants base their methodology of singling out targeted businesses such as plaintiffs and treating them as OAC's subject to the anticompetitive and destructive effects of the Sign Scheme.

75.  As part of the Sign Scheme targeting specific OAC's, defendants have imposed penalties on plaintiffs – which are mere building and property owners and not OAC's – based nonetheless on the Class 1 penalty schedule, in amounts totaling hundreds of thousands of dollars.

76.  The Penalty Scheme is, by its own terms, and as applied under the Sign Scheme, unlawful as ultra vires with respect to the City, exceeding the limit on penalties authorized by the New York Legislature.

77.  Furthermore, as detailed below, plaintiffs have no effective recourse whatsoever for the appeal of such determinations with the byzantine and self-perpetuating system established as part of the Sign Scheme.

78.  Defendants also aggravate their deprivation of plaintiffs' rights by "stacking" or "pyramiding" violations – assessing a notice of a single violation cumulatively, on an ongoing

basis, despite the fact that notice of violations may not be received by plaintiffs for days, weeks or months after they are assessed, and in some case long after any cure is possible.

79.     Similarly, one of the provisions of the Sign Scheme is a requirement that entities defined as OAC's register with the DOB as such, on pain of imposition by defendants of additional penalties included in the Penalty Scheme.

80.     This requirement applies as well to public entities engage in precisely the same outdoor advertising activities as private OAC's and, significantly, do so in competition with private OAC's.

81.     Notwithstanding this requirement, however, defendants have, since the initiation of the Sign Scheme, arbitrarily, capriciously and unlawfully declined to apply this requirement to public entities, including, for example, the Port Authority of New York and New Jersey and the Metropolitan Transit Authority (the "Public Authority Landlords"), which engage in the activities described under the sign scheme as outdoor advertising but are not registered as OAC's.

82.     The City has acknowledged repeatedly, including in judicial filings in numerous actions, that defendants have not enforced the legal requirements underlying the Sign Scheme against Public Authority Landlords even though under the law it should do so.

83.     Similarly, select registered OAC's, in particular the Big Two OAC's, are routinely given a "pass" with respect to violations of the Sign Scheme by defendants, notwithstanding that they erect and maintain signs whose given level of compliance with the Sign Scheme may be identical in all material respects.

84.     Defendants utilize selective enforcement in the foregoing manner to destroy targeted OAC's and, in the process, cause the damage complained of herein to plaintiffs and their property rights.

85.     Moreover, defendants' discriminatory operation of the Sign Scheme, including purported "enforcement" of its underlying regulatory scheme, is grossly and transparently designed to use plaintiff landlords to target OAC's affiliated with one company, OTR Media Group, Inc ("OTR"), with whom plaintiffs in this action contracted to erect outdoor advertising displays on their property.

86.     One method used by defendants to achieve the unlawful goals of the Sign Scheme, resulting in the damage to plaintiffs alleged herein, is by use of pre-planned "sweeps" through a given borough or area of the City for "enforcement" of the regulations but methodically targeting only displays associated with the "bad" OAC's – including those on plaintiffs' properties.

87.     In order to cover up these unlawful and discriminatory "sweeps," a person or persons unknown, but on information acting in cooperation with defendants, methodically "reports" the existence of violations in connection with the targeted outdoor signs, one after another – utilizing lists of signs erected by the targeted OAC's known to be in defendants' possession – to the City's "311" consumer "hotline," one after another and scant minutes apart.

88.     Shortly thereafter and in uncommonly responsive demonstrations of mock civic diligence, defendants dispatch inspectors to the "reported" locations – routinely bypassing legitimate or comparably non-complying outdoor advertising signs operated by either Big Two OAC's, Public Authority Landlords or other favored OAC's – and duly make their inspections, routinely "find" the reported "violations" and, all in a day's work, wreak havoc on defendants by

16

serving them with notices of violation that have merely been concocted as part of the corrupt and unlawful Sign Scheme, in violation of defendants' civil rights.

89.    Defendants also punish defendants for their association with blacklisted OAC's by wrongfully utilizing Stop Work Orders directed at plaintiffs' properties.

90.    Defendant DOB can issue partial Stop Work Orders focusing only on a specific violation or area of hazard or concern.

91.    In the majority of cases, however, defendant DOB imposes "full" Stop Work Orders on plaintiffs' properties, which require that all work on a construction site or building cease, "excluding any necessary remedial work to make the site safe" with respect to the violation in question.

92.    A Stop Worker Order can only be lifted once all "violating conditions that resulted in the issuance of the Stop Work Order" are "corrected," the site is re-inspected by the DOB unit that issued the Stop Work Order, and all applicable civil penalties are paid.

93.    Defendant DOB imposes penalties for violations of Stop Work Orders ranging from $2,000 - $10,000.

94.    Thus defendants utilize Stop Work Order to prevent plaintiffs from doing routine or even urgent repairs, maintenance or other work necessary to maintain or appropriately enhance the economic value of plaintiffs' properties because of alleged violations of the Sign Scheme.

95.    Defendant DOB, describing its own policies and practices, states on its website that it "issues a Stop Work Order when Inspectors find hazardous or unsafe work and/or conditions. Stop Work Orders are issued to protect workers, tenants, the public as well as buildings and properties from unsafe conditions."

96.     In fact, few or none of the violations assessed against plaintiffs in connection with outdoor advertising regulation involves "hazardous or unsafe work and/or conditions," nor any need to protect workers, tenants, the public as well as buildings and properties from" advertising displays.

97.     Furthermore, on information and belief, as part of the Sign Scheme defendants or those working under their direction have contacted clients of OTR and "advised" them not to advertise with the company.

98.     Indeed, on information and belief, as part of the Sign Scheme defendants or those working under their direction and has even warned contractors in the industry not to work with OTR.

99.     Defendants' inappropriate warnings, "advice" and related forms of intimidation have unlawfully caused damage to plaintiffs whose leases are thereby rendered less valuable because of the resulting boycotting of outdoor displays on plaintiffs' properties by advertisers and contractors.

100.    Each of the defendants has, directly or through designees, acted under color of law in concert or individually, or both, to commit, authorize or cause the acts or omissions alleged herein, or wrongfully to fail to prevent them despite being aware of them, pursuant to that defendant's specific official role within the Sign Scheme.

## COUNT I

### DEPRIVATION OF SUBSTANTIVE DUE PROCESS
### VIA THE CITY'S CAPTIVE ECB "COURTS"
*42 U.S.C. § 1983*

101.    Each allegation contained in the foregoing paragraphs is incorporated herein by reference as if fully set forth herein.

102.    The regulations underlying the Sign Scheme provide for extensive civil penalties, by which plaintiffs have been assessed with fines of hundreds of thousands of dollars.

103.    These regulations also provide for criminal prosecution for violations.

104.    Concomitantly, the administrative law judges who serve in the City's "private" ECB "Court" are given, by the City, essentially all the power afforded to judicial officers presiding over civil and penal enforcement matters of such scope.

105.    In particular, those administrative law judges assigned to adjudicate appeals of violations of the Sign Scheme, such as those assessed against plaintiffs, are charged with determining the outcomes of cases which, under the Sign Scheme, carry the highest punitive fine amounts heard by the ECB.

106.    Judicial officers should be afforded all the aspects of judicial independence concomitant with the power the City has granted them to completely destroy small and medium-sized businesses by affirming assessments of the massive penalties the City has authorized itself to collect under the Sign Scheme.

107.    Judges given such responsibility should have the ability to decide cases fairly and without the possibility of retribution, including indirectly by impairment of their financial interests, by the prosecuting authority and the officers given the discretion to instigate the application of such power, i.e., the defendants.

108.    Indeed, as alleged herein infra, the Penalty Scheme in particular is punitive in whole or in part, both facially and as applied, and for this reason plaintiffs should be afforded the full scope of due process guarantees associated with the adjudication, appeal and enforcement of any punitive legal regime.

109. In fact, however, a cornerstone of the Sign Scheme is the packing of the ECB "Court" by per diem staff designated and empowered as judicial officers but whose employment terms, independence and administration are of an entirely non-judicial nature and fall far short of constitutional requirements respecting officers charged with such power over commerce and liberty.

110. The system administered by defendants OATH and the ECB not only lacks traditional safeguards of judicial independence, but the judges presiding over ECB appeals are not even protected by the City's own regulations governing civil service employees.

111. Specifically, defendants have, to virtually ensure the outcomes of appeals in the ECB "Court," established an internally "reliable" system staffed by per diem administrative law judges.

112. These judges lack tenure and even fundamental full-time job security. They can be fired at any time or simply not assigned cases to review based on the whim of the same ECB that issues the violations they are charged to review on appeal.

113. Thus the ECB "Court" judges' income depends entirely on their continued validation of the Sign Scheme and of defendants' actions as alleged herein.

114. In fact, even absent defendants' machinations, if ECB Court judges were to rule that the City's Sign Scheme ran afoul of any governing legal or constitutional provision, resulting in the issuance of fewer violations and hence the filing of fewer appeals, the result would be that in a short time the per diem judges of the ECB "Court" itself would "rule themselves out" of their own part-time administrative law engagements with respect to lucrative sign violation cases.

115.    For this reason, ECB "Court" judges have an unstated but powerfully effective incentive to systematically uphold the Sign Scheme regardless of how administered, as well as to promote the generation of revenue from the collection of fines under the Sign Scheme which indirectly funds their employment.

116.    Moreover, on information and belief, defendants or their representatives or delegates in the DOB hold, as a matter of regular practice, weekly ex parte meetings with the judges of the ECB "Court," ostensibly to discuss new DOB "policies."

117.    On information and belief, no records of such meetings are made kept or made available to the public or to affected parties or, alternatively, no reliable records are kept.

118.    On information and belief, the meetings between DOB personnel, acting on behalf of or under the supervision of defendants, include the provision of "guidance" or instructions as to how the DOB – which, again, employs ECB "Court" judges at will – "believes" ECB "Court" judges should rule with respect to the Sign Scheme and policies promulgated in the furtherance of it.

119.    Such meetings constitute improper ex parte communications between defendants and their representatives or delegates, who represent one party – the City – in each and every proceeding brought before the ECB "Court", regardless of the structure of the ECB "Court" judges' compensation and employment.

120.    On information and belief the ECB "Court" judges who participate in these meetings follow the "guidance" given to them by the ECB and consistently rule against property owners such as plaintiffs and others who appeal from ECB determinations of violations under the Sign Scheme.

121. Under the circumstances alleged herein, such meetings are even more rife with ethical questions and conflicts of interest than they would be if the ECB "Court" were properly structured to take even minimal consideration of traditional notions of judicial neutrality or the basic rights of parties, such as defendants, that appear before it.

122. At the same time, the power of these ECB "Court" administrative law judges extends to approving assessments and liens against the property of such parties such as plaintiffs amounting to hundreds of thousands of dollars, and in fact with no cap or limit whatsoever depending on the whim of defendants.

123. A tribunal, such as the ECB "Court", whose members have a pecuniary interest in the outcome of a given case, much less in the development and maintenance of precedent that has an aggregate effect on cases brought before it which in turn implicates an even stronger pecuniary interest, presents a conflict of interest and is not entitled to the presumption of honesty and integrity typically afforded an adjudicative body.

124. On information and belief, administrative law judges employed by the City's ECB "Court" for outdoor advertising cases are specifically selected based on their past decisions and propensity to deny appeals of violations brought by parties such as plaintiffs.

125. Indeed, out of approximately 80 ECB ALJ's only about twelve are assigned to hear sign cases.

126. As a practical matter, therefore, plaintiffs lack any impartial or constitutionally valid venue for appellate review of violations and assessments made by defendants under color of the Sign Scheme.

127.    The Due Process Clause of the United States Constitution requires that all persons called to account before an adjudicative body at risk to life, limb or property be accorded a fair trial in a fair tribunal.

128.    Defendants' actions have, by virtue of the constitution, administration and structure of the ECB "Courts" for consideration of appeals under the Sign Scheme, denied and continue to deny plaintiffs their right to substantive due process in violation of the Fourteenth Amendment to the United States Constitution.

129.    The actions alleged herein amount to overt acts done in furtherance of an agreement among defendants under color of state law, and on information and belief among certain defendants or their representatives and the Big Two OAC's OAC's, to act in concert to inflict the above-alleged unconstitutional injuries, by which defendants have been and, unless enjoined by this Court, will continue to be damaged in an amount to be determined at trial and in manners for which there is no adequate remedy at law.

## COUNT II

UNCONSTITUTIONALLY EXCESSIVE FINES
*Penalties Clause of the United States Constitution and*
*Excessive Fines Clause of the New York State Constitution*

130.    Each allegation contained in the foregoing paragraphs is incorporated herein by reference as if fully set forth herein.

131.    The Eighth Amendment to the United States Constitution and Article I § 5 of the New York State Constitution prohibit the imposition of excessive penalties and fines.

132.    Any payment to a sovereign as punishment for some offense, regardless of the form of the fine, is subject to review on a claim of excessiveness.

133.    The Penalty Scheme is punitive in whole or in part, because pursuant to NYCAC §28-502.6 it provides for the imposition of criminal penalties for non-compliance.

134.    The Penalty Scheme is punitive in whole or in part, because pursuant to NYCAC §28-502.6.4 it permits daily penalties to be imposed as well as the imposition of separate additional penalties for each day a violation is not corrected, resulting in a single violation becoming cumulative.

135.    The effect of the foregoing is a "pyramiding" of penalties that ratchets up the total fine arising from a single violation to phenomenal amounts bearing no relationship to the time required to receive and process notice of a violation, much less multiple violations on one or more signs issued to an OAC, to cure the violation and to communicate the effectuation of such cure to defendants to stop the running of this cumulative process.

136.    The Penalty Scheme is punitive in whole or in part, because it lacks any correlation, much less a coherent or specific correlation, between the value of the property impaired by its application and the social cost of the violation.

137.    The Penalty Scheme is punitive in whole or in part, because it links the affected property directly to the charged violation, i.e., non-compliance with the Sign Scheme.

138.    The fines and penalties imposed by defendants on plaintiffs under the Penalty Scheme, as effectuated via the Sign Scheme, are facially confiscatory, grossly disproportional to the gravity of the offenses cited and therefore are unconstitutional as excessive fines.

139.    The assessment and penalties issued by defendants under the Penalty Scheme as effectuated via the Sign Scheme and manifested by liens and Stop Work Orders placed or threatened by defendants to be placed on plaintiffs' property amount to partial or complete forfeitures of plaintiffs' property.

24

140.    The Penalty Scheme, as effectuated via the Sign Scheme and with respect to its application to plaintiffs, amounts to a constitutionally excessive fine given the harshness and gross disproportionality of the Penalty Scheme in comparison to the gravity of the offense, and giving due regard to the offense committed and its relation, or here lack of relation, to other relevant prohibited activity, and considering the range of other punishments available and the disproportionate relation to the alleged harm caused by plaintiffs' conduct.

141.    The Penalty Scheme, as effectuated via the Sign Scheme and with respect to its application to plaintiffs, amounts to a constitutionally excessive fine given the attenuated nexus between the property and plaintiffs and the offenses cited in the violations, including the issue of intent and the temporal and spatial extent of the allegedly unlawful use of the property as compared to the total value of the property impaired by the liens placed on the property by the City.

142.    These fines are especially disproportionate and shocking to the conscience when reviewed in context of one of their purported purposes – public safety – yet ECB decisions and policies relating to violations for failing to safely operate a construction crane resulted in ECB issued fines in of a mere $4,000.

143.    In contrast, while no rational argument can be made that life or limb is in jeopardy with respect to the advertising signs on plaintiffs' respective properties, defendants have assessed cumulative fines and interest of well over $750,000 for one sign against one plaintiff in this action alone.

144.    For these reasons, the Penalty Scheme, as effectuated via the Sign Scheme and with respect to its application to plaintiffs, amounts to a constitutionally excessive fine given the

lack of knowledge, sophistication and individual culpability of each plaintiff in connection with the alleged violations.

145.   Moreover, the Penalty Scheme itself is facially unconstitutional due to gross disproportionality.

146.   For example, where an outdoor advertising display is placed in a prohibited zoning district (a B165 infraction), the advertising sign also, axiomatically, exceeds the surface area limits for that district (a B166 infraction), and its placement simultaneously amounts to a miscellaneous violation under the zoning resolution (a B162 infraction).

147.   The cumulative penalty under the ECB schedule involving these three infractions would be $30,000 for a first offense, and $75,000 for a second or subsequent offense.

148.   Where identical violations involve "non-advertising" signs, however, the penalty under the Sign Scheme for exceeding surface area restrictions (a B276 infraction) is merely $1,200 for a first offense and $6,000 for a second offense and the penalty for a miscellaneous violation of the zoning ordinance for non-advertising signs (a B281 infraction) is merely $800 for a first offense and $4,000 for a second offence.

149.   The cumulative penalties for the same two infractions are therefore $2,000 for a first offense and $10,000 for a second offense.

150.   Defendants have thus, as demonstrated in this example, increased the penalties for advertising signs that have nothing to do with their advertising status but merely by virtue of the punitive and cumulative operation of the Penalty Scheme as against OAC's in general and blacklisted or targeted OAC's specifically.

151.   As a result, the cumulative penalties for identical infractions in this example increase by 1500% for first offenses and 750% for second offenses.

152.   These increases are grossly disproportionate to the infractions involved, and therefore violate the Excessive Fines Clause facially and as applied.

153.   Additionally, to the extent any of the violations assessed by defendants against plaintiffs or any of them here pursuant to the Sign Scheme is based on a failure to register or report outdoor advertising, they violate the Excessive Fines Clause as disproportionate in view of the remedial purpose of a mere reporting statute; the activity in question was permissible so long as properly registered; the alleged violation was unrelated to any other illegal activities; and there was no loss to the City or to public welfare arising from such violation.

154.   Finally, the use by defendants of full Stop Work Orders unrelated to any enforcement or compliance goal of the regulations underlying the Sign Scheme but which effectively subject plaintiffs to indefinite economic loss, exposure to liability for possible harm or loss due to hazardous conditions prohibited from repair and other damages amounts vastly out of proportion to the purported harm or compliance goal is confiscatory to the gravity of the offenses and unconstitutional as the imposition of excessive fines by way of forfeiture or an in-kind extraction.

## COUNT III

### TAKING WITHOUT JUST COMPENSATION
*42 U.S.C. § 1983*

155.   Each allegation contained in the foregoing paragraphs is incorporated herein by reference as if fully set forth herein.

156.   Defendants' actions as alleged herein do not substantially advance a legitimate governmental interest, nor do they advance any governmental interest in a legitimate manner.

157.   The effect of defendants' actions is significantly and materially to deprive plaintiffs of the lawful benefit of their property in various ways.

158. Defendants' actions have effected a taking by causing plaintiffs' properties to be encumbered by liens of such magnitude that their satisfaction is practically or economically unfeasible, effecting a confiscation or forfeiture of those properties.

159. Defendants' actions have effected a taking by unlawfully depriving defendants of rental income for outdoor advertising signs to which they are entitled by law.

160. Defendants' actions as alleged herein have frustrated plaintiffs' reasonable investment-backed expectations of plaintiffs, who could never have expected prior to obtaining their interests in the subject properties that, due to the operation of the Sign Scheme, by entering into leases to permit third parties to erect outdoor advertising displays they risked having their property encumbered by liens in amounts and out of proportion by orders of magnitude to the economic significance or effect of such leases.

161. Defendants' actions as alleged herein have frustrated plaintiffs' reasonable investment-backed expectations, who could never have expected that a body of regulations or a municipal enforcement mechanism could amount to the disproportionate, selective and malicious actions of defendants constituting the unlawful Sign Scheme.

162. Additionally, defendants' wrongful issuance of full Stop Work Orders has effected a taking by which defendants have actually prevented, by the City's police power, plaintiffs from taking action on their own property lawfully to make needed repairs, maintenance or improvements, and to protect and enhance the economic value of their properties and the value of the leaseholds affected thereby, all without justification under the law.

163. Defendants have by all the foregoing acts deprived plaintiffs of their rights to possess and exclude, use, and dispose of their properties.

164. For all the foregoing reasons, the actions of defendants alleged above constitute a taking or multiple takings of plaintiffs' properties without just compensation in violation of the Fifth Amendment to the United States Constitution.

165. The actions alleged herein amount to overt acts done in furtherance of an agreement among defendants under color of state law, and on information and belief among certain defendants or their representatives and the Big Two OAC's, to act in concert to inflict the above-alleged unconstitutional injuries, by which defendants have been and, unless enjoined by this Court, will continue to be damaged in an amount to be determined at trial and in manners for which there is no adequate remedy at law.

## COUNT IV

### DISPARATE ENFORCEMENT BASED ON IDENTITY OF OUTDOOR ADVERTISING COMPANY
*Equal Protection – 42 U.S.C. § 1983*

166. Each allegation contained in the foregoing paragraphs is incorporated herein by reference as if fully set forth herein.

167. There is no meaningful difference between plaintiffs and the owners of other properties who have, pursuant to leases or contracts with the Big Two OAC's, erected or permitted the erection or display of outdoor advertising signs on their properties that are materially indistinguishable from those of plaintiffs, yet who unlike plaintiffs have not been treated like OAC's for purposes of assessing fines under the Penalty Scheme, served with notices of violations arising from substantially similar conduct as plaintiffs with respect to such signs and other aspects of alleged non-compliance with the Sign Scheme or had their property encumbered by crippling liens arising from such fines.

168.    Defendants or all of them have intentionally and arbitrarily continued to enforce the Sign Scheme in this manner as against plaintiffs under color of the claim that the City seeks to achieve its alleged policy goals as to safety and ascetic regulation in order to benefit the public, but without the City paying just compensation to plaintiffs for its taking of plaintiffs' property in violation of the Fifth Amendment to the United States Constitution.

169.    The City has arbitrarily and intentionally treated plaintiffs differently from the owners of other private property owners who have been permitted to continue lucrative outdoor advertising activities on their properties under arrangements with the Big Two OAC's while plaintiffs have been deprived of the opportunity to make comparable use of their buildings through arrangements with OTR that are, for all legitimate purposes that are, for all legitimate purposes, identical via defendants' unlawfully discriminatory operation of the Sign Scheme.

170.    Besides depriving defendants of income in this manner, it has made their properties less valuable compared to properties that generate income by the leasing or erection of materially identical outdoor signs which are not connected with the targeted OAC's with whom defendants entered into leases.

171.    Defendants' intentional and arbitrarily different treatment of plaintiffs has denied them equal protection of the law in violation of the Fourteenth Amendment to the United States Constitution and Article I, § 11 of the of the New York State Constitution..

172.    The actions alleged herein amount to overt acts done in furtherance of an agreement among defendants under color of state law, and on information and belief among certain defendants or their representatives and the Big Two OAC's, to act in concert to inflict the above-alleged unconstitutional injuries, by which defendants have been and, unless enjoined by

this Court, will continue to be damaged in an amount to be determined at trial and in manners for which there is no adequate remedy at law.

## COUNT V

### DISPARATE ENFORCEMENT BASED ON PUBLIC ENTITY AS OUTDOOR ADVERTISING COMPANY
*Deprivation of Equal Protection – 42 U.S.C. § 1983*

173.    Each allegation contained in the foregoing paragraphs is incorporated herein by reference as if fully set forth herein.

174.    There is no meaningful difference between plaintiffs and the owners of publicly owned properties who have erected or permitted the erection or display of outdoor advertising signs on their properties that are materially indistinguishable from those of plaintiffs, yet who unlike plaintiffs have not been treated as OAC's, served with notices of violations arising from substantially similar conduct as plaintiffs with respect to such signs and other aspects of alleged non-compliance with the Sign Scheme or had their property encumbered by crippling liens arising from such violations.

175.    Defendants or all of them have intentionally and arbitrarily continued to enforce the Sign Scheme in this manner as against plaintiffs under color of the claim that the City seeks to achieve its alleged policy goals as to safety and ascetic regulation in order to benefit the public, but without the City paying just compensation to plaintiffs for its taking of plaintiffs' property in violation of the Fifth Amendment to the United States Constitution.

176.    The City has arbitrarily and intentionally treated plaintiffs differently from the Public Entity Landlords who have been permitted to continue lucrative outdoor advertising activities on their properties, often under arrangements with the Big Two OAC's, while plaintiffs have been deprived of the opportunity to make comparable use of their own buildings through

arrangements with OTR that are, for all legitimate purposes, identical via defendants' unlawfully discriminatory operation of the Sign Scheme.

177.   Besides depriving defendants of income in this manner, it has made their properties less valuable compared to properties that generate income by the leasing or erection of materially identical outdoor signs which the Big Two OAC's with whom defendants entered into leases.

178.   Defendants' intentional and arbitrarily different treatment of plaintiffs has denied them equal protection of the law in violation of the Fourteenth Amendment to the United States Constitution and Article I, § 11 of the of the New York State Constitution.

179.   The actions alleged herein amount to overt acts done in furtherance of an agreement among defendants under color of state law, and on information and belief among certain defendants or their representatives and the Big Two OAC's, to act in concert to inflict the above-alleged unconstitutional injuries, by which defendants have been and, unless enjoined by this Court, will continue to be damaged in an amount to be determined at trial and in manners for which there is no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that this Court enter judgment:

1.   Declaring that defendants have acted in violation of law;

2.   For consequential damages to be proven at trial;

3.   For punitive or treble or such others damages as provided by law;

4.   For preliminary and permanent injunctive relief prohibiting defendants from continuing the violations of law set forth herein and from taking any action against plaintiffs in connection with the Sign Scheme, including:

- a stay against the issuance of further citations for alleged violations of outdoor advertising regulations against plaintiffs;

- a stay of enforcement or execution of judgments, liens or assessments assessed against plaintiffs based on alleged violations of the City's outdoor advertising regulations;

- a stay of all full Stop Work Orders issued by defendants arising out of alleged violations of the City's outdoor advertising regulations;

- a stay with respect to all conduct in furtherance of the Sign Scheme as alleged above;

5.   For other remedies provided by statute and other applicable law;

6.   For attorneys' fees and costs as provided by law; and

7.   For such other legal and equitable relief as the Court deems appropriate.

Respectfully submitted,

GOETZ FITZPATRICK LLP

By:  Ronald D. Coleman (RC 3875)

One Penn Plaza—Suite 4401
New York, N.Y. 10119
(212) 695-8100
rcoleman@goetzfitz.com
*Attorneys for Plaintiffs*

Dated:  March 22, 2011

## JURY DEMAND

Plaintiffs hereby demand a jury trial on all the issues raised in this action so triable.

GOETZ FITZPATRICK LLP

By:  Ronald D. Coleman (RC 3875)

One Penn Plaza—Suite 4401
New York, N.Y. 10119
(212) 695-8100
rcoleman@goetzfitz.com
*Attorneys for Plaintiffs*

Dated:  March 22, 2011