# OPERATING AGREEMENT

## OF

# SPLASH MEDIA GROUP, LLC

THIS OPERATING AGREEMENT of Splash Media Group, LLC (the "Company"), dated as of December 30 , 2005 (the "Agreement"), is made by and among the Company, Ari Noe ("Noe") and Levi Isaac Eichenstein ("Eichenstein") (the "Members"). For purposes of this Agreement, the term "Members" shall include all other persons then acting in such capacity in accordance with the terms of this Agreement and the Delaware Limited Liability Company Law, as amended from time to time (the "Law"). All capitalized terms used but not otherwise defined herein shall have the meanings provided in Exhibit A hereto.

WHEREAS, the Members have agreed to form a Delaware limited liability company, by organizing the Company in accordance with the Law, for the purposes, and on the terms and conditions, hereinafter set forth;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE I

### Formation

1.1    Formation and Name.    The Company was formed as a Delaware limited liability company on December _____ , 2005, in accordance with the provisions of the Law. The Members hereby make and execute this Agreement to set forth the rights, duties, obligations and limitations on the liabilities of the Members, including, without limitation, the rights of the Members with respect to the assets and profits of the Company which the Members shall be entitled to receive by reason of being members of the Company.

Upon formation of the Company, the Certificate of Formation (the "Certificate") was filed, pursuant to and in accordance with the provisions of the Law, in the Office of the Secretary of State of the State of Delaware. The Company shall comply with all requirements necessary to qualify the Company as a foreign limited liability company in each other jurisdiction in which foreign qualification of the Company is either necessary or appropriate. Each Member shall execute, acknowledge, swear to and deliver all certificates and other instruments conforming to this Agreement that are reasonably necessary or appropriate to qualify, or, as appropriate, to continue or terminate any qualification of, the Company as a foreign limited liability company in all jurisdictions in which the Company may conduct business.

The name of the Company is "Splash Media Group, LLC". The Members shall have the right and authority to operate the business of the Company under such other name(s) as may be necessary or appropriate in any jurisdiction in which the Company operates. In addition, the Company from time to time shall file such certificates of fictitious name as shall be required by law.

1.2.    Principal Office.    The initial principal office of the Company is at 4112 Quentin Road, Brooklyn, New York 11234 may be changed to such other place within or without the State of Delaware as the Managers may determine from time to time.

1.3    Registered Office and Agent.    The address of the Company's registered office in the State of Delaware is _____.

1.4    Purposes.    The purposes of the Company are to conduct an outdoor advertising business and to engage in any and all activities which may be directly or indirectly related or incidental thereto and in any activity which a Delaware limited liability company may lawfully engage. The Company may enter into any partnership, joint venture, limited liability company agreement or other similar arrangement to engage in any of the foregoing activities.

1.5    Duration of the Company.    The term of the Company commenced on December , 2005 upon filing of the Certificate in the Office of the Secretary of State of the State of Delaware, and shall continue in perpetuity unless terminated in accordance with Article X hereof.

1.6    Rights, Obligations and Exculpation.

(a)    The Members shall have no liability under this Agreement or otherwise with respect to the debts, liabilities and obligations of the Company solely by reason of their capacity as Members, except to the extent provided in the Law and in this Agreement.

(b)    No Member shall be entitled to the withdrawal or return of such Member's Capital Contributions (as defined in Section 3.1(a)), except to the extent, if any, which distributions made pursuant to this Agreement or upon termination or dissolution of the Company may be considered as such by law, and then only to the extent provided in this Agreement.

(c)    None of the Members shall have the power to bind any other Members, except as specifically provided in this Agreement. None of the Members or the Company shall be responsible or liable for any indebtedness, liability or obligation of any other Member incurred, either prior to or following the execution of this Agreement, except that the Company shall be responsible and liable for indebtedness, liabilities or obligations incurred in connection with activities within the proper business purposes of the Company.

## ARTICLE II

### Management

2.1    Membership Meetings and Action Without a Meeting.

(a)    The annual meeting of the Members (the "Annual Meeting") shall be held at the principal place of business of the Company or at such other place as the Managers shall designate at least once per Fiscal Year (as defined in Section 7.2 below) of the Company. A written notice containing the time, date, location and a proposed agenda for each Annual Meeting shall be given to each Member no later than ten days prior to the scheduled date of such Annual Meeting. Attendance at any such meeting shall constitute waiver of notice thereof by each Member attending such meeting.

(b)    The Managers may hold special meetings of the Members at any place at which the Annual Meeting may be held. The Managers shall hold a special meeting of the Members upon the written request of one or more Members holding, individually or collectively, not less than [thirty three percent

(33%)] of the aggregate Units of the Company; provided that in no event will a meeting be held on any day which is not a Business Day or during the Jewish Sabbath or Holiday. A written notice with respect to each such special meeting, containing the time, date, location and a proposed agenda for such special meeting, shall be provided to all Members no less than three Business Days prior to the scheduled date of such special meeting. Attendance at any such meeting shall constitute waiver of notice thereof by each Member attending such meeting.

(c)     Any matter requiring approval by the Members may be taken by vote at a meeting of the Members. When a vote of the Members is to be taken, Members shall vote by Unit. Provided that at least fifty one percent (51%) of the aggregate Units of the Company are present at the meeting in person or by proxy, any question or matter shall be decided by the vote of the majority of the Units present, unless a greater percentage is expressly provided for herein or required by the law of the State of Delaware.

(d)     Any action permitted to be taken at any meeting of the Members may be taken by written consent without a meeting; *provided*, that the aggregate Unit Ratio of Members consenting to the action (counted by Unit), is at least equal to that which would be required at a meeting at which all Members were present and voting, and all Members not consenting receive prompt notice of the action taken. Each such written consent shall be treated for all purposes as an action taken at a meeting.

(e)     Members may participate in a meeting by means of a conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other at the same time. Participation in a meeting by such means shall constitute presence in person at a meeting. Any Member desiring to participate in any meeting by such means shall provide the other Members with a telephone number for such participation prior to the time stated in the notice for commencement of the meeting.

(f)      At any meeting of the Members, every Member having the right to vote shall be entitled to vote either in person or by proxy executed in writing by such Member. A telegram, telecopy, cablegram or similar transmission by the Member, or a photographic, photostatic, facsimile or similar reproduction of a writing executed by the Member shall be treated as an execution in writing for purposes of this Section 2.1. No proxy shall be valid after three years from the date of its execution unless otherwise provided in the proxy. Each proxy shall be revocable unless the proxy form conspicuously provides that the proxy is irrevocable and the proxy is coupled with an interest.

2.2      Appointment of Managers. The Company shall initially have two (2) managers (each a "Manager", and together the "Managers" or the "Board of Managers"), and shall be managed by its Board of Managers. One Manager shall be Noe and one Manager shall be Eichenstein. Each Manager may appoint a replacement Manager who must be approved by Members holding a majority interest in the Company. Notwithstanding anything contained in this Agreement to the contrary, each of the Members agrees to approve, elect, ratify and endorse the Managers appointed pursuant to this Section 2.2.

2.3      Powers of the Managers. Any matter may be decided by the Managers without need of a meeting of the Members, except as specifically provided below. Unless otherwise restricted by the Certificate, this Agreement or the Act, the Managers shall have the authority on behalf and in the name of the Company to take any action or make any decisions on behalf of the Company hereunder, to carry out any and all of the purposes of the Company set forth in Section 1.4 hereof, and to perform all acts and enter into and perform all contracts and other undertakings which it may deem necessary or advisable or incidental thereto, including, without limitation, the power: (i) to manage and direct the business affairs of the Company, to do any and all acts on behalf of the Company, and to exercise all rights of the Company with respect to the Company's assets and properties, and (ii) to make such other decisions and enter into such other

agreements and take such other actions necessary or desirable to carry out the purposes of the Company. Ordinary day to day activities of the Company requires only one Manager's signature or approval.

2.4.    Deadlock.

(a)      Arbitration. In the event the Board of Managers fails to reach agreement with respect to any material Company action (a "Deadlock Issue"), the Board of Managers or any single Manager may submit the Deadlock Issue in writing (with sufficient specificity and factual detail relating the contentions of each Manager) to Beth Din Machon L'Hoyroa of Monsey,NY (the "Arbitrator"). The Arbitrator shall review the Deadlock Issue, speak with the Managers, if necessary in the opinion of the Arbitrator, and decide the Deadlock Issue in writing within 48 hours after it has been submitted to the Arbitrator. The Board of Managers in submitting the Deadlock Issue may provide for a longer or lesser period of time in which the Arbitrator may make a decision. The Arbitrator shall be fairly compensated by the Company for his or her services.

2.5.    Day-to-Day Management. Notwithstanding the foregoing, the day-to-day operations of the Company shall be the responsibility of Eichenstein, while the sales efforts shall be the responsibility of Noe. Upon the earlier to occur of 25 months from date of Agreement or the closing of the sale of OTR Media Group/On the Road Outdoor Advertising, Inc. ("OTR") or assets of OTR constituting at least 80% of its inventory (the "OTR Sale"), Noe shall share such equal responsibility with Eichenstein.

2.6.    Responsibility; Hiring of Employees. The responsibilities of the Manager(s) responsible for the Company's day-to-day operations shall include, but not be limited to, entering into lease agreements and all other actions necessary for the development of outdoor sites for advertising. Such Manager(s) shall have the right to hire such employees on such terms as he shall deem appropriate, from Company money.

2.7.    Other Activities. Eichenstein, and Noe at such time as he shares responsibility for the Company's day-to-day operations with Eichenstein, shall devote his full working time to the business of the Company. Members, Managers and their respective Affiliates may engage in, or possess an interest in, other business ventures of any nature and description, independently or with others. Notwithstanding the foregoing, no Member or Manager shall directly or indirectly engage in any business which directly competes with any business in which the Company or any of its Subsidiaries engages (a "Competitive Business"); provided, however, that a Member or Manager may own (solely as a passive investment) publicly-traded securities of any company or other entity which engages in a Competitive Business, as long as (i) it is not a controlling person of, or a member of a group which controls, such company or entity, and (ii) it does not, directly or indirectly, own 5% or more of any class of securities of such company or entity; and, provided, further, however, that the foregoing restriction shall not apply to Noe until the sooner of 25 months from the date of this Agreement or the OTR sale takes place.

2.8.    Reimbursement and Compensation.

(a)      Eichenstein shall receive an initial salary from the Company for his services to the Company of One Hundred Thousand Dollars ($100,000) per annum, net after taxes, payable weekly. The Company will pay all withholding and other employer tax obligations with respect to Eichenstein's salary In addition, commencing on the first anniversary of the date hereof, the Company will pay for medical and dental insurance for Eichenstein and will pay the premium on a $2,000,000.00 locked term life insurance policy that can be converted into a whole life insurance policy on Eichenstein, which policy shall be owned by Eichenstein or his designee and shall name his family or other designee as sole beneficiaries. The Company will also pay for an automobile lease (at a rate of approximately five hundred fifty dollars ($550.00) per month plus all of Eichenstein's expenses (insurance, gas, tolls, etc.) in using and maintaining one automobile, during such period that the automobile is leased but such lease will be in Eichenstein's

name. The Managers, when acting on behalf of the Company, shall be reimbursed for their reasonable expenses, including travel and lodging, in connection with the performance of their duties and obligations hereunder. At such time as Noe shares responsibility for the Company's day-to-day operations, the Company will provide him with equivalent salary and benefits as are then provided to Eichenstein.

(b)    In the event that either Eichenstein or Noe is unable to perform his duties for the Company for any long term (90 days or more) or permanent reason, including death or disability, the other Manager shall be entitled to employ such person or persons during such period of disability or absence, as reasonably necessary to fulfill the duties of the Manager who is unable to perform. The costs of hiring such additional person or persons shall be deducted from salary that would otherwise be made to such Manager or his estate. The Company shall look into obtaining Long Term Disability Insurance for Noe and Eichenstein.

(c)    Except as otherwise expressly provided herein or specifically approved by the Managers, when acting in the capacity of Member, no Member, unless said Member is also a Manager (or any of his, her or its stockholders, partners, members, directors, members, managers, agents and/or Affiliates) shall be entitled to receive (i) reimbursement for expenses incurred on behalf of the Company, or (ii) any fees, salaries or other compensation for any services rendered to or on behalf of the Company.

2.9.    Standard of Care; Indemnification.

(a)    No Member or Manager and none of their respective Affiliates shall be liable, responsible or accountable in damages to the Company for any act or omission on behalf of the Company performed or omitted by such party in good faith and in a manner reasonably believed by such party to be within the scope of the authority granted to the Members and Managers by this Agreement (including such authority in connection with the liquidation and dissolution of the Company) and in the best interests of the Company, unless otherwise expressly provided by applicable law.

(b)    The Company shall indemnify the Members and Managers and their respective shareholders, directors, officers, members, managers, partners, agents or Affiliates for, and hold such parties harmless from, any loss, expense, damage or injury suffered or sustained by any of them arising out of their activities on behalf of the Company or in furtherance of the interests of the Company, including, but not by way of limitation, reasonable attorneys' fees or other costs or expenses incurred in connection with the defense. Notwithstanding the foregoing, none of the foregoing persons or entities shall be entitled to indemnification to the extent that any such loss, expense, damage or injury shall have been the result of his, her or its gross negligence or willful misconduct.

## ARTICLE III

## Capital

3.1.    Capital Contributions and Member Loans. For purposes of this Agreement, the term "Capital Contributions" shall mean and include the initial capital contributions made as of the date of this Agreement, if any (the "Initial Capital Contributions") and all additional capital contributions made by the Members to the Company pursuant to this Article III.

(a)    Noe has contributed $175,000 to the Company and agrees to make additional Capital Contributions totaling $1,325,000 to the Company as follows:

(i)    An additional $200,000 after leases have been signed with respect to 50 sign locations.

    (ii)  As Eichenstein shall reasonably request, up to an additional $650,000 after leases have been signed with respect to a total of 100 sign locations (which funds will be used by Eichenstein to facilitate the construction of the signs), as and when Eichenstein reasonably believes that such funds are needed, provided, however, that if Noe and Eichenstein agree to begin building 30-sheet structures prior to having signed leases with respect to 100 sign locations, then Noe shall deposit an amount equal to $6,500.00 per location signed for a 30-sheet structure;

    (iii)  The balance of $475,000 as and when Eichenstein reasonably believes that such funds are needed, to be used by the Company to cover all operational expenses.

   (b)  Noe shall be required to make the additional Capital Contributions specified in Section 3.1(a) by delivery of immediately available funds to such account as shall be specified by Eichenstein, 15 days after receipt of written notice, as provided in Section 12.6 below, from Eichenstein. In the event that Noe fails to deposit the money in the allotted time, Eichenstein shall send Noe written notice of his failure to make the deposit. If Noe does not make the deposit within 15 days' of receipt of such notice, his Unit Ratio shall automatically be reduced by 50%, which, as reduced, shall be multiplied by a fraction, the numerator of which will be the amount of Capital Contributions made by Noe until such date and the denominator of which will be 1,500,000, and the Unit Ratio of Eichenstein will be correspondingly increased. In addition, Eichenstein may appoint a new Manager, upon, which, Noe shall resign as Manager.

   (c)  Any further capital requirements of the Company, whether for working capital, capital expenditures or any other purpose determined by the Board of Managers, shall be satisfied only in accordance with this Agreement in the following order of priority and under the following conditions:

    (i)  The Company first shall attempt to borrow funds through third party loans, financing facilities or sale and lease back programs ("Third Party Loans"), without diluting the Members' respective Unit Ratios in the Company, on terms acceptable to the Managers.

    (ii)  In the event that additional capital is needed after applying clause (i) above, the Members unanimously may determine to make a capital call or capital calls to the Members. If any amount due by any Member pursuant to a capital call or calls is not contributed or lent by such Member (such amount, the "Deficiency"), then the other Members may contribute or lend such amount. In such event, the contributing and non-contributing Members' Unit Ratios shall be adjusted in such manner as the Members determine to be appropriate.

    (iii)  In the event that a Deficiency remains, then the Company may issue additional Units to raise the remaining portion of the Deficiency. In such event, after taking into account both the amount of new Units issued and any amounts contributed or lent by Members in respect of the capital call, the Members' Unit Ratios shall be adjusted or reduced accordingly.

3.2.  Units and Unit Ratios.  Noe is being granted 50 Units and Eichenstein is being granted 50 Units.

3.3.  No Contribution Required.  Except as otherwise specifically provided by the Law or in this Agreement, no Members shall be required to contribute any capital or lend any funds to the Company.

3.4.  Withdrawal of Capital.  No Member shall be entitled to withdraw any part of such Member's Capital Contributions to the Company, or to receive any distribution from the Company, except as provided in Article VI and Section 10.2 hereof, respectively.

3.5.  No Interest.  No Member shall be entitled to interest on any Capital Contributions made to the Company.

3.6.    Capital Accounts.    There shall be established on the books of the Company a capital account ("Capital Account") for each Member. It is the intention of the Members that such Capital Accounts be maintained in accordance with the provisions of Treas. Reg. §1.704-1(b)(2)(iv), and this Agreement shall be so construed. Each Member's Capital Account shall be: (a) increased by (i) any cash or the fair market value of any additional property contributed by such Member (net of any liabilities assumed by the Company or to which the contributed property is subject), (ii) the amount of all net income (whether or not exempt from tax) allocated to such Member hereunder, and (iii) to the extent not already netted out under clause (b)(ii) below, the amount of any Company liability assumed by the Member or which is secured by any property distributed to such Member; and (b) decreased by (i) the amount of all net losses allocated to such Member hereunder (including expenditures described in Section 705(a)(2)(B) of the Code, or treated as such an expenditure by reason of Treas. Reg. §1.704-1(b)(2)(iv)(i)), (ii) the amount of cash, and the fair market value of property (net of any liabilities assumed by such Member or to which the distributed property is subject) distributed to such Member pursuant to Article VI and/or Article X , and (iii) to the extent not already netted out under clause (a)(i) above, the amount of any liabilities of the Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

If any Member transfers all or any portion of his, her or its Units in accordance with Article IX hereof, then the Capital Account of the transferor Member shall become the Capital Account of the transferee to the extent of the Units transferred.

Following the formation of the Company, and in the event of: (w) a distribution of property which results in a change of Unit Ratios; (x) the distribution by the Company to a Member of more than a *de minimis* amount of the property (other than money); (y) the liquidation of the Company within the meaning of Treas. Reg. §1.704-1(b)(2)(ii)(g); or (z) a change in Unit Ratios pursuant to Section 3.1 hereof ; then in any such event, if the Manager determines, in his sole discretion, that there has been a significant increase or decrease in the fair market value of the Company Property (as defined below) since the last determination of the book basis thereof, the book basis of the Company Property shall be adjusted to fair market value and the Capital Accounts of all the Members shall be adjusted simultaneously to reflect the aggregate net adjustment to book basis as if the Company recognized gain and loss equal to the amount of such aggregate net adjustment. For purposes hereof, "Company Property" shall mean all real and personal property acquired by the Company and any improvements thereto, and shall include both tangible and intangible property.

The foregoing provisions of this Section 3.7 and the other provisions of this Agreement relating to the maintenance of capital accounts are intended to comply with Treas. Reg. §1.704-1(b) and Treas. Reg. §1.704-2, and shall be interpreted and applied in a manner consistent with the Regulations. In the event that the Managers determines that it is prudent or advisable to modify the manner in which the Capital Accounts, or any increases or decreases thereto, are computed solely in order to comply with the Regulations, the Managers may cause such modification to be made without the consent of all of the Members; provided, however, that it will not have a material effect on the amounts distributable to any Member upon the dissolution of the Company.

3.7.    Member Loans.    Subject to the terms and conditions of Article III hereof, the Members may make loans to the Company in such amounts, at such times, and on such terms and conditions as may be specified by the Managers (such loans, "Member Loans"); provided, that interest thereon shall not exceed the Interest Rate (as defined below). In the event that any Member makes a Member Loan, all of the Members shall have the right to make Member Loans upon the same terms and conditions *pro rata* in accordance with their respective Unit Ratios, or in the event that some but not all of the Members elect to make Member Loans, the lending Members shall make their Member Loans *pro rata* in accordance with

the lending Members' respective Unit Ratios. Member Loans shall not be considered as contributions to the capital of the Company. For purposes hereof, the "Interest Rate" shall mean the annual rate of interest publicly announced from time to time by [Citibank, N.A., in New York, New York], as its Base Rate plus two hundred (200) basis points.

## ARTICLE IV

## Allocation of Net Income and Net Loss

4.1     Net Income.

(a)     Subject to Sections 4.1(b), (c), and (d) hereof, net income shall be allocated among the Members at the end of each Fiscal Year in the following manner:

(i)     First, to the Members pro rata in accordance with the amount of net losses allocated to each such Member pursuant to Section 4.2(a)(ii) hereof until the aggregate amount of net income allocated to the Members pursuant to this Section 4.1(a)(i) for such Fiscal Year and all prior Fiscal Years is equal to the aggregate amount of net losses allocated to the Members for the current and all prior Fiscal Years pursuant to Section 4.2(a)(ii) hereof;

(ii)     Second, to Members *pro rata* in accordance with the amount of net losses allocated to each such Member pursuant to Section 4.2(a)(i) hereof, until the aggregate amount of net income allocated to the Members pursuant to this Section 4.1(a)(i) for such Fiscal Year and all prior Fiscal Years is equal to the aggregate amount of net losses allocated to the Members for the current and all prior Fiscal Years pursuant to Section 4.2(a)(i) hereof; and

(iii) ·    Thereafter, to the Members, *pro rata* in accordance with their then respective Unit Ratios.

(b)     If there is a net decrease in the Company's Minimum Gain (which shall have the same meaning as partnership minimum gain is defined in Treas. Reg. §1.704-2(d)) or Partner Nonrecourse Debt Minimum Gain (within the meaning of Treas. Reg. §1.704-2(i)(3)) during any Fiscal Year, each Member shall be allocated, before any other allocations hereunder, items of income and gain for such Fiscal Year (and subsequent Fiscal Years, if necessary), in an amount equal to such Member's share (determined in accordance with Treas. Reg. §1.704(g)(2) and §1.704-2(i)(5), as applicable) of the net decrease in the Company's Minimum Gain or Partner Non-recourse Debt Minimum Gain, as applicable, for such Fiscal Year; provided, however, that no such allocation shall be required if any of the exceptions set forth in Treas. Reg. §1.704-2(f) apply. It is the intention of the parties that the provisions of this Section 4.1(b) constitute a "minimum gain chargeback" within the meaning of Treas. Reg. §1.704-2(f) and §1.704-2(i)(4), and such provisions shall be so construed.

(c)     Notwithstanding anything herein to the contrary, if a Member has a deficit balance in his, her or its Capital Account (excluding from such Member's deficit Capital Account any amount which such Member is obligated to restore in accordance with Treas. Reg. §1.704-1(b)(2)(ii)(c), as well as any amount such Member is treated as obligated to restore under Treas. Reg. §1.704-2(g)(1) and §1.704-2(i)(5)) and unexpectedly receives any adjustment, allocation or distribution described in Treas. Reg. §1.704-1(b)(2)(ii)(d)(4), (5) or (6), then such Member will be allocated items of income and gain in an amount and manner sufficient to eliminate the deficit balance in such Member's Capital Account as quickly as possible. If there is an allocation to a Member pursuant to this Section 4.1(c), then any future allocations of net income pursuant to Section 4.1 shall be adjusted so that those Members who were allocated less income or

a greater amount of loss, by reason of the allocation made pursuant to this Section 4.1(c), shall be allocated additional net income in an equal amount. It is the intention of the parties that this provision constitute a "qualified income offset" within the meaning of Treas. Reg. §1.704-1(b)(2)(ii)(d), and this provision shall be so construed.

(d)     For Federal, state and local income tax purposes only, depreciation (cost recovery) deductions and gain or loss recognized by the Company upon the sale or other disposition of any Company property shall be allocated so as to take into account the difference between the agreed value of such Company property and Members' adjusted basis for such Company property at the time of its contribution to the Company in accordance with the provisions of Section 704(c) of the Code and the regulations promulgated thereunder using the traditional method (within the meaning of Treas. Reg. §1.704-3(b)). Notwithstanding the foregoing, if the gain from the sale of the Company property is being reported on the installment method for income tax purposes, then the total amount of gain which is to be recognized by each of the Members in accordance with the above allocations shall be computed and the amount of gain to be recognized by each of the Members in each year shall be in proportion to the total gain to be recognized by each of the Members in all taxable years.

4.2     Net Loss.

(a)     Subject to Sections 4.2(b) and (c) hereof, net loss of the Company for each Fiscal Year shall be allocated to the Members at the end of each Fiscal Year in the following manner:

(i)     First, to those Members with positive Capital Account balances (determined by (i) taking into account the adjustments, allocations and distributions described in Treas. Reg. §1.704-1(b)(a)(ii)(d)(4), (5) and (6), and (ii) adding to such balances the Member's share of Company Minimum Gain and Member Minimum Gain) in accordance with, and to the extent of, such Capital Account balances, until all such Member's Capital Account balances have been reduced to zero; and

(ii)     Thereafter, the balance, if any, to the Members *pro rata* in accordance with their then respective Unit Ratios

(b)     Notwithstanding the provisions of Section 4.2(a) above, no net losses shall be allocated to a Member if such allocation would result in such Member having a deficit balance in such Member's Capital Account (excluding from such Member's deficit Capital Account any amount such Member is obligated to restore in accordance with Treas. Reg §1.704-1(b)(2)(ii)(c), as well as any amount such Member is treated as obligated to restore under Treas. Reg. §1.704-2(g)(1) and §1.704(i)(5)) unless there would be a deficit in all Member's Capital Accounts. In such case, the net loss that would have been allocated to such Member shall be allocated to the other Members to which such loss may be allocated without violating the provisions of this Section 4.2(b).

(c)     Notwithstanding anything herein to the contrary, the Company's partner nonrecourse deductions (within the meaning of Treas. Reg. §1.704-2(i)(2)) shall be allocated solely to the Member who has the economic risk of loss with respect to the partner nonrecourse liability related thereto in accordance with the provisions of Treas. Reg. §1.704-2(i)(1).

4.3     Allocations Upon Transfers.     In the event of the Transfer of all or any part of a Member's Units pursuant to Article IX or otherwise in accordance with the provisions of this Agreement or the admission of a new Member at any time other than at the end of a Fiscal Year, then the distributive share of the transferring Member, transferee Member, or new Member of the Company's net income, gain, net loss, deductions and credits, as computed both for accounting purposes and for Federal income tax purposes,

shall be allocated between the transferor Member and the transferee Member, or among the new Member and the other Members, as the case may be, in the same ratio as the number of days in such Fiscal Year before and after the date of such transfer or admission, provided, however, that the Members shall have the option to treat the periods before and after the date of such transfer or admission as separate Fiscal Years and allocate the Company's net income, gain, net loss, deductions and credits for each of such deemed separate Fiscal Years in accordance with the Members' respective interests in the Company for such deemed separate Fiscal Years. Notwithstanding the foregoing, if, the Company uses the cash receipts and disbursements method of accounting, the Company's "allocable cash basis items," as that term is used in Section 706(d)(2)(B) of the Code, shall be allocated as required by Section 706(d)(2) of the Code and the regulations promulgated thereunder.

4.4     Allocation of Excess Nonrecourse Liabilities.    For purposes of Section 752 of the Code and the regulations thereunder, the excess nonrecourse liabilities of the Company (within the meaning of Treas. Reg. §1.752-3(a)(3)), if any, shall be allocated to the Members in accordance with their respective Unit Ratios.

## ARTICLE V

## Allocable Shares and Federal Income Tax Elections

5.1     Allocable Shares.    For purposes of Subchapter K of the Code, the distributive shares of the Members of each item of Company taxable income, gain, loss, deduction or credit for any Fiscal Year shall be in the same proportions as their respective shares of the items allocated to them pursuant to Sections 4.1 and 4.2 hereof. Notwithstanding the foregoing, to the extent not inconsistent with the allocation of gain provided for in Section 4.1, gain recognized by the Company which represents ordinary income by reason of recapture of depreciation or cost recovery deductions for Federal income tax purposes shall be allocated to the Member (or the Member's successor-in-interest) to whom such depreciation or cost recovery deduction to which such recapture relates was allocated.

5.2     Elections.    The election permitted to be made by Section 754 of the Code, and any other elections required or permitted to be made by the Company under the Code, shall be made as the Members or the Tax Matters Member (as hereinafter defined) shall determine.

## ARTICLE VI

## Return of Capital and Distributions

6.1     Distributions of Net Cash Flow.    Net Cash Flow shall be distributed to the Members at such time or times as the Managers shall determine. All distributions of Net Cash Flow shall be made in the following order of priority:

(a)     First, to the Members who have Capital Accounts, *pro rata* in accordance with their respective positive Capital Account balances, to the extent of 80% of Cash Flow per fiscal year, until such Capital Account balances have been reduced to zero; and

(b)     Second, to all of the Members, *pro rata* in accordance with their respective Unit Ratios, subject to Section 2.8(c).

6.2    Withholding on a Member's Distributable Share.    Notwithstanding anything contained in this Agreement to the contrary, distributions to a Member pursuant to Article VI or Section 10.2 hereof will be reduced by any and all amounts which are withheld by the Company and remitted to any Federal, state or local tax agency on behalf of such Member.

6.3    Property Distributions.    If any property of the Company, other than cash, is distributed by the Company to any Member(s) in connection with the liquidation of the Company of otherwise, the fair market value of such property shall be used for purposes of determining the amount of such distribution. The difference, if any, of such fair market value over (or under) the value at which such property is carried on the books of the Company shall be credited or charged to the Capital Accounts of the Members in accordance with the ratio in which the Members share in the gain and loss of the Company pursuant to Sections 4.1 and 4.2 hereof, respectively. The fair market value of the property distributed shall be agreed to in good faith by the Member(s) receiving the distribution and the other Members.

## ARTICLE VII

## Accounting

7.1.    Books and Records.    The Company shall maintain full and accurate books at the Company's principal place of business, showing all receipts and expenditures, assets and liabilities, profits and losses, and all other records necessary for recording the Company's business and affairs. Except as otherwise provided herein, such books and records shall be maintained, and the net income and net loss of the Company shall be determined, in the same manner as the Company computes its income and deductions for Federal income tax purposes. Each Member, at his, her or its sole cost and expense, shall have the right, personally or by an independent certified public accountant of his, her or its own choosing, to examine such books and records at the Company's principal offices during regular business hours, and to make copies and/or excerpts therefrom.

7.2.    Fiscal Year.    The fiscal year of the Company shall end on December 31 ("Fiscal Year").

7.3.    Reports.    Within ninety (90) days after the close of each Fiscal Year of the Company, the Company shall furnish to each Member all such information relating to the Company which shall be necessary for the preparation by the Members of their Federal and state income or other tax returns. In addition, the Company shall distribute to each Member:

(a)    not later than ninety (90) days after the end of each Fiscal Year an unaudited balance sheet and unaudited statements of income and cash flows for the Company and its Subsidiaries on a consolidated basis fairly presenting the financial position and results of operations of the Company and its subsidiaries on a consolidated basis at and for such Fiscal Year; and

(b)    from time to time upon request of any Member in writing such other financial information as such Member may reasonably request.

7.4.    Audits.    Any Member whose Capital Contribution has not been repaid in full shall have the right to require a monthly audit of the Company's books [is "audit" the correct term?] and his, her or its representatives be permitted to review the Company's books and records at reasonable times and upon reasonable notice to the Managers.

7.5.    Tax Returns and Other Reports.    The Company shall prepare, or cause to be prepared, and file or cause to be filed on or before the due date (including extensions), all Federal, state and local income tax

returns and information returns, if any, which the Company is required to file. The Company shall prepare and file with appropriate state authorities any reports required to be filed by it with such authorities. All expenses incurred in connection with such tax returns and reports, as well as all reports set forth in this Article VII, shall be at the sole cost and expense of the Company.

## ARTICLE VIII

### Bank Accounts

8.1.    Bank Accounts.    All funds of the Company shall be deposited in its name in one or more separate checking and savings accounts, cash equivalent accounts and/or in short-term investments as shall be designated by the Managers. The funds in the Company's account shall be used solely for the business of the Company and to make the payments and distributions to the Members provided for in this Agreement. Funds belonging to the Company shall not be commingled with those of any other person or entity

8.2.    Withdrawals.    Withdrawals from the Company's accounts shall be made only upon the signature of such person or persons as may be designated by the Managers from time to time. All checks of the Company shall be signed by such person(s) as shall from time to time be designated by the Managers.

## ARTICLE IX

### Transfer of Units

9.1    General Restrictions.    No Member may Transfer all or any part of such Member's Units (including any economic interest therein) for two years following the date of this Agreement. Thereafter, a Member may Transfer his, her or its Units with the consent of the other Members or to a third party which is not his, her or its Affiliate ("Outside Party") or pursuant to Section 9.6 below; provided, however, that the transfer will not, in the opinion of counsel to the Company, cause a termination within the meaning of Section 708 of the Code, as amended. Any purported Transfer of a Member's Units in violation of the terms of this Agreement shall be null and void and without any effect. Any Transfer shall be subject to all of the provisions of this Article IX to the same extent and in the same manner as any other Member desiring to make any Transfer. Each Member shall communicate to the other Members the terms of any offer which it may receive for the purchase of any asset or properties of the Company.

9.2.    Substitute Members.    No transferee of all or part of a Member's Units shall become a "Substitute Member" in lieu of the transferor Member until the provisions of Section 9.6 below were adhered to and unless and until:

(a)    the transferor Member has stated such intention in an instrument of assignment in form reasonably satisfactory to the Managers;

(b)    the transferee has delivered an executed counterpart of this Agreement as a Member, and executed originals of such other documents as may be required by applicable law or reasonably required by the Managers;

(c)    the transferor Member and/or transferee has paid all costs and expenses of the Company, including without limitation, reasonable attorneys' fees, in connection with the admission of the transferee as a Substitute Member; and

(d)    the Managers shall have consented in writing to such transferee becoming a Substitute Member, which consent may be withheld for any or no reason.

Upon satisfaction of all of the foregoing conditions with respect to a particular transferee, the Managers shall cause this Agreement to be duly amended to reflect the admission of such transferee as a Substitute Member.

9.3     Effect of Admission as a Substitute Member.   Unless and until admitted as a Substitute Member pursuant to Section 9.2 above, a permitted transferee of a Member's Units shall not be entitled to exercise any rights of a Member in the Company, including the right to vote, grant approvals or give consents with respect to such Member's Units, the right to require any information or accounting of the Company's business or the right to inspect the Company's books and records, but such transferee shall be entitled to receive, to the extent of the Member's Units transferred to such transferee, the Distributions to which the transferor Member would otherwise be entitled. A transferee who has become a Substitute Member has, to the extent of the Member's Units transferred to such transferee, all the rights and powers of the person for whom it is substituted and is subject to the restrictions and liabilities of a Member under this Agreement and the Law. Upon admission of a transferee as a Substitute Member as set forth herein, the transferor of the Member's Units so acquired by the Substitute Member shall cease to be a Member of the Company to the extent of such Unit. A person shall not cease to be a Member upon assignment of all or any portion of such Member's Units unless and until each transferee becomes a Substitute Member pursuant to the terms hereof.

9.4.    New Members.   Notwithstanding anything to the contrary herein contained, any new or additional Member may be admitted to the Company only upon the prior consent of the Managers.

9.5.    Withdrawal, Retirement or Resignation of a Member.   No Member shall have the right or power, or shall attempt, to withdraw, resign or retire from the Company as a Member or demand or seek the return of any Capital Contribution or Capital Account balance prior to the specific date set forth in the Certificate for the expiration of the term of the Company or pursuant to the terms of this Agreement. Any act or purported act of a Member in violation of this Section 9.5 shall be null and void and of no effect.

9.6.    Right of First Refusal.

(a)     If, at any time, after 2 years, any Member(s) (each, a "Selling Member") desires to Transfer all or in the case of a shortfall of Capital Contribution, some of his, her or its Units (such Units, "Offered Units", and the transaction, a "Proposed Transfer"), to an Outside Party which has made a bona fide written offer to acquire the Offered Units subject to the Right of First Refusal (a "Bona Fide Offer"), then the Selling Member shall give a written notice ("Proposed Transfer Notice") to the Company and to the other Members ("Remaining Members"), dated the date it is given and describing the Proposed Transfer. The Proposed Transfer Notice shall include the following information:

> (i)     the name and address of the Outside Party;
>
> (ii)    the number of Offered Units proposed to be Transferred by the Selling Member;
>
> (iii)   the proposed amount and form of consideration per Unit, and if any consideration is non-cash consideration, such additional information as may be required for the Remaining Members to evaluate such non-cash consideration;
>
> (iv)    the anticipated closing date; and
>
> (v)     any other material terms and conditions of the Proposed Transfer.

(a)     Following the giving of a Proposed Transfer Notice, the Remaining Members shall have the right to purchase their pro rata shares of all (but not less than all) Offered Units (the "Right of First

Refusal") upon the same terms and conditions as the Proposed Transfer, except that the purchase price shall be 90% of the price specified therein and the closing of such purchase shall be no later than 90 days following the receipt of the Proposed Transfer Notice by the last Remaining Member to receive it ("Receipt Date").

(b)      Upon receiving the Proposed Transfer Notice, each of the Remaining Members shall indicate, by written notice (the "First Notice") given to the other Remaining Members within fourteen (14) days of the Receipt Date, whether he, she or it wishes to: (x) consent to the Proposed Transfer on the terms described in the Proposed Transfer Notice; or (y) purchase his, her or its pro rata share of all (but not less than all) Offered Units pursuant to the Right of First Refusal.

(i)      If all of the Remaining Members wish to consent to the Proposed Transfer on such terms, then they shall give the Selling Member a consent signed by each Remaining Member as soon as reasonably practicable but in no case later than 30 days after the Receipt Date.

(ii)     If all of the Remaining Members wish to exercise their Right of First Refusal, then they shall give the Selling Member a notice exercising such right ("ROFR Exercise Notice"), signed by each Remaining Member and stating that they collectively will purchase all (but not less than all) Offered Units and specifying the number of Offered Units to be purchased by each of them, as soon as reasonably practicable but in no case later than 30 days after the Receipt Date.

(iii)    If some, but not all, of the Remaining Members do not wish to exercise their Right of First Refusal, then those who do will have an additional 20 days to agree among themselves whether or not they will purchase all of the Offered Units and shall give the Selling Member a ROFR Exercise Notice, signed by each such Remaining Member and stating that they collectively will purchase all (but not less than all) Offered Units and specifying the number of Offered Units to be purchased by each of them, as soon as reasonably practicable but in no case later than 50 days after the Receipt Date.

(d)      If Remaining Members have exercised their Right of First Refusal by delivering a ROFR Exercise Notice as set forth above, then the Selling Member shall be obligated to sell, and such Remaining Members shall be obligated to purchase, all of the Offered Units on the terms of such sale and purchase set forth in the Proposed Transfer Notice, subject to (b) above. The closing of such sale and purchase shall be held at the offices of the Company. Upon receipt of the entire purchase price, the Selling Member shall execute and deliver all such assignments and other agreements, instruments and documents as the Remaining Members purchasing Offered Units and their counsel shall deem necessary or desirable to facilitate the transfer of the Offered Units, free and clear of all liens and encumbrances.

(e)      If no ROFR Exercise Notice covering the Offered Units shall have been given to the Selling Member as provided above, then the Selling Member may thereafter, at any time within a period of one hundred twenty (120) days from the Receipt Date, sell such Offered Units to the Outside Party at the purchase price and upon the terms described in the Proposed Transfer Notice; provided, however, that if the Selling Member has not so sold such Offered Units to the Outside Party by such one hundred twentieth (120th) day after the Receipt Date, then any sale of any of such Offered Units thereafter shall once again be subject to the Right of First Refusal contained in this Section 9.6.

9.7.    Restriction on Transfer. Except as otherwise provided herein, the sale, assignment or other disposition of, or encumbrance, pledge or other granting of a security interest in, any of the equity interest of a Member by any holder thereof shall be deemed to be a Transfer under this Agreement (and shall be subject to the provisions of this Article IX); provided, however, that the Transfer of all or part of an individual Member's Units (i) in or to trust for the benefit of members of his or her immediate family or to

a wholly-owned Affiliate; or (ii) to or from his or her executors, administrators or legal representatives following his or her death shall not, in either case, be subject to the provisions of this Article IX, except for Sections 9.2(a) – (c).

9.8.      Damages. If a Member resigns or withdraws from the Company or Transfers all or any portion of his, her or its Units in violation of the provisions of this Article IX, or voluntarily liquidates, dissolves or suffers an act of bankruptcy, it shall remain liable for the debts, obligations and liabilities of the Company to the same extent as if such act had not occurred. In addition, any resignation, withdrawal, transfer, pledge or other encumbrance in violation of any provision of this Article IX or any voluntary liquidation, dissolution or act of bankruptcy of a Member, shall render the defaulting Member liable to the other Members for any damages sustained by reason of such act.

9.9.      To Whom Distributions May Be Made. Unless named in this Agreement, or unless admitted to the Company as a Member as provided in this Agreement, no Person shall be considered a Member. The Company and any Member need deal only with Persons admitted as Members, and shall not be required to deal with any other Person merely because of a purported Transfer of a Member's Units to such Person for any reason; provided, however, that any distribution by the Company to a Person shown on the Company records as a Member, or to his, her or its legal representatives or successors, shall acquit the Company and the Members of all liability to any other Person which may be interested in such distribution by reason of any purported Transfer by such Member or for any other reason.

9.10.     Bankruptcy. For purposes of this Agreement, the term "bankruptcy" shall refer to a situation where a Member shall: (a) be adjudicated a bankrupt, (b) suffer or permit a receiver to be appointed to hold or administer any substantial portion of his, her or its assets and such appointment shall remain in effect without a pending valid objection for  sixty (60) days, (c) make an assignment for the benefit of his, her or its creditors, or (d) file a petition for an arrangement with his, her or its creditors or an involuntary proceeding under the provisions of the Federal Bankruptcy Code or any state statute for the relief of debtors.

## ARTICLE X

## Dissolution and Liquidation

10.1.    Events Causing Dissolution. The Company shall begin the process of dissolution and shall wind up its business upon the occurrence of any of the following events:

(d)     the written agreement of all of the Members;

(e)     the sale or other disposition by the Company of all of the assets and properties of the Company; or

(f)     any other event requiring the dissolution and winding up of the Company under the laws of the State of Delaware.

10.2    Liquidation. Upon dissolution of the Company, the Managers or persons chosen by the Managers ("Liquidator") shall (i) within a reasonable time cause the Company assets to be liquidated in an orderly and business-like manner in the sole reasonable discretion of the Liquidator, and (ii) take the following actions and make the following distributions out of the assets of the Company in the following manner and order:

(a)    first, pay or make appropriate provision for all debts and liabilities of the Company to persons and entities other than Members and expenses of liquidation in the order of priority provided by law;

(b)    second, establish any reserves which the Liquidator deems reasonably necessary or advisable to provide for any contingent or unforeseen liabilities or obligations of the Company;

(c)    third, make distributions to the Members who have Capital Accounts, *pro rata* in accordance with their respective positive Capital Account balances, until such Capital Account balances have been reduced to zero;

(d)    thereafter, make distributions to all of the Members, *pro rata* in accordance with their respective Unit Ratios.

Except as otherwise expressly provided herein, upon such distribution, no Member shall have any rights or claims against the Company or any other Member, notwithstanding any imbalance in the respective Capital Accounts of the Members.

10.2    Certain Obligations. No Member shall have any obligation to restore any deficit balance in his, her or its Capital Account following the "liquidation" (as such term is defined in Treas. Reg. §1.704-1(b)(2)(ii)(g)) of his, her or its interest in the Company.

10.3    Right to Defer Liquidation of Certain Assets or Distribute in Kind. Notwithstanding the provisions of Section 10.2 hereof, if, on dissolution of the Company, the Liquidator shall determine that the sale of part or all of the Company's assets would cause undue loss to the Members, the Liquidator may, in order to avoid such losses, either:

(e)    defer the liquidation of, and withhold from distribution for a reasonable time, any assets of the Company, except those necessary to satisfy debts and liabilities of the Company (other than those to Members); or

(f)    distribute to the Members, in lieu of cash, interests in any Company assets and liquidate only such assets as are necessary in order to pay the debts and liabilities of the Company.

10.4    Income and Loss During Liquidation. The Members shall continue to share distributions and allocations of net income and losses during the period of liquidation in accordance with Article IV hereof. Any gain or loss realized by the Company upon the sale of its property shall be deemed recognized and allocated to the Members in the manner set forth in Article IV hereof. To the extent that an asset is to be distributed in kind, such asset shall be deemed to have been sold at its fair market value of the date of distribution, the gain or loss deemed realized upon such deemed sale shall be allocated in accordance with Article IV hereof and the amount of the distribution shall be considered the fair market value of the asset.

## ARTICLE XI

## Investment Representations

11.1.    No Registration.    Each Member acknowledges that, pursuant to exemptions from registration requirements, the Units have not been and will not be registered with the Securities and Exchange Commission or the securities commission of any state and that, accordingly, the Units may not be resold or otherwise transferred except in compliance with applicable federal and state securities laws.

11.2    Economic Risk.    Each Member represents to the Company that: (a) he, she or it is acquiring the Units for investment purposes only and not with a view to their resale or distribution; (b) he, she or it can bear the economic risk of losing his, her or its entire investment in the Company; (c) his, her or its overall commitment to investments which are not readily marketable is not disproportionate to his, her or its net worth, and his, her or its acquisition of the Units will not cause such overall commitment to become disproportionate; and (d) he, she or it has adequate means of providing for his, her or its current needs and personal contingencies and has no need for liquidity in his, her or its investment in the Units.

11.3    Advice of Counsel.    Each Member acknowledges that the Company has advised and urged each Member in writing to consult with his, her or its own tax, legal and financial advisors regarding his, her or its individual circumstances and the suitability of an investment in the Company. Each Member has had such opportunity as he, she or it considers adequate to ask questions of and receive answers from representatives of the Company concerning the Company, and to obtain from representatives of the Company such information which the Company possesses or can acquire without unreasonable effort or expense, as is necessary to evaluate the merits and risks of an investment in the Company.

## ARTICLE XII

## Miscellaneous Provisions

12.1.    Separateness Provision.    The Company, in the conduct of its business activities, shall:

(g)    Maintain books, records and accounts separate from those of any other person or entity;

(h)    Not commingle assets with those of any other entity;

(i)    Maintain separate financial statements;

(j)    Pay its own liabilities out of its own funds;

(k)    Pay the salaries of its own employees and maintain a sufficient number of employees in light of its contemplated business operations;

(l)    Not guarantee or become obligated for the debts of any other entity or hold out its credit as being available to satisfy the obligations of others without the prior written consent of the Managers;

(m)    Allocate fairly and reasonably any overhead for shared office or other similar expenses;

(n)    Hold itself out as a separate entity;

(o)    Not acquire obligations or securities of its Members; and

(p)    Correct any known misunderstanding concerning its separate identity.

12.2.    Amendments.    This Agreement may not be amended except by a writing executed by all Members, except as provided in Section 3.3.

12.3.    Tax Matters Member.    Eichenstein shall act in the capacity of a "Tax Matters Member" as defined in Section 6231(a)(7) of the Code and shall have full authority to take all actions permitted or required of the Tax Matters Member under the Code. If requested by the Tax Matters Member, the Company shall assume, and in connection therewith retain and pay counsel chosen by such Tax Matters Member for, the defense of any claims made by the Internal Revenue Service to the extent such claims

made by the Internal Revenue Service to the extent such claims arise out of or relate to any Member's investment in the Company. In no case, however, shall the Company be liable for any additional tax payable by a Member or for any costs of separate counsel chosen by such Member. The Tax Matters Member is specifically directed and authorized to take whatever steps he, in his sole discretion, deems necessary or desirable to perfect such designation, including filing any forms or documents with the Internal Revenue Service and taking such other action as may from time to time be required under the Code and the Regulations and the Rulings of the Treasury Department or Internal Revenue Service. Any Member shall have the right to participate in any administrative proceeding relating to the determination of Company items at the Company level. Expenses of such administrative proceedings undertaken by the Tax Matters Member shall be expenses of the Company. Each Member who elects to participate in such proceeding shall be responsible for any expenses incurred by such Member in connection with such participation.

12.4.    Confidentiality. All non-public information regarding the Company and/or its Members or Managers shall be treated with strict confidentiality by the Company, Members and the Managers and not disclosed by any of them to any third parties (other than as necessary in the ordinary course of and to further the business of the Company) without the prior written consent of the Managers; provided, however, that the Company, Members and/or the Managers may disclose such information to their respective attorneys, accountants and other professional advisors who have a need for such information, but only if such persons are informed of the confidential nature of the information and are directed to maintain the confidentiality thereof. The confidentiality obligations of the Members and the Managers set forth herein shall survive any termination of their respective memberships in and service with the Company.

12.5.    Severability.    In the event that any provision of this Agreement shall be held to be void or unenforceable for any reason whatsoever, the remaining provisions of this Agreement shall not be affected thereby and shall continue in full force and effect.

12.6.    Notices.    All notices to the Company shall be addressed to its principal mailing address as established from time to time by the Managers. All notices addressed to a Member shall be addressed to such Member at the address of such Member set forth on Schedule 12.6 annexed hereto or otherwise reflected in the books and notice to such effect given to the Company. Unless otherwise specifically provided in this Agreement, a notice shall be deemed to have been effectively given when first received if delivered (a) by hand, (b) by a reputable nationwide overnight courier service capable of tracking deliveries or (c) via facsimile transmission if (with machine-generated confirmation of receipt retained by the sender) if followed by delivery by hand or by such a courier service not later than the next Business Day.

12.7.    Tax Identification Numbers.    The Social Security or other Federal tax identification number of each Member is set forth in Schedule 12.7.

12.8.    No Waiver.    No waiver of any breach or condition of this Agreement shall be deemed to be a waiver of any other subsequent breach or condition, whether of like or different nature.

12.9.    Waiver of Certain Rights.    Except as otherwise expressly provided in this Agreement, the Members hereby specifically renounce, waive and forfeit all rights, whether arising under contract or statute or by operation of law, to seek, bring or maintain any action in any court of law or equity for partition of the Company, or any interest which is considered to be Company property, regardless of the manner in which title to any such property may be held. Each of the Members hereby agrees not to file a bill for a partnership accounting or otherwise proceed adversely in any manner whatsoever against the other Members or the Company, except for fraud or violation of the terms of this Agreement.

12.10. Governing Law. This Agreement shall be governed by and construed in accordance with the internal laws of the State of [Delaware], without giving effect to the conflicts of law principles thereof.

12.11. Counterparts. This Agreement may be executed in one or more counterparts, and each of such counterparts shall, for all purposes, be deemed to be an original, but all of such counterparts shall constitute one and the same instrument.

12.12. Pronouns and Plurals. Whenever the context may require, any pronoun used herein shall include the corresponding masculine, feminine or neuter forms and the singular form of nouns, pronouns and verbs shall include the plural and vice versa.

12.13. Binding Effect. This Agreement shall be binding upon and inure to the benefit of all of the parties hereto and, to the extent permitted herein, their respective personal representatives, executors, administrators, estates, heirs, legal representatives, successors and assigns.

12.14. Captions. The article and section titles and captions contained in this Agreement are for convenience only, and shall not be deemed a part of this Agreement.

12.15. Entire Agreement; Merger. This Agreement constitutes the entire agreement and understanding among the parties hereto pertaining to the subject matter hereof, and merges and supersedes all prior and contemporaneous understandings or oral or written agreements between or among any of the parties hereto in connection with such subject matter, with the exception of the Agreement annexed hereto. There are no representations, agreements, arrangements or understandings, oral or written, among any of the parties hereto in connection herewith which are not fully expressed herein.

*[signatures appear on next page]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

SPLASH MEDIA GROUP, LLC

By:

Name: Levi Isaac Eichenstein
Title: Member

By:

Name: Ari Noe
Title: Member

Levi Isaac Eichenstein

Ari Noe

## Schedule 12.6

## Names and Addresses of Members

**Name:** Ari Noe
        1926 52nd Street
        Brooklyn, NY 11204-1731
        Facsimile: 212/239-8191

**Name:** Levi Isaac Eichenstein
        4112 Quentin Road
        Brooklyn, NY 11234
        Facsimile: 718/701-2783

## EXHIBIT A

### DEFINED TERMS

"Affiliate" means any Person that directly or indirectly Controls, is Controlled by, or is under common Control with, any Member, and any spouse, ancestor or lineal descendant of any individual Member.

"Business Day" means any day other than (i) Saturday or Sunday, (ii) any Federal or state holiday on which commercial banks in New York City generally are closed or (iii) , or (iii) any Jewish holiday recognized by the Orthodox Union .

"Capital Account" means an amount computed as provided in Section 3.6 hereof.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company Minimum Gain" has the meaning attributed to "partnership minimum gain" as set forth in Treas. Reg. §1.704-2(b)(2) and §1.704-2(d).

"Control" of a Person (including, with correlative meaning, the terms "Controlling," "Controlled by" and "under common Control with") means (i) the beneficial ownership (as defined in Rule 13d-3 under the Securities and Exchange Act of 1934, as amended) of ten (10) percent or more of the voting securities of such Person, (ii) the status of being a director, officer, partner, executor, trustee or other fiduciary of such Person or (iii) the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by contract or otherwise. For purposes of the foregoing, the managing partner of a general or limited partnership and any general partner of a limited partnership shall be deemed to be in Control thereof.

"Unit" means one Unit of membership in the Company, the amount of which owned by each Member as of the date of this Agreement is set forth in Schedule 3.2 hereto.

"Unit Ratio" means, as to a Member, a fraction, the numerator of which is such Member's total number of Units and the denominator of which is the total number of Units of all Members.

"Member Minimum Gain" means an amount, determined in accordance with Treas. Reg. §1.704-2(i)(3) with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability.

"Member Nonrecourse Debt" has the meaning given such term in Treas. Reg. §1.704-2(b)(4).

"Net Cash Flow" means, for the applicable period, all cash receipts of the Company, including, without limitation, all interest, dividends or other distributions from any Subsidiary of the Company, less (i) all operating expenses of the Company other than any expense not involving a cash expenditure (such as any amount charged for amortization or depreciation); (ii) all payments on account of any loans made to, and obligations of, the Company (iii) any sum expended by the Company for capital expenditures; and (iv) cash reserves for working capital or other purposes determined after consideration of the Company's financial position, including anticipated operating income, expenses, liabilities, debt service, capital

A-1

expenditures and prudent reserves, the aggregate amount of which shall be reasonably determined by the Managers.

"Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"Regulations" means the Treasury Regulations promulgated pursuant to the Code, as amended.

"Subsidiary" means, as to any Person, any corporation, limited liability company, partnership, association, joint venture or other entity as to which such Person (directly or indirectly, including through votes cast by its Subsidiaries or Affiliates) owns, controls or otherwise has the power to direct the vote of stock, Units or other equity interests entitled to cast more than 50% of the votes that may be cast in an election of directors, the Managers or other persons acting in similar capacities, regardless of whether or not at the time any stock or other equity interests (of any class or classes) of such corporation or other entity might have voting power by reason of the happening of any contingency.

"Transfer" means (i) when used as a verb, to sell, assign, hypothecate, gift, dispose of, exchange, mortgage, pledge, grant a security interest or participation in, make any voting trust or other arrangement or agreement with respect to the transfer of voting rights (including any proxy or otherwise (whether or not revocable)), or any other beneficial interest in any of the Units, or otherwise transfer or encumber, whether directly or indirectly, voluntarily or involuntarily, (by a derivatives transaction or otherwise) and (ii) when used as a noun, a direct or indirect (by a derivatives transaction or otherwise) sale, assignment, hypothecation, gift, disposition, exchange, mortgage, pledge, granting of a security interest or participation in, voting trust or other arrangement or agreement with respect to the transfer of voting rights (including any proxy or otherwise (whether or not revocable)) or any other beneficial interest in any of the Units, or other transfer or encumbrance.