Gary M. Kushner
Ronald D. Coleman
Scott D. Simon
GOETZ FITZPATRICK LLP
One Penn Plaza—Suite 4401
New York, NY 10119
Tel: (212) 695-8100
gkushner@goetzfitz.com
rcoleman@goetzfitz.com
ssimon@goetzfitz.com
*Attorneys for Debtor*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------- X

| | |
|---|---|
| In re: | Chapter 11 |
| OTR MEDIA GROUP INC. | |
|              Debtor. | Case No. 1-11-47385 (ESS) |

-------------------------------------------------------- X

OTR MEDIA GROUP, INC., 203 17TH
REALTY LLC, SAKELE BROTHERS, LLC
*and* ONE MAIDEN LANE REALTY, LLC, *all
New York limited liability companies*, 848
FULTON REALTY CORP. *and* MING SHENG          Adv. Pro. No. 1-11-01448
INC., *New York corporations*, GOTHAM
BROAD, LLC, *a Delaware limited liability*          **AFFIRMATION OF**
*company*, FOTINI THEOHARIDU, and          **ARIEL S. HOLZER, ESQ.**
PHILLIPE JOCELINE, *natural persons*,

                          Plaintiffs,

       - *vs.* -

The CITY OF NEW YORK,

                         Defendant.

-------------------------------------------------------- X

Ariel S. Holzer, being of full age, duly affirms and states as follows:

    1.    I am an attorney admitted to practice in the United States District Court, Eastern

District, New York, and was employed by the Debtor as in-house counsel from October 2009

through September 2010, after which I have worked as outside counsel for the Debtor. I am an expert in New York City advertising regulation, including all areas of the current law as expressed in the New York City Administrative Code, Zoning Resolution and Rules of The City of New York, I have also researched the history of New York City Sign Regulations, including the considerations involved in the passage of the most recent reincarnations as expressed and enacted in Local Law 14 of 2001 and Local Law 31 of 2005. I appear at hearings held before the Environmental Control Board on an almost weekly basis. I am fully aware of the facts set forth herein based upon my personal knowledge.

2.      I submit this affirmation in opposition to New York City's (the "City's") motion (i) for a declaration that the automatic stay does not apply to either (a) the issuance by the City's Department of Buildings of notices of violation ("NOVs") citing violations by the Debtor, or its affiliates or indemnitees (if any), of the City's Administrative Code, Zoning Resolution, or another law or rule regulating outdoor advertising in the City, or (b) the adjudication of those NOVs by the City's Environmental Control Board; and (ii) in the alternative, granting the City relief from the automatic stay with respect to the issuance and adjudication of NOVs against the Debtor.

### The Existing NOVs

3.      At the outset, it should be noted that the City's case for enforcing its "police power" – its claim that stay relief is imperative to protect the public safety and welfare – is vastly overstated. The City's moving papers assert that "at least 119 NOVs" are currently pending before ECB in connection with 18 locations controlled by OTR. See Declaration of Brian T. Horan ("Horan Declaration") at ¶ 5. A thorough examination of these 18 locations, however, gainsays the City's contention that public health would be threatened by enforcement of the stay.

4. Of the City's list of 18 signs, at the vast majority – the following 13 locations – OTR has removed its sign:

| Sign Location | Property Owner |
|---|---|
| 174 Broadway, Manhattan | One Maiden Lane Realty, LLC |
| 185 Bowery, Manhattan | OSIB-BCRE Bowery Street Holdings LLC |
| 2 East Broadway, Manhattan | CCW Realty LLC |
| 203 17th St., Brooklyn | 203 17th Realty LLC |
| 2562 Briggs Ave., Bronx | 79 S N Ltd. |
| 310 E. 23rd St., Manhattan | 310/312 East 23rd Apartment Corp |
| 324 W. 125 St., Manhattan | 324 West 125th Street LLC |
| 330 McGuinness Blvd., Brooklyn | Hedygus Realty LLC |
| 45 Broadway, Brooklyn | 45 Broadway NY LLC |
| 59 4th Ave., Manhattan | Fourth Ave Loft Corp |
| 7 Dey St., Manhattan | Sakele Brothers LLC |
| 747 Park Ave., Brooklyn | 777 NY Realty Inc |
| 935 Bronx River Ave., Bronx | 705 Realty LLC |

At each of these 13 locations, not only OTR has removed the offending sign, OTR no longer even has the right to erect a new sign, as its leases with the respective property owners have expired or been terminated. The "public health and safety" argument for lifting the stay, so the City can proceed to judgment and docket fines and penalties against signs no longer extant, is entirely specious.

5. Thus, of the 18 locations cited in the Horan Declaration, the Debtor is operating signs at only five:

| Sign Location | Property Owner |
|---|---|
| 430 W. 33 St., Manhattan | 424 West 33rd Street |
| 460 W. 41st St., Manhattan | Covenant House |
| 330 Bruckner Blvd., Bronx | Ess Prisa LLC |
| 945 Zerega Ave., Bronx | Ess Prisa II LLC |
| 838 6th Ave., Manhattan | Yung Brothers Real Estate Co. |

6. At 430 West 33rd Street, ECB has already adjudicated the sign to be nonconforming. The Debtor will change the sign to comply with the applicable provisions of the

City's Administrative Code, Zoning Resolution, or other local law (collectively, the "Sign Laws"). Accordingly, no stay relief is necessary.

7. At 460 West 41st Street, there is an open question as to whether New York State holds an interest in the property, which interest would make the location exempt from the Sign Laws. I personally have made inquiries with the relevant State authorities and am still awaiting an official clarification. DOB and ECB have acceded to adjournments until this outstanding issue can be elucidated, but the City omitted mention of this fact in its submission. Because the parties agree that the question of State interest in this sign would be dispositive, no stay relief is necessary.

8. As to the next two signs, 330 Bruckner Boulevard and 945 Zerega Avenue, OTR agrees to lift the stay, provided that the City grant the Debtor a financial hardship waiver of the City's requirement (discussed in greater detail below) that OTR must immediately pay (or bond) any fine or else forfeit all further right to appeal.

9. The Court need not grant a stay as to the last of the 18 locations, 838 Sixth Avenue, as New York State Supreme Court has already stayed further enforcement of the City's NOV until the Appellate Division rules on OTR's Article 78 petition.

10. In sum, a mere two of the handful of alleged violations that could be adjudicated (not the 18 claimed by the City) should proceed. Once the City grants the Debtor a financial hardship waiver, OTR will stipulate to lift the stay as to these two.

### The City's Regulatory Scheme

11. In further considering the City's arguments, the Court should be aware that there are two alternative enforcement methods available to the City's Department of Buildings ("DOB") if it believes that an installed outdoor advertising sign may be unlawful under the Sign Laws. In its moving papers, the City has discussed only one.

12.    The most direct procedure for enforcement of the Sign Laws to abate an alleged sign violation is for the DOB to file a petition in New York City's Office of Administrative Trials and Hearings ("OATH"), seeking adjudication of an alleged violation of the Sign Law and an order authorizing the City to remove the sign.

13.    An OATH proceeding, in fact, is the only proceeding which can authorize the City to remove an offending sign.

14.    The statute authorizing the above-referenced enforcement method is Section 28-503.3 of the New York City Administrative Code (the "OATH Statute"), which states:

> Hearing.  The  office of administrative trials and hearings shall conduct the hearing. The administrative law judge assigned to hear the matter shall submit his or her proposed findings of fact and recommended  disposition  to  the  commissioner.  If based on such recommended disposition, proposed findings of fact and the record of the hearing the commissioner determines (i) that the sign has a surface area greater than 200 square feet (19 m{2}) and, (ii) that the sign has  been erected, maintained, attached, affixed, painted on, or in any other manner represented on the building  or  premises  in  violation  of  the zoning  resolution,  this  code, the 1968 building code or rules adopted pursuant thereto, he or she may order the removal of the illegal sign or its sign structure or both.

15.    The second enforcement method, and the only one the City seeks relief from the automatic stay to utilize here, involves issuing an NOV – much like a parking or moving violation issued to a motorist – to be adjudicated by the Environmental Control Board ("ECB").

16.    Section 28-501.4 of the New York City Administrative Code (the "ECB Statute") authorizes ECB to do no more than issue fines and civil penalties:

> Civil Penalties. Any person who places or maintains a sign on a building or premises without an appropriate permit in violation of this article shall be liable for a civil penalty of, for a first violation, not more than fifteen thousand dollars and, for a second or subsequent violation,  not more than twenty-five thousand dollars. Each day's continuance shall be a separate and distinct violation. Such civil penalties may be recovered in

an action in any court of appropriate jurisdiction or in a proceeding before the environmental control board. Such board shall have the power to impose the civil penalties provided for in this article. Notwithstanding the provisions of section six hundred sixty-six of the charter, a notice of violation issued by the department pursuant to this section 28-501.4 shall not be subject to review by the board of standards and appeals.

17.     In contrast to the OATH Statute, the City's sole remedy under the ECB Statute is pecuniary – the ECB Statute cannot authorize the City to remove an offending sign, although its ultimate effect is to compel the offending OAC to remove the sign in the face of mounting and severe penalties that render the sign economically unviable.

18.     It must be emphasized that under this scheme, if the City wants to solve a problem with a sign, its only direct route to abatement is via OATH.  In contrast, fines and penalties imposed pursuant to the ECB Statute may or may not result in abatement of the alleged violation and removal of the alleged threat to the public good, and may or may not result in any such abatement occurring promptly.

19.     In sum, the regulatory plan now in effect provides the City with two ways to exercise its "police power". If the City is aware of a public-safety, aesthetic or other threat to the public because of what it believes is a violation of the Sign Laws, it seek the right to affirmatively abate the violation through the OATH Statute.   Alternatively, it can proceed via the ECB Statute to obtain fines and civil penalties which, indirectly, may eventually result in an abatement of the condition.

20.     Concomitantly, the City may, through ECB fines and penalties, seek – as it does here – to force an outdoor advertising company (an "OAC") into bankruptcy or cause the liquidation of an OAC, such as the Debtor, which is attempting reorganization.  How this will happen if the City's motion is granted is discussed in greater detail below.

21.     But one effect of such a choice by the City to utilize the financial penalties of the ECB Statute over the direct-abatement powers of the OATH Statute is that the Debtor would be deprived of any ability to adjudicate pending appeals of ECB fines, as the Debtor here is.   Another effect is that proceeding via ECB and "piling on" more fines would minimize the recovery of all creditors (including the City itself) from the bankruptcy estate while also effectuating a preference in favor of the City as a creditor, allowing it to increase the amount of indebtedness owed to it while other creditors' claims are stayed.

22.     But one effect the City **cannot** claim is that proceeding via the ECB Statute, rather than through the OATH Statute, is the fastest and most direct route to the abatement of violations. If the City's policy goal is to truly utilize its police powers and protect the public interest as it interprets that interest, the way for it to do so readily, speedily and effectively is through the OATH process provided for by law.   Alternatively, if its goal is not abatement of violations but destruction of the Debtor, it will seek, as it does now, to drain the estate by imposition of fines and penalties in the ECB and to use that forum to effectively eliminate the Debtor's ability to adjudicate the issue at any appellate level.

23.     That elimination of the Debtor's business is the City's goal is the premise of the Adversary Proceeding filed by the Debtor, which premise will be developed further in these proceedings.   But at this juncture, it should also be brought to the Court's attention that even short of making reorganization impossible by adding to OTR's debt, the City has more prosaic and expedient motives in bypassing the OATH Statute, which would authorize sign removal, and instead seeking financial redress alone under the ECB Statute.   This motive is that the City "likes its chances" before ECB far more than in the OATH courts, as discussed below.

24.     As set out in length in the Section 1983 action filed by certain OTR landlords in this

District, the City's domination of the ECB personnel and process has – for years – effected a

rubber-stamp adjudication system of questionable constitutional validity.   To put a finer point on

this, and to address a specific aspect of that process not detailed in the allegations of that action,

Section 3-73 of Title 48 of the Rules of the City Of New York states as follows (emphasis added):

> (a) No appeal by a respondent shall be permitted **unless** within 20 days
> of the mailing of the hearing officer's recommended decision and order
> **the civil penalty imposed by said order is paid or the respondent
> shall have posted a cash or recognized surety company bond in the
> full amount** imposed by the decision and order appealed from.

> (b) Any application for a waiver of such prior payment of the civil
> penalty must be made within 20 days of the mailing of the hearing
> officer's recommended decision and order and must be supported by
> evidence of financial hardship. Waivers of such prepayment may be
> granted in the discretion of the executive director.

25.     This statute, applicable only to ECB hearings, provides for the wholesale disposal

of any challenge to an ECB ruling by forcing indigent respondents to immediately pay (or bond)

the fine or else forfeit all further right to appeal.   An ECB respondent such as the Debtor cannot

pay the rapidly accumulating and multiplied fines that can be imposed by the City in a manner that

is essentially unilateral, and for the same reason cannot get a bond.   Thus the Debtor would be

deprived of any ability to appeal ECB's rulings, which would be docketed as final judgments

immediately and simply added to the City's claim as a creditor, while other creditors remain

stayed.

26.     It should go without saying that while subsection (b) of Section 3-73 speaks to a

waiver process, because the decision on said waivers rest solely at the discretion of the executive

director of ECB – i.e., the City, which is the party seeking the imposition of additional fines by

lifting the stay – the Debtor cannot seriously be said to have any prospect of being awarded such

8

waivers. This is not speculation; in September, immediately after OTR filed for protection under Chapter 11, ECB began issuing denials of scores of pending hardship waiver applications by the Debtor and its indemnitees, en masse. Copies of these denials can be provided at the Court's request.

27. It should be noted that the former practice of DOB was to issue both NOVs pursuant to the ECB Statute and a Petition for sign removal pursuant to the OATH Statute. For example, NOVs and a Petition for removal were issued for the Debtor's signs located at the Manhattan properties known as 174 Broadway, 59 Fourth Avenue, and 838 Sixth Avenue.

28. Following a ruling favorable to the Debtor in an appeal concerning the property at 838 Sixth Avenue, however, DOB ceased attempting to obtain orders of removal and now seeks the exclusive remedy of imposing pecuniary fines through ECB, bypassing the OATH Statute altogether, for obvious reasons. The City's legal strategy may be understood by considering that even if it is successful in OATH actions seeking sign removal, it will be exposed to substantive appeals to the New York State Supreme Court challenging the City's administration of the Sign Laws, including the administrative judiciary system as alleged in the Section 1983 action, under Article 78 of the CPLR.

29. This is exactly what happened following the grant of an order for the removal of the sign at 838 Sixth Avenue, in connection with which OTR immediately filed an Article 78 proceeding. Disagreeing with the determinations of both the DOB and the OATH Administrative Law Judge, Justice Walter B. Tolub's order found that "petitioners have presented a compelling argument supporting their claim that they will very likely succeed on the merits." Matter of Yung Bros. Real Estate Co. Inc. v Limandri, 26 Misc 3d 1203 (Sup. Ct. 2009). The full text of Justice Tolub's decision is annexed hereto as Exhibit "A". Justice Tolub's decision stayed further

enforcement action until a formal decision could be rendered by the Appellate Division in accordance with CPLR 7804. This effectively caused the cessation of all further enforcement actions at that location.

30.     Since that decision, the City has not once brought a petition seeking an order authorizing the removal of an offending sign under the OATH Statute. It may fairly be inferred that the City does not wish to risk independent judicial review of the relatively friendly ECB and OATH tribunals. The City now solely proceeds under the ECB Statute for ECB's exclusive remedy of pecuniary fines. The matter before the Court underscores that the City's motion is to continue its barrage against the Debtor only in the ECB forum in order to indirectly abate an alleged sign violation, rather than proceed directly to address that issue through the OATH process, where an OAC may get a fair day in court.

31.     The City's strategy, therefore, may be understood as follows:    It is already preventing the Debtor from obtaining rulings vindicating its legal positions regarding the City's misapplication of the Sign Laws by avoiding OATH and its shorter path to an Article 78 appeal. Meanwhile, the City seeks to force the Debtor into the City-friendly ECB process which, under Section 3-73, is designed to eliminate any opportunity for appeal by a bankrupt entity. This would enable the City to take the position that the Debtor has no meritorious defenses with respect to pending violations – one premise of its argument that the Debtor cannot reorganize successfully. The City's strategy also would effectuate the City's goal of adding to the Debtor's indebtedness to the City and, axiomatically, making reorganization less likely.

32.     One thing the City's approach would not do, however, is represent a rational, efficient or speedy exercise of the City's police powers such that relief from the automatic stay is justified.

10

## Unlawful Signs "Subject to Confirmation"

33.    Finally, it is necessary to address the City's misrepresentations concerning the status of the Debtor's sign locations.

34.    In its moving papers, the City states that NOVs have been issued to eight of the locations listed on the inventory list provided to the Court.  See Horan Declaration at ¶¶ 8-14. What the City neglects to mention is that at least half of these eight locations where violations were issued are not illegal sign locations – which in theory cannot be cured – but are correctable offenses.

35.    For example, 424 West 33rd Street has a valid outdoor advertising permit, but the sign at the time of inspection allegedly exceeded the size on the permit.   The same is also true of 261 Walton Avenue, 330 Bruckner Boulevard and 945 Zerega Avenue, which all have valid advertising permits, but which the City maintains should have been registered as "arterial highway signs" – an entirely technical violation.

36.    Of the remaining locations at which violations were issued, 838 Sixth Avenue has already been mentioned above as the one Justice Tolub found the Debtor was likely to succeed on the merits and entered a stay.   Two other properties on the City's list of eight, 59 Fourth Avenue and 13 Carmine, share similar facts and circumstances as 838 Sixth Avenue.   A decision in the Debtor's favor there would be dispositive in these locations as well.

37.    The final location referred to by the City for which violations have been issued is 460 West 41st Street, a location, as discussed earlier, where there is an open question as to whether New York State holds an interest in the property, which interest would make the location exempt from the Sign Laws.   I personally have made inquiries with the relevant State authorities and am

11

still awaiting an official clarification. The DOB and ECB have acceded to adjournments until this outstanding issue can be elucidated, but the City omitted mention of this fact in its submission.

38. The City also attempts to discredit the grandfathering credentials of four locations, namely 25 Skillman Street in Brooklyn, 340 Flatbush Avenue in Brooklyn, 101-11 East 161st Street in the Bronx and 207 Dyckman Street in Manhattan, by stating that no permit has been issued for these locations. This is a non-sequitur; the nature of a grandfathered location is that it does not require a permit. While the City may issue a grandfathered permit for a grandfathered sign, the lack of a permit does not change the fact that a sign has attained grandfathered status. To make clear the bona fides of the Debtor's claim that these locations are entitled to claim grandfather status for these locations, representative documentation of the grandfathered evidence complied by the Debtor for each of these locations is attached hereto as Exhibits "B", "C", "D", and "E", respectively.

39. The City's claims that there is some significance to the Debtor's applications for grandfather status at 838 Sixth Avenue and 59 Fourth Avenue should also be discounted as mere rhetoric. It is never proof of a fact regarding a claim to grandfather status in one case to demonstrate that a party's similar claim was rejected in another case. Here the claim is particularly disingenuous because, as explained above, the rejection of that claim – at 838 Sixth Avenue – was already found by the State Supreme Court to have been an abuse of discretion. It is submitted that the facts regarding 59 Fourth Avenue would, if given a proper hearing and opportunity for appeal – which the City seeks to prevent by this application – elicit a similar outcome.

_____/s/_____
ARIEL S. HOLZER

Dated: November 21, 2011

12

# EXHIBIT "A"

Unreported Disposition
906 N.Y.S.2d 784
(The decision of the Court is referenced in a table in
the New York Supplement.)
Supreme Court, New York County, New York.

In the Matter of the Application of YUNG
BROTHERS REAL ESTATE CO., INC., and OTR 296A,
LLC, Petitioners,
v.
Robert D. LIMANDRI, as Commissioner of The
New York City Department of Buildings, The New
York City Department of Buildings, The New York
City Office of Administrative Trials and Hearings
and The City of New York, Respondents.

No. 111986/09. | Dec. 29, 2009.

Attorneys and Law Firms

Howard C. Crystal, Esq., Novack Burnbaum Crystal,
New York, for Petitioner.

Michael A. Cardozo, Esq. by Christina L. Hoggan,
Esq., Corporation Counsel, New York, for
Respondent.

Opinion

WALTER B. TOLUB, J.

*1 Petitioners bring this Article 78 special
proceeding as part of their challenge to the July 29,
2009 Report and Recommendation of an OATH
Administrative Law Judge Faye Lewis ("ALJ Lewis")
who determined that petitioners had failed to
establish a prior legal non-conforming use with
respect to a exterior building sign ("the sign")
located on the exterior wall of a building owned by
petitioner Yung Brothers Real Estate Co., Inc.,
("Yung Brothers") located at 838 6th Avenue in
Manhattan ("the premises").

By this application, brought by Order to Show
Cause, petitioners seek an order pursuant to CPLR
7805 staying respondents from removing the

aforementioned sign or causing its removal, or, if
the sign has already been removed, an order
preventing petitioners from installing an advertising
sign on the premises during the pendency of this
proceeding. Although sought in the petition but not
expressly asked for in the Order to Show Cause,
petitioners additionally seek an order pursuant to
CPLR 7803 and New York City Administrative Code
28–503.6 invalidating and rescinding the Order of
Removal issued by respondent, Robert D. LiMandri,
as Commissioner of the New York City Department
of Buildings ("the Commissioner"), which
authorized the removal of the sign on the grounds
that the decision of ALJ Lewis was both affected by
an error of law and not supported by substantial
evidence. Petitioners further seek an award of
damages for lost revenue incurred as a result of the
respondents' actions. In opposition, respondents
cross-move to dismiss the within application and
petition pursuant to CPLR 3211(a)(7) on the grounds
that the petition fails to state a cause of action.

As a preliminary matter, inasmuch as petitioners
have raised the issue as to whether the decision
issued by ALJ Lewis was supported by substantial
evidence, the portion of petitioner's application
which seeks an order invalidating the decision
issued by ALJ Lewis, and respondents' cross-motion
to dismiss the petition are respectfully transferred
to the Appellate Division, First Department, in
accordance with CPLR 7803(4) and 7804(g).

The balance of petitioner's request for a stay of the
execution of the Order of Removal for the duration
of this special proceeding may be addressed by this
court, and thus requires a recitation of the facts of
this case.

Background

The sign at the core of this application is located on
the site of another sign which has existed since at
least 1940 and advertises a company known as
Bratman Brothers (Affirmation in Opposition, ¶
37).1 Bratman Brothers moved its business to the
premises in 1929 where it remained until the
mid–1980's (id.)

Yung Bros. Real Estate Co., Inc. v. Limandri, 26 Misc.3d 1203(A) (2009)

906 N.Y.S.2d 784, 2009 N.Y. Slip Op. 52653(U)

At the time of the installation of the Bratman Brothers sign, the building sat in an area zoned as M1–6, which allows for the erection and display of advertising signs (id.). The Bratman Brothers sign was still in place when petitioner Yung Brothers became the owner of the subject premises in the early 1980's. (Order to Show Cause, Exhibit B, p. 4). At some point thereafter, and it is unclear to the court as to when, petitioner OTR 296A, LLC ("OTR"), an outdoor advertising company, leased the Bratman Brothers sign location from Yung Brothers.

*2 On September 19, 1995, the district where the premises are located was rezoned from an M1–6 district to a C6–4X district, which prohibits advertising signs. In 2007, petitioners installed at least one new sign on the site of the Bratman Brothers sign. In March of 2007, respondent Department of Buildings ("DOB") issued Yung Brothers two Notices of Violation and Hearing (NOV), one for failing to obtain a permit for the new sign, and one for violating the post–1995 zoning restriction by installing the new sign.

On June 5, 2007, Yung Brothers submitted a Certificate of Correction to DOB saying that they had removed the sign. Petitioners then applied to DOB for a permit to install an advertising sign on the site of the Bratman Brothers sign. The application was pending when on August 1, 2007, DOB again issued Yung Brothers an NOV for erecting an illegal sign on the premises without a permit.

On August 17, 2007, the DOB approved petitioners' permit application, indicating, in pertinent part, that the "non illuminated flex face advertising wall sign inside the property line complies with ZR 52–83 as per historical photos from the New York City Municipal Archives dated 1940–present day" (Order to Show Cause, Exhibit C). Three months later, DOB reversed its position, and, asserting that the permit had been issued in error, issued Yung Brothers Notices of Intent to Revoke and Notices of Objections.

Petitioners did not remove the sign, and apparently did not answer the Notices of Objections. On May 17, 2008, DOB issued Yung Brothers three additional NOVs pertaining to the claimed illegal signage. This was followed by revocation of the August 2007 permit on November 13, 2008 (Affirmation in Opposition, Exhibit K; Order to Show Cause, Exhibit B, Decision of ALJ Lewis, p. 2–3).

By Petition and Notice of Hearing dated February 5, 2009, DOB commenced an Office of Administrative Trials and Hearings (OATH) nuisance abatement proceeding charging that petitioners had violated § 28–105.1 of the New York city Administrative Code. An OATH hearing was held on April 29, 2009, at which petitioners argued that they were legally permitted to maintain advertising signs because of the DOB August 17, 2007 permit. Petitioners further argued that the sign was entitled to non-confirming use status based on the existence of the Bratman Brothers sign.

In DOB's post-hearing brief, DOB argued that petitioners failed to establish that the sign was entitled to non-conforming use status because petitioners failed to present evidence with respect to when the Bratman Brothers sign was used and if it was legally allowed at that time. DOB further noted petitioners' failure to establish whether the Bratman Brothers sign had been discontinued for a period of two or more years (Affirmation in Opposition, Exhibit O). Petitioners, in their post-hearing brief, argued that the respondent's petition should be dismissed because petitioners held a valid permit from DOB. Petitioners further claimed that they were not required to establish that the sign qualified for non-conforming use based on proof that the use of the Bratman Brothers sign had not been discontinued for a period of two or more years, because the cited zoning rules containing the two or more year non-use inquiry, was adopted in 1961, and as such, were not applicable to the sign at issue because the sign predated the zoning regulations sought to be applied by respondents (Affirmation in Opposition, Exhibit P).

*3 On July 29, 2009, ALJ Lewis recommended the issuance of an Order of Removal for the petitioners' sign. The decision was largely based on the finding that petitioner had failed to obtain the required permit allowing for the maintenance of their sign,

and had failed to demonstrate that the sign was used for advertising as opposed to accessory purposes prior to 1995.2 This application followed.

## Discussion

Pursuant to CPLR 7805, a court may order a stay of further proceedings or the enforcement of a determination under review in order to preserve the status quo until the Article 78 proceeding is resolved (Town of East Hampton v. Jorling, 181 AD2D 781 [2nd Dept 1992]; see generally Barr Altman, Lipshie and Gerstman; New York Civil Practice Before Trial [James Publishing 2009] § 42:430–42:432). The criteria assessed are similar to those used in determining whether a party should be entitled to a preliminary injunction. As such, to prevail, the moving party must demonstrate a likelihood of success on the merits, irreparable injury in the absence of provisional relief, and a balancing of the equities in the movant's favor (Melvin v. Union College, 195 A.D.2d 447 [2nd Dept 1993]; Jarrett v. Westchester County Department of Health, 166 Misc.2d 777 [Sup Ct. Westchester Co.1995] ).

The papers submitted with this application support petitioners' claim that in the absence of a stay, both petitioner Yung Brothers and petitioner OTR stand to be irreparably harmed, both financially, and by damage caused by loss of their respective business reputations. While financial loss suffered by a party can often be calculated, the damage of a lost relationship with an existing business client is more difficult to calculate, and thus can be held to constitute irreparable harm (see, Register.com Inc. v. Verio, Inc., 356 F.3d 393, 404 [2nd Cir.2004]; Ticor Title Insurance Co. v. Cohen, 173 F.3d 63, at 66 and 69 [2nd Cir.1999] ).

More significantly, is the fact that petitioners have presented a compelling argument supporting their claim that they will very likely succeed on the merits. New York City, from a historical perspective, began implementing limiting' zoning regulations with respect to signs in 1916. It was not until 1940, however, that the City Planning Commission ("CPC") amended the 1916 Zoning Resolution to create a

distinction between off-site commercial or, "advertising signs" which direct attention to another location, and on-site, or "business" or "accessory" signs, which direct attention to a business at the same location where the sign exists (see, ZR § 12–10 [2001] ); ZR § 3(q) [1940], renumbered as ZR § 12–10 [1998]. For a general overview of the history of New York City Zoning Laws, see, Infinity Outdoor, Inc. v. City of New York, 165 F.Supp.2d 403 [E.D.NY 2001] ).

When a zoning authority challenges the use of property as being in violation of a zoning ordinance, the property owner may raise the defense of nonconforming use. To prevail, the individual asserting the defense must demonstrate that the property was in use for the nonconforming purpose at the time that the zoning ordinance became effective (see, Matter of Syracuse Aggregate Corp. v. Wise, 51 N.Y.2d 278 [1980] ).

*4 In the instant application, the sign involved, as conceded by respondents, existed in 1940. The sign had existed for more than 20 years when the City of New York adopted ZR § 12–10 and § 52–11, both of which pertain to the definition of nonconforming use. Since preexisting use within the context of zoning is to be evaluated solely on whether the use offends the regulations which were in effect at the time of the use (see, Costa v. Callahan, 41 AD3d 1111 [3rd Dept 2007]; Kellner v. Haller, 226 A.D.2d 639 [2nd Dept 1996] ), petitioners have raised a very valid issue as to whether the 1961 zoning regulations were improperly applied by ALJ Lewis in determining whether or not petitioners' sign qualified for preexisting nonconforming use designation. Having reviewed the papers submitted, and under the circumstances, it is this court's determination that pending the Appellate Division, First Department's review of the substantial evidence issues advanced by the parties, a stay pursuant to CPLR 7805 is warranted. As such, it is

ADJUDGED that the portion of petitioners' application which seeks a stay preventing respondents from removing the aforementioned sign or causing its removal, or, if the sign has already been removed, preventing petitioners from installing an advertising sign on the premises during the pendency of this proceeding, is granted; and it

is further

ORDERED that the balance of the issues raised in this application which involves questions as to whether a determination made as a result of a hearing held, and at which evidence was taken, pursuant to direction of law, is on the entire record, supported by substantial evidence (CPLR 7803(4)), is respectfully transferred to the Appellate Division, First Department for disposition pursuant to CPLR 7804(g); and it is further

ORDERED that the Clerk of Court is directed to transfer the file to the Appellate Division, First Department, upon service of a copy of this order with notice of entry.

This memorandum opinion constitutes the decision and order of the Court.

Parallel Citations

26 Misc.3d 1203(A), 2009 WL 5174193 (N.Y.Sup.), 2009 N.Y. Slip Op. 52653(U)

Footnotes

1   The Bratman Brothers sign appears in a New York City archived photograph taken in 1940.

2   An accessory sign is one which directs attention to businesses on the zoning lots where the signs are located. By contrast, an advertising sign is one which directs attention to a business sold or offered in a location other than where the sign is located (ZR § 12–10).

End of Document

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT "B"

No. 1097

Reg. No. 1097

# THE CITY OF NEW YORK

$ 25.00

## HOUSING AND DEVELOPMENT ADMINISTRATION

### DEPARTMENT OF BUILDINGS

### BOROUGH OF BROOKLYN

Brooklyn, May 25, 18 83

Received from O. H. Williams Co. of 4563 Madison St.

twenty five Dollars, which sum has this day been paid to the undersigned as a fee in connection

with 8 ft. Application No. 95/82 for leave to erect a Allen edison St. 4567 Madison St. SIGN STRUCTURE

size 11'5" x 9ft. 9 ft. facing W E C Madison at No. 257 Madison St. Borough of Brooklyn

It is understood by the aforesaid applicant that the payment of this fee does not give him permission to erect said sign or structure, and that
he is not to proceed with the erection of said sign or structure until plans and specifications for the same have been duly approved by the undersigned,
and the said sign or structure shall not be maintained in violation of any laws relating to such structures.

Cashier

**GEORGE E. BERGER**
Superintendent, Borough of Brooklyn

R.P 130—5C sets 70114(C7)

# THE CITY OF NEW YORK

### SIGN STRUCTURE

HOUSING AND DEVELOPMENT ADMINISTRATION

DEPARTMENT OF BUILDINGS

BOROUGH OF BROOKLYN

N°. 1098

Reg. No. _1098_

$ 25.00

Brooklyn, _May 26_ 19 _83_

Received from _Dr. L. Willforge Ave._ of _99-02 Flatbush_ Ave.

_Twenty Five_ Dollars, which sum has this day been paid to the undersigned as a fee in connection

with _Application No. 1783_ for leave to erect a _Roof Sign_ _500 sq ft._

size _11.3 ft x 43.9 ft facing_ _N.F.C. of Willoughby Ave._ Borough of Brooklyn

It is understood by the aforesaid applicant that the payment of this fee does not give him permission to erect said sign or structure, and that he is not to proceed with the erection of said sign or structure until plans and specifications for the same have been duly approved by the undersigned, and that said sign or structure shall not be maintained in violation of any laws relating to such structure.

SIGN STRUCTURE

GEORGE E. BERGER

Superintendent, Borough of Brooklyn

_____ Cashier

R.P. 135—JC mets-7011-2(71)

# EXHIBIT "C"



**year: 1933**

Image Title: Downtown Brooklyn
Creator: NY Daily News
Created Date: 1933
Source: NY Daily News Archives
ID No.



**year: 1951**

Image Title: Downtown Brooklyn
Creator: Skyview Photos
Created Date: 1951
Source: NY State Archive Collection, Albany, NY
ID No.



**year: 1956**

Image Title: Brooklyn looking South Aerial Views
Creator: NYC Municipal Archives
Created Date: May 15, 1956
Source: NYC Dept of Records, 31 Chambers St, NYC, NY
ID No. DMA_09073



**year: 1959**

Image Title: Dekalb Avenue Station, Flatbush Ave Ext & Willoughby St
Creator: Private Collection BrooklynPix.com
Created Date: March 18, 1959
Source: Bryan Merlis Private Collection
ID No.



**year: 1961**

Image Title: Dekalb Avenue Station
Creator: Metropolitan Transit Authority
Created Date: Sep 27, 1961
Source: NYC MTA, Archives Department
ID No. SC4-155 (155-4) R.9C, S.1



**year: 1969**

Image Title: Flatbush Ave Extension
Creator: Patrick Cullinan
Created Date: March 18, 1959
Source: Bryan Merlis Private Collection BrooklynPix.com
ID No.



**year: 1978**

Image Title: Dime Savings Bank
Creator: Private Collection
Created Date: 1978
Source: Private Collection
ID No.

# EXHIBIT "D"



**year: late 1930's**

SP5.1 11

DATE PHOTOGRAPHED
late 1930's

LOCATION
Bronx, New York, New York, USA

COLLECTION
The Bronx County Historical Society
3309 Bainbridge Ave
Bronx, NY 10467



**year: 1938**

DATE PHOTOGRAPHED
1938

LOCATION
Bronx, New York, New York, USA

COLLECTION
Private



CORBIS
U948944INP

**year: 1942**

---------------------------------------------------------------------

Mrs Lou Gehrig Unveiling Plaque for Gehrig Plaza
Original caption: Mrs. Lou Gehrig is shown unveiling the plaque to the memory of her husband at Gehrig Plaza today. Left to right at the ceremony are Bill Dickey, of the New York Yankees; Mr. and Mrs. Henry Gehrig; manager Joe McCarthy of the Yankees; Mrs. Gehrig and Borough President Lyons of the Bronx.
IMAGE:
© Bettmann/CORBIS

DATE PHOTOGRAPHED
1942

LOCATION
Bronx, New York, New York, USA

COLLECTION
Bettmann



**year: 1950's**

AF350
Max Levine - Photographer

DATE PHOTOGRAPHED
late 1950's

LOCATION
Bronx, New York, New York, USA

COLLECTION
The Bronx County Historical Society
3309 Bainbridge Ave
Bronx, NY 10467



**year: 1957**

**DATE PHOTOGRAPHED**
1957

LOCATION
Bronx, New York, New York, USA

COLLECTION
private archives
bronxboard.com



**year: 1960's**

PK2237

DATE PHOTOGRAPHED
1960's

LOCATION
Bronx, New York, New York, USA

COLLECTION
The Bronx County Historical Society
3309 Bainbridge Ave
Bronx, NY 10467

# EXHIBIT "E"



**year: 1936**

Image Title: Manhattan: Broadway - Dyckman Street
Created Date: 1936
Standard Reference: 0754-B7
Source: New York Public Library - Photographic views of New York City, 1870's-1970's / Manhattan
Location: Stephen A. Schwarzman Building / Photography Collection, Miriam and Ira D. Wallach Division of Art, Prints and Photographs
Digital ID: 717803F
Record ID: 407601
Digital Item Published: 2-16-2005; updated 2-28-2011



**year: 1945**

Image Title: Dyckman and Broadway. View looking east at S.E. corner of Broadway and Dyckman.
Creator: Wurts Brothers NYC, NY
Created Date: Dec 18, 1945
Source: Museum of the City of New York
Location: 1220 Fifth Avenue at 103rd St., New York, NY 10029
Record ID: X2010.7.1.8930



year: 1968

Image Title: Dyckman St v E at Broadway
Created Date: 1968
Standard Reference: 4503912514
Source: Flickr Private Collection Herbert Maruska