Gary M. Kushner
Ronald D. Coleman
Scott D. Simon
GOETZ FITZPATRICK LLP
One Penn Plaza—Suite 4401
New York, NY 10119
Tel: (212) 695-8100
gkushner@goetzfitz.com
rcoleman@goetzfitz.com
ssimon@goetzfitz.com
*Attorneys for Debtor*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------- X

In re:

OTR MEDIA GROUP INC.
              Debtor.

Chapter 11

Case No. 1-11-47385 (ESS)

---------------------------------------------------------------- X

OTR MEDIA GROUP, INC., *et al.*,

        Plaintiffs,
     - *vs.* -

THE CITY OF NEW YORK,

        Defendant.

Adv. Pro. No. 1-11-01448(ess)

---------------------------------------------------------------- X

**MEMORANDUM OF LAW IN OPPOSITION TO
THE CITY OF NEW YORK'S MOTION TO VACATE AUTOMATIC STAY
<u>AS TO ENVIRONMENTAL CONTROL BOARD PROCEEDINGS</u>**

**PRELIMINARY STATEMENT**

OTR Media, Inc. ("OTR" or the "Debtor") can only agree with the uncontroversial core premise of the pending motion of the City of New York (the "City"): the determination and enforcement of advertising regulations is a legitimate exercise of the City's police power and generally exempt from the automatic stay under section 362(b)(4) of the Bankruptcy Code. But what the City is asking the Court to allow it to do here is, as demonstrated below, only remotely related to enforcement – while it is much related to destroying the Debtor's chances of reorganization.

The obvious vehicle for the City to exercise its police power is New York City Administrative Code § 28-503.3, which provides an expedient and direct route to abatement of violations of outdoor advertising regulations: a hearing before the City's Office of Administrative Trials and Hearings ("OATH"), which can order the removal of a non-compliant sign. An OATH proceeding is the sole method available to the City to obtain such an order. But the City is not seeking permission – or even consent, which the Debtor would grant – to proceed in OATH regarding the handful of alleged violations (not the 18 sign locations claimed by the City) that could be adjudicated. Despite its appeal to the police power and the public interest, the City has not requested permission to actually take any action to abate the alleged violations.

Instead, the City is asking the Court to lift the automatic stay so it may utilize an entirely different procedure, namely a hearing before the Environmental Control Board ("ECB"). The ECB does have authority to rule on disputes over sign violations, but it has no power whatsoever to order abatement or removal of a violation. All ECB can do (and which it does without fail) is impose financial penalties for sign violations. And these penalties, not abatement of violations, are what the City seeks, because such penalties are guaranteed to doom any prospect of

reorganization, regardless of the ultimate merits of its dubious violation claims. By failing to distinguish the case at bar from the general rule implicating the police power, the City also ignores recent precedent in this District demonstrating that before granting a governmental unit's request to lift the automatic stay to permit regulatory enforcement, the Court must consider the premise of such an application: whether the facts indicate that future violations are even possible. If they are not, there is no need for the police power and no basis for lifting the stay.

And indeed, they City's premise – that the automatic stay is depriving the City of its ability to protect the City of New York from a dozen and a half festering threats to its health, safety and welfare – is entirely fallacious. This is not a matter of opinion, nor does recognition of these facts require the Court to step into the shoes of the agencies best qualified to determine the legality of a given sign. The overwhelming majority of the 18 violations claimed by the City in its papers refer to locations not operated by the Debtor, as demonstrated in the papers filed in support of this opposition. As is axiomatic, and explained with citations to case law in Point I.a below, the police power exception does not extend to these signs because no danger to public health or safety is implicated. The fact that a governmental unit, no longer needing to enforce its regulations, wishes to still proceed with collection of pecuniary penalties – even under a remedial statute – does not make such a desire "police power." Rather, it makes that governmental unit a "creditor" and, in regard specifically to the City, a creditor who is not the slightest bit interested in collecting on its debt.

Trying to stack the deck on this issue, the City also takes the position that, "subject to confirmation" the Court should assume – without any adjudication regarding a number of signs – that they are unlawful, because it says so. (Ironically, in this instance the City has no problem asking the Court to adjudicate such matters.) The Debtor, not surprisingly, is ready and able to

dispute any Notice of Violation ("NOV") pertaining to these signs once the City is finished with its "confirmation" procedure. In fact, the Debtor consents to relief from the stay in order to adjudicate the legality of these pursuant to NYC Administrative Code § 28-503.3, i.e., by a hearing before OATH. As demonstrated below, the City fails to meet the legal standard either for a declaratory judgment that the automatic stay does not apply, or that under these facts it is entitled to discretionary relief from the stay.

## ARGUMENT

**I.a. The police power exception does not apply where, as here, the debtor cannot resume the challenged conduct.**

Buried as a footnote on page 10 of the City's motion is a citation to FTC v. Consumer Health Benefits Ass'n, No. 10-CV-3551, 2011 U.S. Dist. LEXIS 61305 (E.D.N.Y. June 8, 2011), included in the City's papers in support of the suspect premise that any opposition by the Debtor's to the City's motion "could be considered frivolous." In fact, Consumer Health presents a particularly apt recitation of the principle, set forth in In re Enron Corp., 314 B.R. 524 (2d Cir. 2004), that while the government's exercise of its police power is, generally, exempt from the automatic stay, this exception is narrowly tailored to actions designed and practically able to effectuate a remedial purpose. It also demonstrates why the stay should not be lifted to allow the City to proceed unfettered against OTR in a manner meant not to protect the public welfare, but to assure the failure of this reorganization.

In Consumer Health, the FTC sought a permanent injunction to stop the debtor's fraudulent marketing and management of medical discount plans, rescission or reformation of contracts to protect harmed consumers, and an order of restitution. The FTC argued that its action was exempt from the automatic stay because the injunctive relief it sought was in direct

4

furtherance of the government's police and regulatory power. In weighing the FTC's argument against the general presumption that all actions against a debtor are stayed pursuant to 11 U.S.C. § 362, the court considered various tests other circuits use to determine whether a particular action falls within the scope of the 362(b)(4) exception, concluding that in the Second Circuit a government lawsuit to prevent or stop the violation of consumer protection laws or to fix damages for violation of such a law is exempt from the automatic stay – except where, as here, the facts demonstrated that the defendants could not resume the challenged conduct, which vitiates the rationale underlying the police power exception.

Relying on In re Enron Corp., 314 B.R. 524 (Bankr. S.D.N.Y. 2004) as a statement of the applicable standard, the Eastern District in Consumer Health noted that the Southern District Bankruptcy Court stayed a fraud lawsuit by the State of California against debtor Enron because, inter alia, Enron had sold its trading operations, making it "practically impossible" for Enron to resume the challenged activity. Id. at 537. The Court explained that not every legal action taken by a government body justifies the exceptional invocation of the police power exemption, even when, as in Enron and as here, the proposed proceedings are based on a remedial statute, focusing on the following language from the legislative history of § 362(b):

> In adopting section 362(b)(4), the police power exception to the automatic stay, Congress explained that "where a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws, or attempting to fix damages for violation of such law, the action or proceeding is not stayed under the automatic stay."

Id. at 534 (emphasis in original). Thus if the facts suggest that, as an enforcement matter, the government's claim is, as here, "all about the money," the stay will not be disturbed. In Enron, the Second Circuit had no difficulty making that determination:

> The request for injunctive relief, under the circumstances presented, is an attempt to portray the California Complaint as a police and regulatory action when it is in fact solely brought in furtherance of the State of California's pecuniary interest. . .

5

> The remaining relief that the State of California seeks is money damages in restitution, disgorgement, civil penalties, and money damages. When the primary purpose of a government lawsuit is to seek money damages or other monetary relief for past conduct, and not to prevent future conduct that could harm the public health or safety, the courts hold that the police power exception to the automatic stay does not apply.

Id. at 537-38, citing U.S. v. Seitles, 106 B.R. 36, 39 (S.D.N.Y.1989), vacated on other grounds 742 F. Supp. 1275 (S.D.N.Y.1990).

Applying these principles in Consumer Health, the Court found that, unlike in Enron, the individual defendants might, absent injunctive relief, be able to resume the sale and marketing of medical discount plans, and ruled that an action seeking injunctive relief and restitution was the appropriate ground for relief from the automatic stay. Moreover, the court noted that the FTC's action was not **solely** an effort to fix damages because the FTC also sought to rescind or reform consumers' contractual obligations to the defendants and an injunction to prevent the defendants from violating the FTC Act in the future.

In contrast to Consumer Health, the facts here echo those in Enron. The Horan Declaration states that "pending before ECB are at least 119 NOVs issued to OTR for sign violations in connection with 18 locations that DOB believes were, at the time of issuance, controlled by OTR." See Horan Declaration at ¶ 5. The spreadsheet provided by the City, titled "OTR and Property Owner Vios [*sic*] 10/4/2011" similarly lists 18 signs against which the City seeks to enforce more than 200 violations totaling over $2,000,000 in penalties. But in fact, out of these 18 locations, the Debtor is currently operating signs at **five**, as set forth in the accompanying affirmation of Ariel Holzer (the "Holzer Affirmation"). Stated another way, 13 of the 18 locations cited in the Horan Declaration as being "unlawful" pertain to signs that were removed long ago, at locations for which the Debtor no longer has valid leases – a fact of which

6

the City has long been aware, as set forth in the Holzer Affirmation.[1]

Based on the record, clearly the City's 13 sign locations for which there are ongoing ECB proceedings fall under the Enron exception: the automatic stay may be lifted to allow a government unit to effectuate the police power, but only "where a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws." Like Enron that no longer operated its business and was therefore entitled to a stay of a government litigation claim seeking pecuniary relief, the Debtor here has no legal or other power to violate the outdoor advertising regulations at these 13 locations, and the City's desire to nonetheless proceed against OTR in ECB proceedings is – as further demonstrated by the point below regarding the City's choice of proposed forum – unrelated to public safety and welfare.

Finally, unlike in Consumer Health, where the FTC's action sought multiple forms of relief, including restitution to innocent consumers and an injunction against restarting the fraudulent business under a new name, here the vast majority of the City's proceedings against OTR are **solely** for the purpose of fixing the amount of damages, as, again, the Debtor is no longer operating 13 of these 18 signs.[2] Indeed, as the Enron court explained, even if the City's proposed ECB action could be characterized, somehow, as being in furtherance of its police powers (e.g., on the basis of its "deterrent" effect), such an attenuated policy goal does not justify

---

[1] The City's awareness of this fact, along with not only its failure to disclose it in its moving papers but to premise an entire motion on this misrepresentation, makes its menacing citation to the "frivolous" language in Consumer Health particularly ironic.

[2] Of the five remaining active signs referred to in the Horan Declaration at ¶ 5, the ECB proceedings for 838 Sixth Avenue have already been stayed by the New York State Supreme Court while the Appellate Division decides on a motion by OTR and the property owner to dismiss all violations on the ground that OTR's permit for this location is valid. ECB has already made a judgment on 430 West 33rd Street. OTR agrees to modify the sign to a conforming size, but there is no other obligation which can or would be obtained by the City if stay relief were granted, and none is cited in the City's motion. See Holzer Affirmation. As to the three remaining active signs on the City's chart, those at 330 Bruckner Boulevard, 460 West 41st Street, and 945 Zerega Avenue, the Debtor does not object to proceeding with ECB hearings on the condition that the Commissioner of the Environmental Control Board provide financial hardship waivers, thereby eliminating the need for OTR to bond or pay the amount of any violation into ECB before instigating an appeal. Id.

lifting the automatic stay. "[E]ven if a government action is a proper exercise of the police power, the collection of a money judgment is barred by the stay and can only occur (if at all) in the bankruptcy court in connection with the debtor's distribution of estate assets to creditors." Id. at 534, citing City of New York v. Exxon Corp., 932 F.2d 1020, 1024 (2d Cir.1991).

**I.b. The City's ECB proceedings seek nothing more than pecuniary fines against the Debtor in a forum structured to prevent the Debtor's right to appeal.**

As set out in detail in the Holzer Affirmation, there are two alternative enforcement methods available to the City's Department of Buildings ("DOB") if it believes that an installed outdoor advertising sign may be unlawful under an applicable provision of the City's Administrative Code, Zoning Resolution, or another local law (collectively, the "Sign Laws"). The most direct procedure for enforcement of the Sign Laws to abate an alleged violation is for the DOB to file a petition in New York City's Office of Administrative Trials and Hearings ("OATH"), seeking adjudication of an alleged violation of the Sign Laws and an order authorizing the City to remove the sign. An OATH proceeding, in fact, is the only proceeding which can authorize the City to remove an offending sign. The second enforcement method, and the one the City seeks relief from the automatic stay to utilize here, involves issuing a Notice of Violation ("NOV") – much like a parking or moving violation issued to a motorist – to be adjudicated by the Environmental Control Board ("ECB"). In contrast to the OATH statute, the City's sole remedy under the ECB statute is pecuniary – the ECB statute does not empower the ECB to authorize the City to remove an offending sign.

It must be emphasized that under this scheme, if the City wants to solve a problem with a sign, its only direct route to abatement is via OATH. In contrast, fines and penalties imposed pursuant to the ECB statute may or may not result in abatement of the alleged violation and

removal of the alleged threat to the public good, and may or may not result in any such abatement occurring promptly. The City may proceed via both routes simultaneously, but, tellingly, it has not even mentioned OATH in its motion. This is because the City's sole purpose is, through the imposition of ECB fines and penalties, to force the Debtor into liquidation. The signs, and the "police power," are besides the point.

How the City's plan of putting the Debtor out of business would happen if the City's motion were granted is discussed in greater detail below. As explained there, one result of proceeding in ECB would be to deprive the Debtor of any ability to adjudicate appeals of the new ECB fines. Another is that proceeding via ECB and "piling on" more fines would minimize the recovery of all creditors (including the City itself) from the bankruptcy estate while also effectuating a preference in favor of the City as a creditor, allowing it to increase the amount of indebtedness owed to it while other creditors' claims are stayed. But one effect the City <u>cannot</u> claim is that by proceeding via the ECB, rather than through the OATH process, it is undertaking the fastest and most direct route to the abatement of violations – i.e., the application of its police powers. Rather, it is transparently obvious that the City's goal is not abatement of violations but destruction of the Debtor by draining the estate through ECB fines and penalties, even in connection with properties the Debtor no longer controls or has the right to erect a sign.

The City also has more prosaic and expedient motives in bypassing the OATH statute, (which would authorize sign removal) and seeking financial redress alone under the ECB statute. The ECB statute provides for the wholesale disposal of any challenge to an ECB ruling by forcing OACs such as the Debtor to immediately pay the fine imposed (or post a bond) or else forfeit all further right to appeal. The City has discretion under a "hardship" provision to stay such payments, but while indigents in general need not apply, this Debtor has no chance

9

whatsoever of receiving a hardship stay. (Indeed, following this Chapter 11 filing, the City immediately denied a raft of applications for hardship stays on pending violations.[3])

Thus if the City were granted the relief it seeks, the Debtor would be deprived of any ability to appeal ECB's rulings – which, based on past history and as set out in more detail in the Holzer Affirmation, are certain to affirm the violations. These determinations would be docketed as final judgments immediately and simply added to the City's claim as a creditor, while other creditors' ability to add to their claims remain stayed. That is why, as to the three remaining signs eligible for new adjudication via OATH, the Debtor is willing to stipulate to stay relief conditioned on enabling the Debtor to afford its day in court – but not to be thrown to the ECB, assured of a negative outcome and deprived by operation of law of any review.

The Court should be aware of the full procedural landscape regarding appellate review of outdoor advertising violations, which is relevant to the pending application. As briefly mentioned above, the Department of Buildings may issue both NOVs pursuant to the ECB statute and a Petition pursuant to the OATH statute. For years it in fact did so. For example, NOVs and a Petition for removal were issued for the properties known as 174 Broadway, New York, 59 Fourth Avenue, New York and 838 6th Avenue, New York. This raises the obvious question of why the City would not take a "belts and suspenders" approach and always do so, and why it has not asked for permission to proceed both via the ECB and OATH routes to effectuate its police powers here.

The answer is that the City has found it far more expedient to rely solely on the ECB than the risk the eventual outcome of the OATH process – notwithstanding that, as in the ECB, the City seldom loses in OATH. That is because the rulings in OATH actions seeking sign removal

---

[3] Notably, the City chose to proceed with these ECB proceedings although a proceeding for automatic stay relief such as that requested by this motion had not been brought before this Court for adjudication. See also Holzer Affirmation at ¶¶ 24 through 26.

10

are, unlike the determinations of the ECB, eligible for immediate, direct appeals to the New York State Supreme Court via Article 78 proceedings. The City's policy now is to avoid any exposure to substantive appeals in neutral forums, however, because sometimes things do not go its way there.

This is exactly what happened following the grant of an order in OATH for the removal of the sign at 838 Sixth Avenue, in connection with which OTR immediately filed an Article 78 proceeding. (This is one of the City's "18 locations.") Disagreeing with the determinations of both DOB and the OATH Administrative Law Judge, Justice Walter B. Tolub found that "petitioners have presented a compelling argument supporting their claim that they will very likely succeed on the merits." Matter of Yung Bros. Real Estate Co. Inc. v Limandri, 26 Misc.3d 1203 (N.Y. Cty. Sup. Ct. 2009). Justice Tolub's decision stayed further enforcement action until a formal decision could be rendered by the Appellate Division in accordance with CPLR 7804. This decision on the merits by a judge not directly employed by the same agency issuing the violations caused the cessation of all further enforcement actions at that location.

Since the decision in Yung Bros., the City has not once brought a petition seeking an order authorizing the removal of an offending sign under the OATH Statute. It may fairly be inferred that the City does not seek the risk of independent judicial review of the relatively friendly ECB and OATH tribunals. The City now solely proceeds under the ECB statute for ECB's exclusive remedy of pecuniary fines.

The City's strategy, therefore, is comprehensive:

- It is already preventing the Debtor from obtaining rulings vindicating its legal positions regarding the City's wholesale misapplication of the Sign Laws by avoiding OATH, with its shorter path to an Article 78 appeal. It seeks permission to do more of the same here.

11

- Meanwhile, the City seeks to force the Debtor into the City-friendly ECB process which, under Section 3-73, is designed to eliminate any opportunity for appeal by a bankrupt entity.
- This in turn would enable the City to take the position that the Debtor has no meritorious defenses with respect to pending violations – one premise, in this case a self-fulfilling prophecy, of its argument that the Debtor cannot reorganize successfully.
- The City's strategy also would effectuate the City's goal of adding to the Debtor's indebtedness to the City and, axiomatically, making a successful reorganization less likely.
- At the same time, the City would be granted a preference with respect to its financial claims, while the claims of all other creditors remain stayed, despite the absence of any public welfare rationale or improvement in the safety or well-being of the City's citizens.

As a litigation strategy, and a policy for the focused elimination of a lawful business by the use of government power, the foregoing is a fairly airtight plan, if the Court were to permit it. One thing the City's approach would not do, however, is represent a rational, efficient or speedy exercise of the City's police powers such that relief from the automatic stay is justified under the controlling law.

At the end of the day, because 13 out of the 18 signs for which the City seeks solely to set penalties are no longer operating, the City cannot legitimately argue that its request for a stay is based on anything but a pecuniary interest with respect to these signs. Accordingly, pursuant to criteria set out by the Second Circuit decision in Enron, these ECB violation proceedings are properly subject to the automatic stay, and the City's motion for a declaratory judgment to the contrary should be denied.

## II. Once this Court determines that the police powers exception is inapplicable as to the 13 locations at which OTR cannot operate, the Court should deny the City's request for discretionary relief from the stay

It is within the sound discretion of the bankruptcy court to determine whether to grant relief from the automatic stay to allow litigation to continue in another forum. In re Sonnax Industries, Inc., 907 F.2d 1280 (2d Cir. 1990). If the movant fails to make an initial showing of cause, however, a court should deny relief without requiring any showing from the debtor that it is entitled to continued protection. Id.

The Second Circuit in Sonnax adopted the dozen factors set forth in In re Curtis, 40 B.R. 795 (Bankr. D. Utah 1984) in its analysis on whether to lift the stay (otherwise known as the "Curtis factors" or the "Sonnax factors"). In Sonnax, the debtor filed its Chapter 11 petition after failing to obtain relief in state court from an injunction prohibiting it from soliciting business from, or conducting business with, a competitor's customers. The competitor moved in the bankruptcy court to lift the stay to allow it to continue prosecution of its litigation in state court and to enforce the injunction. Of the twelve Curtis factors, the Sonnax court cited four as relevant to the case before it: (1) whether the New York proceeding was connected to or might interfere with the bankruptcy case; (2) whether the bankruptcy petition was filed in bad faith; (3) the balance of harms; and (4) the interests of judicial economy and the expeditious and economical resolution of litigation.

The City has not carried its burden of showing a public safety and welfare need to proceed with the ECB hearings. Under the Enron exception described above in point I.a., the literal impossibility of the Debtor again violating City regulations at 13 of the 18 locations cited by the City precludes the City's argument that its police power exempts it from the automatic

stay with respect to those 13 locations. As to the other five locations, the Debtor's willingness to stipulate to an OATH proceeding – with the concomitant possibility of being ordered to abate the violations – for those locations where it still operates signs demonstrates that the Debtor is not taking the position that the City has no interest in enforcing its regulatory scheme. On these grounds, the City is not entitled to discretionary relief from the stay.

The City argues that the existence of a specialized tribunal to decide advertising violations should persuade this Court to lift the stay, but applying the Sonnax factors requires a contrary result. With regard to factor (1), whether the stayed proceeding was connected to or might interfere with the bankruptcy case, the Sonnax court found the state court proceedings were so inextricably intertwined with the bankruptcy issues, as the state court proceeding barred the debtor from doing business, that the outcome "may have a drastic impact" on the reorganization. Clearly, the violations before the ECB are similarly tied to the Debtor's ability to emerge from bankruptcy.

Considering factor (2), the question of bad faith in filing the bankruptcy petition, the Sonnax court held that the competitor failed to show bad faith. Notwithstanding its already tiresome accusations, the City has not demonstrated and cannot demonstrate bad faith as grounds for lifting the stay.

Weighing factor (3), the balance of harms, the Sonnax court found that this consideration mitigated against lifting the stay because to do so might doom the debtor's attempts to reorganize. The Court here need not rely on a record rich with implication that the City is engaged in a selective campaign to drive the Debtor out of business; it is self-evident that the stay here is the only thing preventing that, considering that the City's use of the ECB process as a club to force the submission of both the Debtor and its indemnitees has brought matters to this

point.  In contrast, as demonstrated above, no harm to the City's enforcement efforts can plausibly be claimed by the City, which has itself eschewed the most direct route to enforcement of the sign laws via OATH.  The balance of harms therefore weighs in favor of the Debtor.

Finally, factor (4), as in <u>Sonnax</u> the interests of judicial economy and the speedy and economical determination of litigation support a denial of relief from the stay.  The record is clear that ECB proceedings are but a rubber stamp allowing the City to collect massive fines and penalties, and are but the first step in a labyrinth of administrative appeals which have at their end nothing but the docketing of money judgments for fines, penalties and interest against a debtor already seeking the protection of the bankruptcy laws.  In contrast, these proceedings promise to provide a single, expeditious forum for resolution of many disputed issues between the Debtor and the City, while assuring other creditors that their interests will not be prejudiced.

                          GOETZ FITZPATRICK LLP

                          By: _____/s/_____
                               Gary M. Kushner

                          Ronald D. Coleman
                          Scott D. Simon
                          One Pennsylvania Plaza, 44th Floor
                          New York, NY 10119
                          Tel: (212) 695-8100
                          gkushner@goetzfitz.com
                          rcoleman@goetzfitz.com
                          ssimon@goetzfitz.com
                          *Attorneys for Debtor*

Dated:  New York, New York
        November 21, 2011