Gary M. Kushner                                    **Hearing Date:**
Scott D. Simon                                     **May 6, 2014 at 9:30 a.m.**
GOETZ FITZPATRICK LLP
One Penn Plaza
New York, New York 10119
gkushner@goetzfitz.com
ssimon@goetzfitz.com
*Former Attorneys for Debtor*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
In re:                                             Chapter 11

OTR MEDIA GROUP INC.,                              Case No. 1-11-47385 (ESS)

                        Debtor.
-----------------------------------------------------------X
OTR MEDIA GROUP, INC.,
203 17th REALTY LLC, SAKELE BROTHERS, LLC,
ONE MAIDEN LANE REALTY, LLC,
848 FULTON REALTY CORP., MING SHENG INC.,
GOTHAM BROAD, LLC, FOTINI THEOHARIDU,
and PHILLIPE JOCELINE,                             Adv. Pro. No. 11-01448 (ESS)

                        Plaintiffs,

        -against-

THE CITY OF NEW YORK,

                        Defendant.
------------------------------------------------------------------X

## DECLARATION OF GARY M. KUSHNER
## ON BEHALF OF GOETZ FITZPATRICK LLP
## IN OPPOSITION TO MOTION OF EDWARD ARRIGONI

        GARY M. KUSHNER declares, pursuant to 28 U.S.C. §1746 and subject to the penalty

of perjury, that the following statements are true and correct:

**Preliminary Statement**

1.      Before the Court is an application that seeks almost $29,000 for attorneys' fees incurred in connection with a simple, *pro forma*, motion to quash a subpoena.

2.      The demand is not merely exorbitant and excessive, but altogether unwarranted because it is predicated on the entirely false premise that service of the subpoena was made for an improper purpose.

3.      As set forth in complete detail below, the purpose of the subpoena was justified and my firm acted in good faith to attempt to obtain an amicable resolution of the issues that arose after Mr. Arrigoni objected to being served with the subpoena.

4.      The amount of sanctions sought in the Motion, although entirely unwarranted, also bears no reasonable relationship to the task at hand.

5.      First, of the nearly $29,000 in legal fees Mr. Arrigoni seeks to recover in connection with the motion to quash, approximately $12,500 comes from Mr. Arrigoni's general counsel – Edward Saviano – who, upon information and belief, does not engage in the practice of either litigation or bankruptcy law. It is for that reason that Mr. Saviano apparently called upon the services of Donald Watnick to represent Mr. Arrigoni's interests in the Debtor's chapter 11 case.

6.      Given Mr. Saviano's apparent need for only limited involvement and that he lacked experience on this issue, there can be no justification for Mr. Arrigoni seeking recovery of Mr. Saviano's time, where almost the entirety of his services are seemingly duplicative of Mr. Watnick's.

7.      Second, the approximately $16,500 in legal fees that Mr. Watnick expended in connection with the motion to quash is simply astounding. By all accounts, Mr. Watnick is an extremely experienced attorney whose primary expertise and practice is, and has been, focused

on litigation and bankruptcy matters. At one point in his distinguished career, Mr. Watnick was in-house general counsel for a large public corporation and served in a supervisory role over all litigation matters involving his employer. It is unimaginable that the simple task of preparing a motion that was neither factually intensive nor involved complex issues of law, and attending a simple hearing in connection with these rather *pro forma* issues, would require $16,500 worth of Mr. Watnick's time, or anything near it.

8.      Third, the demand for an award of almost $29,000 in legal fees is outrageous, as much of the time devoted by Mr. Watnick was needlessly created by his own actions.

9.      The documentary evidence will show that most of the work associated with the motion to quash was actually completed weeks before it was actually filed – during the time Mr. Watnick was engaged in conversations with Scott D. Simon of my office, who was attempting, in good faith, to address Mr. Arrigoni's objection to attending a deposition.

10.     Stated another way, Mr. Watnick had already made up his mind to file the motion to quash and he had no intention of trying to reach an amicable settlement – charting the path to where we are now, where Mr. Watnick is seeking a windfall for work that was largely unnecessary.

11.     On no fewer than three (3) occasions – one verbal and two others in writing – Mr. Watnick was asked (at a very early stage of these proceedings) to produce his time logs so that I could attempt to procure an offer from the Debtor to reimburse Mr. Arrigoni for his costs and resolve this matter in its infancy. True copies of my firm's written demands to Mr. Watnick are annexed hereto collectively as Exhibit "1."[1]

12.     On each occasion, Mr. Watnick steadfastly refused to provide his time records,

---

[1] By no means should my attempts to resolve these issues at the early stages be taken as an admission of any liability (by me, or my firm) to Mr. Arrigoni. Rather, it was the Court's wish for me to discuss the issues with Mr. Arrigoni's counsel and attempt to resolve them. I did the very best I could to follow the Court's instructions but could not resolve these issues given Mr. Watnick's refusal to cooperate.

even though I pointed out to him that he would be required to produce those records were he to go forward with the filing of a motion to recover his client's fees.[2]

13.     Fourth, Mr. Arrigoni's costs for legal representation was certainly exacerbated by the belated filing of the Motion itself.

14.     Mr. Watnick knew that the bankruptcy case was going to be dismissed, likely even before the motion to quash was filed, and had knowledge, as early as the hearings held on November 19, 2013, about the likelihood that the Adversary Proceeding would be dismissed as well.

15.     The Court provided Mr. Watnick with no fewer than three (3) opportunities, spanning more than three (3) months, to address the request for recovery of legal fees by way of proper written pleading **before** the Adversary Proceeding was actually dismissed. There is no explanation as to why he delayed the filing of the Motion until long after the Adversary Proceeding was dismissed, nor could there be.

16.     There is no legitimate dispute that a significant part of the memorandum of law in support of the Motion – belatedly before this Court – is dedicated exclusively to Mr. Arrigoni's request to either reopen the Adversary Proceeding or, alternatively, to advocate for the proposition that the Court has the inherent power to issue a sanctions award notwithstanding the closure of the case.

17.     Clearly, the extensive research and briefing on these points would have been entirely unnecessary if Mr. Watnick had been diligent all along by either originally requesting attorneys' fees in the motion to quash or by filing a motion at any time after the Court signaled that consideration of the request for attorneys' fees would be entertained by the Court only after

---

[2] Mr. Watnick's refusal to produce his time records was, on one occasion, expressed in an e-mail which, quite frankly, I am loathe to provide to the Court as it contains unnecessary and unprofessional ad hominem attacks on both me and my associate which bear no place in the practice of law, much less in this declaration in opposition.

the filing of a written demand.

18.     Thus, while Goetz Fitzpatrick LLP ("GFLLP") does not take material issue with the case law cited in the Motion with regard to whether the Adversary Proceeding can be reopened or whether the Court has the inherent authority to issue sanctions regardless, we nevertheless seriously question why these issues should be addressed at all under the circumstances. Certainly, Mr. Watnick should not be compensated for a penny of this work.

19.     When the Court distills all of the facts it should see that much of the Motion is based upon misstatements of facts, embellishments or innuendo which have been gratuitously integrated into Mr. Arrigoni's legal argument by his counsel.

20.     As set forth below, the purpose of requesting Mr. Arrigoni's simple testimony was unquestionably in aid of the Debtor's continuous battle with the City of New York (the "City") **in this proceeding** (not solely others) and was pursued with my firm's good intentions, as was our attempt to resolve Mr. Arrigoni's protest once it was made.

## Background Facts

21.     I am a partner with GFLLP, which was formerly chapter 11 counsel to OTR Media Group, Inc. ("OTR" or the "Debtor").

22.     In my role as Debtor's chapter 11 counsel, I attained personal knowledge of the facts set forth below.

23.     I submit this declaration in opposition to the motion of Edward Arrigoni, submitted through his counsel, Donald Watnick, dated February 6, 2014 (ECF No. 89, the "Motion"), which seeks to reopen the above-captioned adversary proceeding (the "Adversary Proceeding"), impose sanctions and compel the Debtor[3] and my firm to pay his attorney's fees.

24.     By way of brief background, I first became involved with the Debtor about four (4) or five (5) weeks prior to the actual filing date of the Debtor's chapter 11 petition (August 25, 2011, the "Petition Date").

25.     I was approached by the Debtor to attempt to resolve its dispute with the City, which had begun to aggressively enforce ECB violations that had become money judgments against the Debtor and several of its landlords.

26.     Specifically, the City had obtained a judgment against the Debtor's landlord at One Maiden Lane in Manhattan. The Debtor sought a meeting with the City, spurred by restraining notices served on the landlord's tenants, by which the City sought to collect rent payments which had become due from these tenants.

27.     As the Court may recall, the typical lease agreement(s) between the Debtor and its landlords required the Debtor to indemnify the landlords from and against, *inter alia*, ECB

---

[3] Although the Debtor and GFLLP are aligned and united in interest, GFLLP does not represent the Debtor for purposes of this Motion, nor has this firm represented the Debtor after the chapter 11 case was dismissed, except in attending a single workout conference with the City. It appears from the certificate of service on file for this Motion (Adv. Pro. ECF No. 94) that Mr. Watnick did not serve the Debtor. GFLLP did not agree, nor was it requested, to accept service of the Motion for the Debtor.

violations and any resulting penalty/judgment entered in favor of the City. The Debtor's involvement, as well as my initial involvement, was reasoned by way of the indemnification obligations of the Debtor under the lease.

28.     GFLLP was asked by the Debtor in late July 2011 to contact the City for the purpose of obtaining a global resolution for the Debtor, the landlord for One Maiden Lane, and several other landlords, to be embodied in a payment plan and forbearance agreement with the City.

29.     I personally, with my client and other members of my firm, attended a meeting held at the Law Department of the City of New York in early August 2011. Alan Kleinman and Brian Horan represented the City at the meeting. This was the first time I met Messrs. Kleinman and Horan. GFLLP had not previously had any dealings with the Law Department with respect to legal matters involving OTR.

30.     During the meeting, a meaningful settlement proposal was made to the City, fashioned in part on terms taken from similar settlement agreements between the City and the Debtor's competitors – made known to me by way of public filings (for example, in a competitor's bankruptcy case), or through other state court pleadings.

31.     The City flatly rejected the Debtor's offer early in the meeting and did not seem intent on making a counterproposal. I vividly remember Mr. Kleinman's words to me when I asked him to consider a forbearance agreement. Mr. Kleinman stated – and I quote – "There is no such word as 'forbearance' in the City's vocabulary when it comes to OTR!"

32.     From and after that initial meeting, the Debtor attempted to engage the City in settlement negotiations. However, it was clear that the City's interest in collecting money was secondary to its desire to destroy OTR's ability to operate. The City believed that OTR was the premier violator of the City's sign laws and should simply be put out of business.

33.     Following the meeting in early August, the City did not cease its efforts to enforce its judgments against the Debtor's landlords. Relying on several published decisions in this jurisdiction where courts had extended the automatic stay to non-debtor indemnitees such as the landlords, I suggested to OTR, as the option of last resort, that a chapter 11 filing appeared to be the only way to stop the City's enforcement efforts against the Debtor and its landlords.

34.     While the chapter 11 filing served to prevent the City from enforcing its judgments against the Debtor, the landlords were nevertheless pursued after the Petition Date despite my zealous efforts to convince the City that prevailing bankruptcy law prohibited the enforcement of a money judgment against the Debtor's landlords, as well.

35.     Hence, there was a compelling and urgent need for this Adversary Proceeding and the immediate filing of an emergency order to show cause in this Court for declaratory relief that the automatic stay applied to the indemnity landlords or, alternatively, for the imposition of separate injunctive relief preventing the City's enforcement activities against the landlords.

36.     Within days of filing its chapter 11 petition, the Debtor commenced the Adversary Proceeding and filed an order to show cause for the purpose of extending the automatic stay for the benefit of the Debtor's landlords, to whom the Debtor owed indemnification for purported violations of the City's zoning resolution and advertising regulations (the "Sign Laws").

37.     It appeared to both GFLLP and OTR when I filed the chapter 11 case that a significant component of the chapter 11 exit strategy was to litigate affirmative claims against the City. The City had steadfastly refused to discuss any possibility of an economic settlement during our meeting in early August, and there was nothing to deter it from destroying the chances of reorganizing absent the commencement of an action wherein the Debtor would assert its own affirmative claims.

38.     Despite our belief that litigation against the City would become necessary, the Debtor nevertheless intentionally omitted alleging any "Section 1983 Claims"[4] in the Adversary Proceeding complaint in order to avail itself of Rule 2004 discovery on that issue within the context of the main case.

39.     It was my partner's belief that in order to demonstrate sustainable Section 1983 Claims against the City, the firm needed concrete evidence of the City's misconduct *vis-à-vis* the Debtor's business and could not simply rely upon the Debtor's perceptions of wrongful conduct.

40.     The order to show cause filed in the Adversary Proceeding was settled by stipulation with the City on terms that were favorable to the Debtor and its landlords in that it temporarily prevented the City from judgment enforcement and the exercise of other rights and remedies arising under the Sign Laws.

41.     On December 21, 2011, the Debtor filed a motion pursuant to Bankruptcy Rule 2004 (ECF No. 72, the "Rule 2004 Application"), seeking to take discovery of the City on the basis that:

> The Debtor has reason to believe that the City's enforcement actions have been unlawfully selective, are part of a scheme that, contrary to law and conducted under color of governmental authority, wrongfully deprives the Debtor of its rights and property as well as that of those with whom the Debtor does business, and that the City's actions and policies are calculated solely to eliminate Debtor's lawful business.

See Rule 2004 Application at ¶ 5.

42.     During the hearings on the Debtor's Rule 2004 Application, which spanned several months, the Court repeatedly expressed concern with the Debtor's apparent chapter 11 strategy of litigating claims of disparate treatment by the City under the Sign Laws.

43.     For example, at a hearing held before the Court on January 23, 2012, Debtor's

---

[4] "Section 1983 Claims" refers to causes of action arising under 42 U.S.C. § 1983.

counsel advised the Court that the Debtor was specifically contemplating bringing a claim against the City for selective enforcement. The Court commented:

> I'm just not seeing here, and I'm also wondering is this any kind of a sensible way for this debtor to be engaging with the City of New York?
>
> ***
>
> I think I'm going to need more perhaps both on the law and the facts, and it's going to be your decision whether this is the time and whether it's worth the effort, but to go down this path in the management of this case.

See Transcript of January 23, 2012 hearing at p. 34:5-8; p. 36:10-15, a copy of which is annexed hereto as Exhibit "2."

44.     More than a year later, the Debtor again raised the possibility of litigating the Section 1983 Claims against the City as part of its strategy to exit from chapter 11, and again the Court made its position clear:

> I do want to note, and I've said this from time to time in this case, and it bears repeating. A business model founded on litigation with the City is not a business model that seems likely to me to lead to a successful reorganization of this enterprise, and moving this enterprise on to a different track has been perhaps the single most significant component of this reorganization effort. This case was filed back in 2011. So yes, professionals are important. Is litigation a business strategy? I hope not, but it's not for me to set the business strategy in a case.

See Transcript of March 12, 2013 hearing at p. 31:12-22, a copy of which is annexed hereto as Exhibit "3."

45.     Acknowledging the Court's wisdom and view of what might be a more effective reorganization strategy, the Debtor – **upon my specific advice** – did not immediately pursue an amendment of the Adversary Proceeding complaint to assert the Section 1983 Claims, instead allowing the Adversary Proceeding to lay fallow while the Debtor made every effort to productively work with the City towards an amicable resolution of the City's economic claims.

46.     At the onset, I point out that Mr. Arrigoni's claim that the subpoena was issued

"after OTR and the other major parties agreed to dismiss this case" (See Memorandum of Law in support of the Motion, ECF No. 90 [the "MOL"] at p. 14) is mistaken. Nor is it true that the Debtor wrote to the Court in February 2012 seeking an unqualified dismissal of the adversary proceeding, as Mr. Arrigoni suggests. See MOL at p. 6.

47.     The Debtor's "request to dismiss the adversary proceeding" was explicitly contingent upon the Court giving continuing effect to the so-ordered stipulation enjoining the City from collecting on judgments or otherwise enforcing the Sign Laws against the Debtor's landlords: "Thus, the Adversary Proceeding should be dismissed **with the Stipulation remaining in full force and effect**." See February 21, 2012 letter from Debtor's counsel to the Court (Adv. Pro. ECF No. 41) at p. 4 (emphasis added), a copy of which is annexed hereto as Exhibit "4."

48.     These key words express an absolute condition for dismissal of the Adversary Proceeding that is lost in Mr. Watnick's analysis.

49.     On March 29, 2012, the Court issued an Order to Show Cause why the Adversary Proceeding should not be dismissed (Adv. Pro. ECF No. 44, the "Order to Show Cause").

50.     The Debtor's response to the Order to Show Cause specifically provided that if the Court determined that the so-ordered stipulation was no longer in effect, "the Debtor-Plaintiff would seek to litigate this adversary proceeding to final judgment." See Debtor's Submission in Response to Order to Show Cause, Adv. Pro. ECF No. 46, a copy of which is annexed hereto as Exhibit "5."

51.     Although the particulars of the stipulated injunction were eventually stripped away by decision of the Court, the Adversary Proceeding nevertheless remained active and viable.

52.     On May 18, 2012, the Office of the United States Trustee (the "UST") filed a

motion to convert or dismiss the Debtor's case (ECF No. 154, the "Motion to Convert"). Unsurprisingly, the City joined the UST in vigorously pursuing the Motion to Convert. In so doing, the City became the loudest voice in favor of conversion, as conversion would achieve its objective of putting the Debtor out of business.

53.     Following extensive negotiation between the UST, the City, the Debtor and the Debtor's largest secured creditor, Metropolitan National Bank (the "Bank"), the parties submitted, and on July 19, 2012, the Court so-ordered, a consent order conditionally granting the Motion to Convert (ECF No. 214, the "Consent Order"), but allowing OTR to continue operations under certain narrowly tailored conditions.

54.     The parties to the Consent Order agreed that the Motion to Convert would be adjourned indefinitely, provided that the Debtor follow a structured protocol designed primarily by the City, which required the Debtor to immediately remove certain signs and to hire Phyllis Arnold, Esq., a well-respected former Deputy Commissioner and General Counsel of the New York City Department of Buildings ("DOB"), to facilitate a massive review of the Debtor's sign inventory.

55.     Ms. Arnold agreed to opine on the viability of the Debtor's signs and, thereafter, to work with the Debtor to take down signs that she, in her sole discretion, determined were not capable of legalization given documentation the Debtor had compiled to date.

56.     The parties to the Consent Order further agreed to rely on Ms. Arnold's sole and absolute discretion with respect to the viability of the Debtor's sign inventory, and the Court endorsed this resolution by entry of the Consent Order.

57.     The process implemented under the Consent Order was intended to give the Debtor flexibility to submit proof, while ensuring (solely as a concession to the City) that certain signs were taken down immediately until Ms. Arnold determined that such proof was sufficient

to make the signs viable via the process established under the City's Administrative Code.

58.     The hiring of Ms. Arnold was also purposely designed to open up channels of communication with the City *vis-à-vis* the resolution of the City's economic claims, which were manifested in existing ECB judgments and other penalties that would soon become judgments.

59.     There was every expectation that Ms. Arnold's longstanding reputation with DOB, its senior management, and professionals would provide the Debtor with the most meaningful way to attempt to resolve the City's filed claims through a structured payout – a result that neither the Debtor, nor the Debtor's other professionals, could seemingly accomplish to date.

60.     The Debtor made every effort to comply with the Consent Order by filing applications with DOB to legalize its signs and taking down those signs that Ms. Arnold determined were not viable.

61.     But early in the process contemplated by the Consent Order, it became clear to the Debtor (and, eventually, Ms. Arnold) that the City violated the Consent Order's spirit, if not its precise language, by aggressively revoking the Debtor's preexisting permits (which had been determined to be valid – in some cases over 20 years ago) and adjudicating new violations returnable before the ECB **relating to signs then controlled by the Consent Order**.

62.     The City's sudden revocations and new violations required the Debtor to perform additional work which was wholly duplicative of the filings the Debtor had made at DOB as required under the Consent Order, because the proof the Debtor was assembling pursuant to the Consent Order to establish the lawfulness of its signs through its filings was identical to the proof required to contest the City's permit revocations and new violations.

63.     Ms. Arnold encouraged this Court, in a declaration filed on December 7, 2012, to re-institute the automatic stay to the extent of staying DOB from prosecuting zoning and related

violations in the face of the Debtor's ongoing submission of applications. <u>See</u> ECF No. 296 (the "Arnold Declaration"), a copy of which is annexed hereto as Exhibit "6."

64. The Arnold Declaration described how the essential issue and supporting evidence in the Debtor's filings, on the one hand, and the City's enforcement proceedings, on the other, was the same. Ms. Arnold explained that addressing the same issue in three different venues – the Debtor's affirmative filings, the permit revocation proceedings, and the ECB adjudications – created the risk of inconsistent administrative determinations and depleted the Debtor's assets of funds required to operate its business.

65. Ms. Arnold also noted that the City was forcing the Debtor to pay its retained professionals to appear and make the same case with the same evidence multiple times.

66. Evident in the Arnold Declaration – and even more so in private conversations Ms. Arnold had with Ari Noe (the Debtor's principal) and members of my firm – is that her longstanding relationship with the City, which literally spanned decades, had severely and rapidly eroded by virtue of becoming involved with the Debtor.

67. Ms. Arnold expressed to me, more than once, her fervent belief that the City was discriminating against OTR, which had come out on the short end of two (2) sets of rules developed by the City – one for larger outdoor sign companies and another for OTR.

68. Suffice to say, Ms. Arnold had formed the opinion that the City's actions were consistent with what the Debtor believed was disparate treatment, potentially actionable under federal law.

69. Following the Court's denial of the Debtor's motion to reinstitute the automatic stay to prevent the City's aggressive and duplicative enforcement efforts, the City continued to issue new violations and permit revocations while the Debtor's registrations and permit applications were pending.

70.     At the same time, the Debtor's efforts to provide evidence of legality to DOB through informal meetings – a practice the City extended to all outdoor advertising companies – was being stymied by DOB. The Debtor's filing representatives were turned away from submitting further information about pending permit applications.

71.     DOB's Special Enforcement Team (headed by Edward Fortier) intercepted OTR's applications, even auditing and revoking the Debtor's permit for 330 Bruckner while the Debtor's application was before DOB – begging the question of why Edward Fortier, a high level official of the City – was involved in this process at all.

72.     The City's runaround was extended to numerous locations including 330 Bruckner, as a May 20, 2013 email from Ms. Arnold to the Debtor described. A copy of this email is annexed hereto as Exhibit "7."

73.     The June 14, 2013 email from Ms. Arnold to Mr. Fortier cited the City for *twice* intercepting the Debtor's application on a different sign. Ms Arnold wrote: "The delays are simply intolerable and are going to kill this company." A copy of this email is annexed hereto as Exhibit "8." It was at this time that the Debtor asked GFLLP to seriously consider an amendment to the Adversary Proceeding complaint, remove the action to Federal District Court, and prosecute the Section 1983 Claims, as was originally the plan when the chapter 11 case was filed.

74.     Knowing that the Section 1983 Claims required evidence not simply of the City's ultra-aggressive enforcement against OTR but of leniency toward similarly-situated outdoor advertising companies, the Debtor requested the City's enforcement records pursuant to the Freedom of Information Law ("FOIL"), knowing that Rule 2004 discovery was not going to be granted by this Court.

75.     Literally thousands of documents were acquired by the Debtor, including those

produced in response to the FOIL demand.

76.     After an extensive review of these materials by many of the Debtor's expediters, professionals, and Ms. Arnold, the Debtor found evidence that DOB maintained a widespread use of relatively relaxed enforcement standards – except as compared to those applied to OTR.

77.     In other instances applied to the Debtor's competitors where DOB actually found violations of the Sign Laws, the City did not aggressively pursue permit revocations. And where close questions of a sign's legality came into play, DOB routinely found for the outdoor advertising company – except whenever an OTR sign was at issue.

78.     The Court should also be aware that during this time, the Debtor was engaged in defending a notice of non-compliance with the Consent Order first cited by the City, and then separately by the UST, and simultaneously attempting to move forward with confirmation of its amended plan of reorganization.

79.     As the summer of 2013 wore on, the City's refusal to negotiate its economic claims for purposes of a chapter 11 plan and the City's new violations heaped onto pending and adjudicated ones put any revenue projections supporting the plan from the Debtor's signs in question. This made confirmation of a plan impossible, and I knew the Debtor would not survive chapter 11 if the plan process went forward. Simply put, the Debtor had major feasibility issues and the City knew it.

80.     What is more, the Debtor was also vulnerable to a conversion of the chapter 11 case, as evidence of the Debtor's default under the Consent Order began to surface.

81.     Consequently, I contacted the UST and the Bank at the end of August 2013 in an attempt to strategically align them with the Debtor's forthcoming request to dismiss the chapter 11 case instead of convert it. The purpose, of course, in bringing the UST and the Bank on board with dismissal was to overcome expected resistance from the City, whose objective was to

convert the case and destroy the Debtor's potential to operate.

82.     After much discussion with the UST and the Bank, I was able to make the case with them that the interests of creditors would be best served by a dismissal of the chapter 11 case. But the very real problem of dealing with the City and its enforcement rights was yet another problem to be dealt with on the horizon, as a dismissal of the chapter 11 case would take with it the breathing spell offered by the automatic stay in regard to the soon-to-be-resumed efforts of the City to enforce its money judgments immediately following dismissal of the chapter 11 case.

83.     The Debtor therefore began planning for a near future when it would be naked against the City's enforcement efforts, knowing full well that the need for an injunction against the City – through a resumption of the Section 1983 Claims litigation on hiatus during the pendency of the chapter 11 case – would now become urgent.

84.     It took merely three (3) weeks between a hearing on September 3, 2013 and a hearing on September 20, 2013 to come to a global agreement with the UST, the City, the Bank and the Debtor on the terms of dismissal of the chapter 11 case.

85.     During this time period, more than one effort was made by me to reach an agreement with the City on its economic claims so that the Debtor would be given forbearance from the exercise of the City's judgment enforcement rights, provided that the Debtor made payments to the City over a negotiated term.

86.     The City would have none of it, acting no different than it acted in August 2011, prior to the filing of the chapter 11 petition.

87.     Thus, the major problem at hand was to figure out how to stop the City from destroying the Debtor's business after dismissal of the chapter 11 case. The only apparent way to accomplish that injunction was through the pending Adversary Proceeding.

88. The Debtor was advised by my office that, procedurally, the Adversary Proceeding could either remain active in the Bankruptcy Court despite dismissal of the chapter 11 case or, alternatively, could be removed to the District Court once the chapter 11 case was dismissed.

89. During this time period (early September 2013), I was in daily contact with Ariel Holzer, an attorney who was retained by the Debtor as general counsel during the chapter 11 case. Mr. Holzer has made a career of engaging with the City's Sign Laws for the Debtor and other outdoor sign companies, and I considered him to be knowledgeable about this aspect of the Debtor's business.

90. There were also numerous conferences with Mr. Noe, Mr. Holzer, Ms. Arnold and lawyers from GFLLP to discuss and plan for the day when the chapter 11 case was dismissed.

91. Knowing that the City had to be enjoined from enforcing judgments once the dismissal order was entered, the focus was to gather sufficient and compelling facts which could support the Debtor's filing of an order to show cause which sought injunctive relief.

92. Mr. Holzer advised GFLLP that the City's conduct *vis-à-vis* 330 Bruckner Boulevard was, in his opinion, the poster child case to advance the Debtor's arguments.

93. The Court is surely aware that the Debtor's motion to dismiss the chapter 11 case (ECF No. 547) was intentionally silent on the disposition of the Adversary Proceeding. Moreover, none of the parties at the September 20, 2013 hearing – at which counsel for the UST first advised the Court that the parties agreed the chapter 11 case should be dismissed with prejudice – discussed disposing of the Adversary Proceeding. See Transcript of September 20, 2013 hearing, a copy of which is annexed hereto as Exhibit "9."

94. The Debtor intended to file an emergency Order to Show Cause once the

Adversary Proceeding was transferred, seeking a stay of the City's enforcement efforts based on the Section 1983 Claims of disparate enforcement of the Sign Laws.

95.     The Debtor and Mr. Noe **insisted** that GFLLP undertake the prosecution of the Section 1983 Claims. The firm refused for a number of reasons, not the least of which was our significant outstanding bill for services rendered to the Debtor during the chapter 11 case.

96.     The Debtor contacted several attorneys who specialize in such constitutional claims, including Robert Goldstein, a Buffalo, New York, practitioner. We were advised by Mr. Holzer and Mr. Noe that the Debtor was going to retain Mr. Goldstein and use his services to prepare an amended complaint and order to show cause in the soon-to-be-removed Adversary Proceeding.

97.     In the interim, we were asked by Mr. Holzer and Mr. Noe whether, through the pending Adversary Proceeding, we could issue document demands and information subpoenas to obtain the evidence necessary to support the Debtor's request for injunctive relief.

98.     Given that there was no agreement with the City to dismiss the Adversary Proceeding and knowing that the Debtor was going to vigorously prosecute the Adversary Proceeding after it was removed to District Court – we saw no prohibition against issuing a subpoena in this Adversary Proceeding.[5]

99.     The testimony sought from Mr. Arrigoni, although relevant to the Debtor's ongoing dispute with the City before BSA and ECB, was primarily intended to be used as part of a disparate treatment test case for the 330 Bruckner sign in the context of this Adversary Proceeding, which we were told was going to be removed by the Debtor once separate counsel was retained and the chapter 11 case dismissed. The relevance of Mr. Arrigoni's testimony to the

---

[5] Of course, none of this strategy about the Adversary Proceeding could be disclosed to this Court or to the City in the context of the Motion to Dismiss. The City's consent to dismissal of the chapter 11 case was tenuous in the fist place, and capable of being withdrawn at any time proper to the hearing on November 19, 2013.

Section 1983 Claims is discussed below.

100.     In or around the early 1980s, Mr. Arrigoni stated in a permit application that his company, New York Bus, operated out of the building at 330 Bruckner. Therefore, the sign New York Bus sought to place on that site would be a legal, "accessory" sign – that is, the sign advertised a business located under the sign – as opposed to an "advertising" sign that promoted a company that did not operate out of that location.

101.     DOB determined to treat 330 Bruckner as an accessory sign despite a questionable factual basis for doing so. It was a common practice for companies to rent closets in a building or otherwise falsify accessory permit applications, and in reviewing DOB's records relating to its determination of New York Bus's application, the Debtor found no evidence that New York Bus actually rented there.

102.     Years later, DOB recognized this widespread scam and stopped issuing accessory permits without proof that the advertiser had substantial operations at the advertising location.

103.     Yet, it was only when the Debtor came into possession of the lease for the 330 Bruckner sign that the City insisted that if OTR wished to continue advertising there, it would have to "grandfather" the sign with a showing that there was a continuous *non-conforming* use. Stated differently, the Debtor had to prove that Mr. Arrigoni's accessory application and the decades-old resulting permit were improper.

104.     In one of several informal meetings with DOB, the Debtor presented a letter dated November 24, 1980 from Mr. Arrigoni to his sign painter thanking him for a job well done at the 330 Bruckner location. Notably, New York Bus's letterhead indicated a mailing address of "The New England Thruway (Route 95) at Exit 13," not "330 Bruckner Boulevard," where the sign in question was posted. A copy of Mr. Arrigoni's letter is annexed hereto as Exhibit "10."

105.     OTR believed that this letter – along with the notable lack of documentary proof

20

of New York Bus's contemporaneous operations at 330 Bruckner accompanying its "accessory" permit application – was affirmative proof that DOB's 1980s determination that 330 Bruckner was "accessory" advertising should be overturned so that the Debtor's current sign could be legalized.

106.     OTR intended to set the groundwork for its anticipated order to show cause for a temporary restraining order by attempting to gather as much evidence as possible to support its Section 1983 Claims and concomitant motion for a temporary restraining order.

107.     The Debtor was willing to bet on DOB's refusal to consider OTR's evidence sufficient to overturn its earlier classification. The Debtor predicted that DOB would <u>never</u> overturn its revocation of the sign permit at 330 Bruckner no matter how compelling OTR's evidence. This trap, baited by Mr. Arrigoni's testimony, was to be the foundation of the Debtor's order to show cause for a temporary restraining order.

108.     The Debtor was advised by its state-court regulatory counsel (Mr. Holzer) that DOB had in fact overturned a determination that a sign was accessory when other outdoor advertising companies presented evidence similar to Mr. Arrigoni's expected testimony that the accessory permit application was a scam.

109.     Had Mr. Arrigoni provided the requested testimony, the Debtor would have had, in its opinion – and the opinion of a lawyer with vast Sign Laws experience – an airtight case for not only legalizing 330 Bruckner, but also for an emergency motion in the Adversary Proceeding. But even with such strong evidence, the Debtor expected the City to decline to overturn its "accessory" classification. This would have substantiated the Debtor's contention that when DOB was presented with a choice between a favorable and unfavorable disposition, the City came down averse to OTR when in comparable and similar cases the City decided in favor of the advertiser.

110.    **So, yes, Mr. Arrigoni's testimony was pertinent to matters before BSA, but its use was not intended to be limited to that forum. This evidence would primarily have been used to document an example of the City's disparate treatment of the Debtor with the hope that the example could support an application for a temporary restraining order and permanent injunction, which the Debtor desperately needed to fend off the City's anticipated enforcement activities after dismissal of the chapter 11 case.**

111.    Our client requested that in our role as Debtor's counsel in an active, ongoing adversary proceeding, we obtain evidence to be used to continue that proceeding in another forum to obtain provisional remedies after the chapter 11 case was dismissed, which we believed would be presented through Mr. Goldstein, or another lawyer of the Debtor's choosing.

112.    The Debtor initially sought Mr. Arrigoni to simply state on the record that New York Bus never operated out of 330 Bruckner, and the **initial** contact directly with Mr. Arrigoni came on July 29, 2013 – well before the September 2013 hearing at which the terms of the agreement to dismiss the chapter 11 case were announced.[6]

113.    During the July 29, 2013 telephone conversation prior to issuing the subpoena, Debtor's counsel asked Mr. Arrigoni if he would consensually provide such a statement. Mr. Arrigoni told Debtor's counsel that he would not do so – not because, as he later claimed, he "did not recall," but because he would not cooperate absent a Court compelling him to do so.

114.    In the July 29, 2013 telephone call between Debtor's counsel and Mr. Arrigoni, it was made clear to Mr. Arrigoni that his testimony would be used in the active Adversary

---

[6] Mr. Watnick erroneously presumed that the initial contact with Mr. Arrigoni was made by my office after September 20, 2013 to suggest that I made a false statement to the Court during the dismissal hearing on November 19, 2013.

Proceeding.[7]

115.    Obviously, Debtor's counsel could not explain to Mr. Arrigoni the specific use to which his testimony would be put in the Adversary Proceeding because negotiations with the City to dismiss the chapter 11 case remained ongoing.

116.    Yet even in the context of this Motion, Mr. Arrigoni admits that Debtor's counsel at all times made clear that any discovery taken would be used "in this case" – not in state court. See Exhibit "C" to Declaration of Donald Watnick.

117.    After the Debtor served a subpoena on Mr. Arrigoni, and Mr. Watnick advised Debtor's counsel that Mr. Arrigoni was an old man who could not remember where his own business operated, Debtor's counsel provided Mr. Watnick with a copy of Mr. Arrigoni's 1980 letter as a means of refreshing Mr. Arrigoni's recollection.

118.    Mr. Watnick, on Mr. Arrigoni's behalf, also cited the "undue burden" the Debtor sought to impose on an elderly man by compelling him to attend a deposition. In response, Mr. Simon of my office drafted a short declaration for Mr. Arrigoni's signature stating, in essence, the facts described above (along with a statement that at all times Mr. Arrigoni believed that he was not in violation of the Sign Laws). This was intended in lieu of any deposition.

119.    Mr. Watnick refused to have Mr. Arrigoni sign the stipulation, again on the grounds that Mr. Arrigoni could not remember.

120.    Mr. Simon then offered, in lieu of a deposition, to have Mr. Arrigoni respond to written interrogatories in an effort to resolve these issues. Once again, Mr. Watnick responded that Mr. Arrigoni claimed he still did not recall and would not be able to respond to questioning, whether by deposition, answers to interrogatories, or declaration.

---

[7] Mr. Arrigoni admits – in his declaration under the Adversary Proceeding's caption – that my colleague Scott D. Simon explained to him that the Debtor needed his testimony "in this case." See Declaration of Edward Arrigoni dated October 13, 2013, annexed to the Motion as Exhibit "C" to the Declaration of Donald Watnick.

121.     Debtor's counsel thus conducted itself in the utmost good faith by giving Mr. Arrigoni multiple options short of providing live testimony, but Messrs. Watnick and Arrigoni stymied those attempts at every turn.

122.     Unbeknownst to GFLLP, Mr. Watnick was already preparing and had obtained a signed affidavit from Mr. Arrigoni as early as October 13, 2013, demonstrating, in hindsight, Mr. Watnick's intent to create motion practice despite the fact that Mr. Simon was making every reasonable effort to avoid taking Mr. Arrigoni's deposition or otherwise inconveniencing him in any way. The Motion to Quash was eventually filed by Mr. Watnick on or about October 31, 2014, at a time when he was told by GFLLP that we wanted to work things out absent any need for his client's deposition.

123.     The filing of the Motion to Quash provided yet another opportunity for the City to pipe in one last time. The City availed itself of that opportunity, by filing a statement in support of the Motion to Quash – supporting it with a number of flagrant misstatements of fact.

124.     As described above in ¶¶ 46-51, the City's misstatement – that the Debtor filed the subpoena after asking the Court to dismiss the case – should be given no credence.

125.     Immediately following the filing of the City's statement in support of the Motion to Quash came Mr. Watnick's reply on behalf of Mr. Arrigoni, which in sum and substance dovetailed with the City's position. See time logs submitted by Mr. Watnick, which evidence telephone conversations between himself and City attorneys.

126.     Having received both the City's statement in support and Mr. Arrigoni's reply, I was anxious to file a response. In hindsight, however, I regretted doing so, as acknowledged by my statements to the Court on November 19, 2013, when the Court conducted the hearing on the Motion to Quash.

127.     My regret in filing the November 12, 2013 reply stems from the fact that

Mr. Watnick had told us repeatedly that, if required to testify, Mr. Arrigoni would simply state under oath that he could not remember the facts of some 28 years ago. Again, in hindsight that should have ended the issue right then and there, but my office proceeded to hurriedly file the reply over my signature without me having made a complete review.

128.    That is what I expressed to the Court in response to Your Honor's direct question as to why I filed the November 12, 2013 reply, and what I meant by my statement that "We simply went too far."

129.    My statement did not mean, as Mr. Watnick embellishes, that GFLLP should not have served the subpoena in the first place. As explained above, the subpoena was intended primarily in support of a litigation strategy to be implemented through this Adversary Proceeding once the matter was transferred to the District Court following dismissal of the chapter 11 case.

130.    I should also comment that the practice of allowing pleadings to be filed over my name with insufficient review is a lesson learned and a practice stopped by way of this matter. But I strongly submit that the filing of the November 12, 2013 reply was made after the Motion to Quash was filed, which is the pleading for which Mr. Arrigoni requests his attorneys' fees – and the reply provided no additional work for Mr. Arrigoni's counsel.

131.    Lastly, I must – without breaching the confidences of parties who engage in settlement negotiations – address the incompleteness of Mr. Watnick's description of our telephone call the night before the November 20, 2013 hearing. What is missing is Mr. Watnick's recollection that I told him I would speak with my client to obtain its consent to voluntarily withdraw the subpoena and report back to him as soon as possible. Obviously, Mr. Watnick knew that I could not, on my own volition, unilaterally make that decision without my client's consent. I did not get that consent until the following morning, when I immediately advised Mr. Watnick of the Debtor's consent.

## LEGAL ANALYSIS

132. Mr. Arrigoni argues that the Debtor's subpoena imposed an undue burden on him. This claim is based, in part, upon his belief that (i) the adversary proceeding had been dormant since February 2012, when Debtor's counsel wrote to the Court requesting that the adversary proceeding be dismissed; and (ii) there were no live issues in any contested matter relating to 330 Bruckner. Mr. Arrigoni relatedly asserts that sanctions are appropriate because the Debtor issued an overly-burdensome subpoena in bad faith, without a colorable basis for doing so. Mr. Arrigoni's argument sweeps too broadly.

133. Even if he can show that one purpose underlying the subpoena is improper, it is not unduly burdensome so long as other, proper purposes exist. See Donaldson v. United States, 400 U.S. 517, 532-33, 91 S.Ct. 534, 543-44, 27 L.Ed.2d 580 (1971) (noting that taxpayer could claim that the IRS sought material for an improper purpose only if that purpose were the sole object of the investigation).

134. The Motion fails to acknowledge the substantive distinction between the Debtor's main chapter 11 case and the Adversary Proceeding against the City of New York. Accordingly, when Mr. Arrigoni argues, "Despite having informed the Court of the agreed upon [*sic*] dismissal of this case…" (See MOL at p. 3), he betrays a lack of understanding of the Bankruptcy Code.[8] While there was an agreement to dismiss the chapter 11 case, there was no agreement with the City to dismiss the Adversary Proceeding.

135. After the agreement to dismiss the chapter 11 case was complete, the Debtor's plan was to continue the Adversary Proceeding in District Court, transformed to include the Section 1983 Claims, which I refused to prosecute during the chapter 11 case for the reasons

---

[8] Mr. Arrigoni admits – in his declaration under the adversary proceeding's caption – that my colleague Scott D. Simon explained to him that the Debtor needed his testimony "in this case." See Declaration of Edward Arrigoni dated October 13, 2013, annexed to the Motion as Exhibit "C" to the Declaration of Donald Watnick.

previously articulated – over my client's instruction to do so.

136.    Accordingly, at all times relevant to the subpoena served on Mr. Arrigoni, the Adversary Proceeding was an active matter on the Court's calendar, one that the Debtor had every intention of pursuing following dismissal of its chapter 11 case. GFLLP believed that the Debtor was going to prosecute the Adversary Proceeding when the firm issued the subpoena, and that issuance of the subpoena was thus for a proper purpose.

### a.    The Debtor did not serve the subpoena on Mr. Arrigoni in bad faith.

137.    This Court has the authority to impose sanctions in connection with the improper use of the Court's subpoenas under Federal Rule of Civil Procedure 45, which provides:

> A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction-which may include lost earnings and reasonable attorney's fees-on a party or attorney who fails to comply.

Fed. R. Civ. P. 45(c)(1).

138.    The Court also has the "inherent" power to impose attorney's fees "when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons .... [or] if a court finds that a fraud has been practiced upon it." See Chambers v. NASCO, Inc., 501 U.S. 32, 45-46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (internal quotation marks omitted). This inherent power "serv[es] the dual purpose of vindicating judicial authority without resort to the more drastic sanctions available for contempt of court and making the prevailing party whole for expenses caused by his opponent's obstinacy." Id. at 46.

139.    To impose a sanction upon a party under § 1927, a clear showing of bad faith is required. Oliveri v. Thompson, 803 F.2d 1265, 1273 (2d Cir.1986), cert. denied, 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987); Williams v. Amity Bank, 703 F.Supp. 223, 228 (D.Conn. 1988). In this circuit that means that the court must not only find clear evidence that

the party's conduct was motivated by an improper purpose, such as harassment or delay, but also that it was "entirely without color." See Dow Chem. Pac. Ltd. v. Rascator Maritime S.A., 782 F.2d 329, 344 (2d Cir. 1986); Sierra Club v. United States Army Corps of Engineers, 776 F.2d 383, 390 (2d Cir. 1985), cert. denied, 475 U.S. 1084, 106 S.Ct. 1464, 89 L.Ed.2d 720 (1986) ("The test is conjunctive and neither meritlessness alone nor improper purpose alone will suffice."). A claim is meritless or " 'entirely without color' when it lacks *any* legal or factual basis." Sierra Club, supra, 776 F.2d at 390 (emphasis added). See also Nemeroff v. Abelson, 620 F.2d 339, 348 (2d Cir.1980). "[A] high degree of specificity in ... factual findings" is required in order to award sanctions on the basis of bad faith. Weinberger v. Kendrick, 698 F.2d 61, 80 (2d Cir.1982), cert. denied, 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983). See also Dow Chem., supra, 782 F.2d at 344.

140.     As discussed at length above, the Debtor sought Mr. Arrigoni's testimony in connection with the pending Adversary Proceeding, which the Debtor intended to transfer to District Court to assert the Section 1983 Claims. There is both a proper purpose and colorable rationale for the Debtor's issuance of the subpoena. Although Mr. Arrigoni's testimony was also going to be used in the proceedings before BSA, as set forth in the reply, Mr. Arrigoni's testimony and, indeed, the entire BSA ruling, was intended to be used in the larger pursuit of prosecuting the Adversary Proceeding to its next logical step.

141.     The Debtor's good faith in doing so is evidenced, moreover, by the multiple attempts to obtain Mr. Arrigoni's testimony by a method other than a deposition. As noted above, following weeks of discussion in which the Debtor tried in vain to take Mr. Arrigoni's testimony by interrogatories or by declaration (instead of deposition), the Debtor ultimately withdrew the subpoena because Mr. Arrigoni purportedly could not remember from what location his own business operated.

142. The Debtor also attempted in good faith to resolve the issues raised in this motion by asking for Mr. Watnick's time records after he had filed the Motion to Quash, which Mr. Watnick declined to provide.

143. Once it became clear that no discovery would be had on Mr. Arrigoni, the Debtor tried to nip this controversy in the bud. The parties are now before the Court because of Mr. Arrigoni's counsel, not the Debtor's.

**b.     Mr. Arrigoni's attorneys' fees are excessive and duplicative.**

144. Should the Court nevertheless determine that a sanction is warranted, the amount of the sanction requested in the Motion is excessive and unwarranted.

145. To determine the reasonableness of an attorneys' fees application, the Second Circuit uses the lodestar method. See Luciano v. Olsten Corp., 109 F.3d 111, 115 (2d Cir.1997) (citations omitted). The lodestar amount is calculated by multiplying a reasonable hourly rate by the number of hours reasonably expended on the litigation. Id.; Hensley v. Eckerhart, 461 U.S. 424, 433 (1983). A court assessing the reasonableness of time expended may adjust portions of an invoice that reflect "excessive, redundant or otherwise unnecessary" hours. Hensley, 461 U.S. at 434. "If the court determines that the number of hours expended was excessive, redundant or otherwise unnecessary, the court may make reductions to individual entries, or elect to account for such over-billing in an across-the-board percentage deduction." Manzo v. Sovereign Motor Cars, Ltd., No. 08 Civ. 1229, 2010 WL 1930237, at *8 (E.D.N.Y. May 11, 2010).

146. In dealing with such overbilling, the court has discretion simply to deduct a reasonable percentage of the number of hours claimed as a practical means of trimming fat from a fee application. See Francois v. Mazer, 523 Fed.Appx. 28, 29 (2d Cir.2013) ("The district court, in imposing a 40% reduction in plaintiff's counsel's hours – a reduction which we deem to be reasonable under the circumstances – acted well within its discretion in awarding attorney's

fees."); Ritchie v. Gano, 756 F.Supp.2d 581, 583 (S.D.N.Y.2010) (reducing the attorneys' fees award by forty percent and holding that "[i]n the instance where a court has directed parties to parse out records to clearly state how much time the attorneys spent on each claim, and the parties have done so insufficiently and have referred to an unrealistic volume of hours as 'inextricably intertwined' with many claims, the court may also decrease the requested award amount"); DeVito v. Hempstead China Shop, Inc., 831 F.Supp. 1037, 1045 (E.D.N.Y.1993) (reducing attorneys' fee request by 40% due to duplication of work, vague descriptions of some of the work performed and the necessity of the work).

147.     Following Mr. Watnick's oral application for recovery of Mr. Arrigoni's attorneys' fees at the November 19, 2013 hearing where the request was first made, Debtor's counsel and Mr. Watnick engaged in repeated meetings and telephonic conferences in an attempt to resolve this matter without the Court's intervention.

148.     The substance of those settlement negotiations will not be discussed here, but it should not breach confidentiality to advise the Court that on numerous occasions during these discussions, Mr. Watnick declined to provide Debtor's counsel with his time logs substantiating the $28,788.21 in fees he seeks by the Motion. See correspondence dated December 10, 2013 in which Watnick refuses to provide his time logs, a copy of which is annexed hereto as Exhibit "1." Indeed, Mr. Watnick never provided the requested backup until he filed the Motion on February 6, 2014.

149.     Reviewing these time entries, it is unsurprising that Watnick would not provide them, as they demonstrate excessive and redundant billing on this matter. Several of the time entries are also transparently excessive for example:

    10/24/13 – Five and a half hours to review the Debtor's bankruptcy docket.
    10/31/13 – Four and a half hours to review the motion papers and file them *via* ECF
    10/31/13 – One and a half hours to "arrange for filing of motion papers" along with a

conference and telephone call

<u>See</u> Exhibits to Watnick Affidavit and affidavit of Edward Saviano submitted with the Motion.[9]

150.    Notably, all of this time was expended **after** Mr. Watnick's office had already

prepared Mr. Arrigoni's affidavit in support of the Motion to Quash, which was completed on

October 13, 2013, at a time when he was discussing a resolution of the issues with Mr. Simon.

151.    What is more, Mr. Arrigoni makes clear that he also seeks attorney's fees for

"[p]reparation of the instant motion for attorneys' fees. (To be determined.)" <u>See</u> Mr. Arrigoni's

memorandum of law at p. 24. This, even though Mr. Arrigoni distinctly refused to substantiate

his fee request, precluding reasonable negotiations, and even though Mr. Watnick declined to

enter into settlement discussions between the December 17, 2013 conference before the Court

and the February 6, 2014 filing of the Motion. Mr. Arrigoni's legal fees in preparing the Motion

were unnecessary because they could have been eliminated had Mr. Watnick reasonably

provided the requested backup

152.    The two (2) firms retained by Mr. Arrigoni to contest the subpoena spent nearly

$30,000 responding to an allegedly improper subpoena. The response by Mr. Arrigoni's

attorneys was excessive and untenable.

153.    A party defending against an improper filing has a duty to mitigate its legal fees

and expenses by resolving such issues quickly and efficiently. Counsel must mitigate damages

by correlating its response, in terms of hours and funds expended, to the merit of the claims. The

Court must consider to what extend a defending party's injury could have been avoided or was

self-inflicted. <u>In re Wonder Corp. of America</u>, 109 B.R. 18, 36 (Bankr.D.Ct. 1989).

154.    Here, Mr. Arrigoni's counsel declined at all relevant times to substantiate the

---

[9] These are just the most glaring examples of excessive time, and GFLLP reserves the right to address other
examples of overbilling should there be evidence taken on the Motion.

attorneys' fees sought by the Motion, precluding any possible resolution and causing the motion practice currently before the Court. Mr. Watnick failed to mitigate as required and he should not be rewarded for his own failures.

## **Conclusion**

155.    It is respectfully submitted that Motion should be denied.

Dated:  New York, New York
        April 7, 2014

                                          ___/S/GARY M. KUSHNER_____
                                          GARY M. KUSHNER

t:\scottdsimon\otr media group inc\chapter 11\arrigoni\motion to reopen adversary proceeding\objection\final declaration in opp to motion to reopen adv pro.doc

32