```
 1                  UNITED STATES BANKRUPTCY COURT
                    EASTERN DISTRICT OF NEW YORK
 2

 3

In re:                          .    Brooklyn, New York
                                .    March 12, 2013
OTR MEDIA GROUP, INC.           .
                                .    11-47385
 6          Debtor.             .    Calendar Time:
. . . . . . . . . . . . . . .        10:30 A.M.
 7

 8               [9] ADJOURNED STATUS CONFERENCE
         ADJOURNED FROM:  10/25/11, 12/12/11, 12/15/11,
 9      1/6/12, 3/15/12, 7/17/12, 8/9/12, 9/27/12, 11/6/12

10               FINAL DECREE SIGNED 2/28/13

11       [335] HEARING ON NBC COMPENSATION REQUEST (RE:
        RELATED DOCUMENT(S) 323 AFFIDAVIT FILED BY DEBTOR,
12                   OTR MEDIA GROUP, INC.)

13      [327] THIRD APPLICATION FOR COMPENSATION FOR GOETZ
               FITZPATRICK, LLP AS DEBTOR'S COUNSEL
14
        [328] FIRST APPLICATION FOR COMPENSATION FOR BRYAN
15         CAVE, LLP AS DEBTOR'S SPECIAL COUNSEL

16          BEFORE HONORABLE ELIZABETH S. STONG

17
Attorney for Debtor:            GOETZ FITZPATRICK, LLP
18                              One Penn Plaza
                                44th Floor
19                              New York, New York  10119
                                BY:  GARY M. KUSHNER, ESQ.

20
Attorney for City of
New York:                       NEW YORK CITY LAW DEPARTMENT
                                OFFICE OF THE CORPORATION COUNSEL
22                              100 Church Street
                                New York, New York  10007
23                              BY:  BRIAN T. HORAN, ESQ.

24

25
```

```
 1                                                         2

 2

Attorney for Metropolitan
National Bank:               TANNENBAUM HELPERN SYRACUSE &
 4                           HIRSCHTRITT, LLP
                             900 Third Avenue
 5                           New York, New York  10022
                             BY:  WAYNE H. DAVIS, ESQ.
 6

Attorney for United States
Trustee:                     U.S. DEPARTMENT OF JUSTICE
 8                           OFFICE OF UNITED STATES TRUSTEE
                             271 Cadman Plaza
 9                           Suite 4529
                             Brooklyn, New York  11201
10                           BY:  WILLIAM CURTIN, ESQ.

Attorney for Debtor:         NOVACK BURNBAUM CRYSTAL, LLP
                             300 East 42nd Street
12                           New York, New York  10017
                             BY:  HOWARD C. CRYSTAL, ESQ.

13
Attorney for Debtor:         LAW OFFICES OF ARIEL S. HOLZER
14                           BY:  ARIEL HOLZER, ESQ.

Attorney for Debtor:         BRYAN CAVE, LLP
                             1290 Avenue of the Americas
16                           New York, New York  10104
                             BY:  PHYLLIS ARNOLD, ESQ.

17
Principal of Debtor:         ARI NOE
18
Court Recorder Operator:     D. CAPERS
19

Court Transcriber:           CATHERINE ALDRICH
                             COMPU-SCRIBE, INC.
21                           2376 Cleveland Street
                             Bellmore, New York  11710
22

Proceedings recorded by electronic sound recording,
transcript produced by transcription service
24

25
```

1          THE CLERK:  Numbers 46, 47, and 48 on the calendar,
2  OTR Media Group, hearing on NBC compensation request, third
3  application for compensation for Goetz Fitzpatrick, first
4  application by Bryan Cave.

5          THE COURT:  All right.  Good morning.  Come on up.
6  All right.  Let's get your appearances on the record.  Good to
7  see everyone.

8          MR. KUSHNER:  Good morning again, your Honor.  Gary
9  Kushner, Goetz Fitzpatrick, for OTR Media, the debtor.

10          THE COURT:  All right.

11          MR. HORAN:  Good morning, your Honor.  Brian Horan,
12  New York City Law Department, for the City.

13          THE COURT:  Thank you, Mr. Horan.

14          MR. DAVIS:  Good morning, your Honor.  Wayne Davis
15  of Tannenbaum, Helpern Syracuse & Hirschtritt, for
16  Metropolitan National Bank.

17          MR. CURTIN:  William Curtin for the United States
18  Trustee, your Honor.

19          MR. CRYSTAL:  Good morning, your Honor.  Howard
20  Crystal, Novack Burnbaum Crystal.

21          MR. HOLZER:  Ariel Holzer, Law Office of Ariel S.
22  Holzer, for the debtor, OTR Media.

23          THE COURT:  And Ms. Arnold.

24          MS. ARNOLD:  Phyllis Arnold, Bryan Cave.

1    THE COURT: All right. Mr. Kushner, let me hear
2  from you.

3    MR. KUSHNER: Regarding the status, your Honor, I
4  believe the debtor is current with its operating reports and
5  payment of United States Trustee fees, continues to make a
6  profit post-petition. I know it's a separate part of today's
7  calendar, but we have an agreement with Metropolitan National
8  Bank regarding use of cash collateral and an agreed-upon
9  budget. We continue to battle it out with the City in state
10  court and various other administrative proceedings outside of
11  this Court regarding the lawfulness of various signs. Ms.
12  Arnold has been involved in that on a day to day basis, and
13  perhaps if you want more specificity as to status of those, I
14  can have Ms. Arnold make that presentation to your Honor, but
15  generally speaking we are following the Court's rulings, going
16  through the various administrative application permitting
17  processes, and then dealing with the resulting adjudications
18  as appropriate under the sign laws, and of course the City has
19  a different view, but that is my report of status.

20    I have spent a great deal of time since the last
21  hearing trying to be receptive to the various comments, most
22  of them productive comments, regarding the final disclosure
23  statement which your Honor actually conditionally approved the
24  last time, but because of scheduling and various requests

accommodating various delays as a result of schedules, I did receive some more comments last night from the City which I now have to evaluate, and our intention obviously is to get you a document, file it, and submit to you a final order regarding the confirmation process, you know, the formal approval of the disclosure statement and then setting a hearing on disclosure, on confirmation, and various associated dates.

I can't -- other than that, we are proceeding towards a date -- confirmation date, and that's where we're headed in this case.

THE COURT: All right. And I know we have our February 20 -- excuse me, April 23rd date set for --

MR. KUSHNER: Which is another thing, your Honor, I did bring to Mr. Curtin's attention. Even in the most optimistic light if I were to drop everything today, get final approved comments, get you a proposed order, your Honor were to jump through hoops and sign it with copying and everything, it's not going to go out until early next week, so that as I read the Code, you need at least 28 days plus three days notice on the hearing on confirmation. There are probably every bit a good reason to give some more dates for objections and what have you, filing certification, so taking that thought on the calendar, having discussed that with Mr.

Curtin, I think it's more appropriate to move that date into perhaps the first or second week of May.

THE COURT: That's -- I'd rather invest a little bit more time now and have the right record in terms of timing, service, substance in this case.

MR. KUSHNER: So the April 23rd date is now, you know, not going to be used for confirmation.

THE COURT: Well, we'll look for a date in the window you're describing some time in May.

All right. Who else would like to be heard on status?

MR. HORAN: Just very briefly, your Honor, on status Mr. Kushner has referred to OTR's ongoing compliance efforts and dealings with DOB and the other administrative agencies pursuant to the consent order, we learned -- the City learned yesterday that the debtor's operating a signing at a location, 13 Carmine Street in Manhattan, that under the consent order was a designated location, meaning that Ms. Arnold found that that location could not be brought into compliance, and that the copy had to be removed and any structure had to be removed because that was no longer a viable sign.

DOB conducted an inspection late last month, February, found that the debtor is operating a sign there. We ask that the copy be removed pursuant to the consent order,

1  and if not, we intend to move for a default under the order.

2  I just wanted to advise the Court of that.

3         THE COURT:  Mr. Curtin, how are we doing on -- Mr.

4  Kushner, how are we doing on Carmine Street?

5         MR. KUSHNER:  I learned of this at 7:00 o'clock last

6  night, quarter to 7:00, and I --

7         THE COURT:  So you're on it?

8         MR. KUSHNER:  So I haven't had a chance to speak

9  with Mr. Noe this morning regarding that, and we will give the

10 City an appropriate response, and certainly abide by the

11 spirit of the consent order.

12        THE COURT:  Glad to hear it.

13        Mr. Curtin, anything to add with respect to status?

14        MR. CURTIN:  No.  I don't think so, your Honor.

15 Nothing on status.

16        THE COURT:  Thank you.

17        And from the bank?

18        MR. DAVIS:  Just one brief comment with respect to

19 use of cash collateral.  The bank had reviewed during the

20 first week of March the proposed budget for March and supplied

21 the debtor with an order to be submitted to the Court for

22 signature.  The Office of the U.S. Trustee reviewed the order

23 and had no objection to it.

24        My understanding, my belief is that it was submitted

1  to the Court last week.

2          MR. KUSHNER:  March 8th.

3          THE COURT:  We will track this down.  If it's not
4  done already, it will be done soon.  Let's make sure we know
5  where this is.  We'll look.  All right.  We will follow up.
6  If there's any questions at all we'll be in touch with
7  debtor's counsel.  It's important to get that taken care of,
8  and than you so much.

9          Anything further on status from any other party?

10         All right.  There are a number of other matters on
11 the calendar.  Mr. Kushner, where do you suggest that we
12 proceed?

13         MR. KUSHNER:  Why don't we take the contested fee
14 application of Novack Burnbaum & Crystal if that's okay with
15 your Honor?

16         THE COURT:  That's fine.  Novack Burnbaum Crystal,
17 NBC compensation request?

18         MR. KUSHNER:  Yes.

19         THE COURT:  Number 46 on the calendar.  Please
20 proceed.

21         MR. KUSHNER:  It is -- I don't have the ECF filing
22 here.  I think it's got to be more than that.

23         THE COURT:  I'm sorry.  It's number 46 on my
24 calendar, on our calendar of today.

1          MR. KUSHNER: Okay. I don't -- yes. I don't know.

2          THE COURT: With respect to the ECF calendar, this

3 would be the order scheduling hearing is number 335 on the

4 docket.

5          MR. KUSHNER: Novack -- yes. May I proceed?

6          THE COURT: Please.

7          MR. KUSHNER: Novack, Burnbaum & Crystal was

8 retained to do essentially litigation work regarding various

9 issues over the debtor's -- over the lawfulness of the

10 debtor's signs, and pursuant to the protocol that was set up

11 by the Court on a monthly basis payment to ordinary course

12 professionals such as Novack, Burnbaum, Crystal required NBC

13 and others to submit on a monthly basis a monthly fee

14 statement, and then there's a procedure that's in place

15 pursuant to that order. Does the Court want me to stop?

16          THE COURT: I'm sorry?

17          MR. KUSHNER: I think the Court calendar is being --

18          THE COURT: Oh, we'll have our changeover at the

19 court reporting. Please continue.

20          MR. KUSHNER: Thank you, Judge.

21          THE COURT: Thank you, Mr. Kushner.

22          MR. KUSHNER: And on February 11th, which is within

23 the time period prescribed by the Court, NBC put in its fee

24 request for the time it incurred in January of 2013 seeking

fees of $5,749.73, and reimbursement of expenses of $70.86, and along with its application or its notice, it submitted its time log, and its undisputed that NBC's time for the month of January revolved around the preparation, briefing, and filing of an Article 78 proceeding involving the sign at 174 Canal Street.

There has been one objection filed by the City. Essentially the City's objection states that no compensation should be awarded to NBC with respect to this fee notice because it's work in January on the Article 78 contravening the stay order, and that's the order -- the order I'm referring to is the order of the Court dated January 9th, 2013, which denied the debtor's application to reinstate the stay, and NBC's work also violated what I'll call the consent order which was the consensual order entered on July 19th, 2012, which resolved the U.S.T.'s motion to convert or dismiss the case.

The City also objects to the payment of fees to NBC for January on the basis that no attorney should be compensated for work that it voluntarily discontinued, and in that vein what NBC did was after it filed the appropriate application in state court it learned that the issue that it was seeking provisional relief became moot, so the application was withdrawn, and then the third basis of the objection was

1 that the consent order restricts all together the use of NBC
2 in any state court litigation, and the debtor has filed a
3 response to the City's objection on behalf of NBC, essentially
4 addressing each one of the points that were raised by the
5 consent order -- I'm sorry, by the City's objection.

6           Specifically with respect to the City's contention
7 that the NBC work in January contravened the stay order and
8 the consent order, the debtor disputes that all together.
9 Number one, the stay order in its most simplistic form was the
10 order that was entered by this Court denying the reinstatement
11 of the automatic stay.  It did not in any way prohibit the
12 debtor from defending itself or exercising its remedies in
13 connection with the enforcement, the City's enforcement of the
14 sign laws in state court.  Essentially that if the City felt
15 that it had a basis to issue a notice of violation or work
16 permit, nothing in that stay order prevented the debtor from
17 defending the claims of the City in defending against the
18 quote, "allegations" that existed vis a vis the lawfulness of
19 the signs.

20          The stay order simply allowed the City without the
21 existence of the automatic stay to enforce its police powers,
22 and that order makes implicit, as it was never before the
23 Court, that the debtor was supposed to lie down and do nothing
24 to protect itself in the event it felt it was inappropriate --

the City's actions were inappropriate under state law. So we
think that that's an argument that does not have any merit.

Similarly, the consent order is even more explicit
and expressly reserved all of the debtor's rights to defend
itself against enforcement and to exercise whatever
appropriate remedies it had under state law to basically react
to what the City felt was their right to implement the sign
laws. This is a process that is adversarial, and state law --
under state law the City issues a violation, the debtor has a
right to defend it. If the City's issuance of a violation
under the debtor's belief is contrary to the sign laws, the
debtor has remedies under the CPLR and otherwise, and that's
really all that this is about.

THE COURT: Well, the ability of the debtor to
defend itself is a slightly different question than I think
the question posed by the application, which is, or at a
minimum includes the question whether the services were
reasonably likely to yield a benefit to the estate.

MR. KUSHNER: Well, the City is arguing that the
consent order and the stay order either collectively or by
themselves eliminated the debtor's right to exercise the right
to seek a temporary injunction under, for example CPLR 7805.
That's not in the debtor's opinion, I think if your Honor
looks at it, it couldn't possibly -- it would be stretching

the meaning of those documents that the debtor was --
basically walked into state court without arms and legs and
couldn't defend it, and essentially what NBC's services were
in this case was that the debtor felt that the City's issuance
of a work -- a stop-work order did not comply with its own
sign laws.

The administrative requirements I understand is two
instances in which a stop-work order can be issued. One is
that the debtor is operating an unlawful sign or that the work
that's involved poses a threat to the health, welfare, safety
of the public, and in neither of those cases, at least in the
debtor's view, did it exist in that circumstance where a stop-
work order was appropriate. NBC was called upon to the debtor
to bring the appropriate proceeding, an Article 78 proceeding
in state court to adjudicate that issue, whether or not it was
an appropriate action on behalf of the City to issue the stop-
work order in that instance and also sought provisional relief
as it is allowed to do in an Article 78 proceeding under 7805
of the CPLR.

So under the circumstances I submit to your Honor
that nothing before this Court was ever issued or contemplated
that would prevent the debtor from going in and defending
itself against what it perceived to be an excessive improper
violation of the City's enforcement rights. That's why NBC

1 was called upon.

2       Second issue, your Honor, was the withdrawal of the
3 Article 78, and I had a discussion with Mr. Horan or my office
4 did last night, and even as a result of that discussion and my
5 conversations with Mr. Crystal, who is in the courtroom, what
6 happened here was that after the Article 78 was filed and they
7 were about to argue it, it was discovered that the issue --
8 the factual basis became moot, that the sign had already been
9 painted over and that the only thing that was prudent and
10 reasonable under the circumstances was for NBC to withdraw the
11 application because the application was moot as to the TRO
12 request, and was not ripe as to the other issue.

13       So I think that NBC shouldn't be penalized for doing
14 what it -- what a reasonable attorney would have done.  It
15 should be commended for not belaboring the point and argue
16 what's unarguable.  So I don't think that that's a meritorious
17 objection, and then the consent order, according to the City,
18 says that NBC couldn't be used at all by the debtor, and I
19 submit to your Honor that's not what the express language of
20 the consent order says.

21       What was contemplated in the consent order was that
22 there would not be an overlapping of professionals dealing
23 with various aspects of the sign laws or the process in which
24 the debtor's signs needed to go through in order to become

1 lawful or -- and you understand my point.

2       Bryan Cave undertook under that consent order a
3 large part of the administrative aspect of that process.  NBC
4 was still contemplated to do various litigation work that
5 would not be undertaken by Bryan Cave, and the express
6 language of the consent order says that the debtor would limit
7 its use of NBC.  As an abundance of caution even before NBC
8 was actually utilized by the debtor, my office contacted Mr.
9 Curtin of the United States Trustee's Office and Mr. Davis at
10 the bank to let them know that NBC was going to come in to do
11 this, and they certainly did not express an objection to doing
12 that.  We didn't ask the City out of practical reasons, your
13 Honor, because in this case we're not going to ask the City
14 who we can retain to engage in a legitimate litigation against
15 the City.  So I mean it's not something that common sense
16 would have dictated their response.

17       So for all of those reasons, we think that the time
18 spent by NBC, and Mr. Noe is here, he's agreed that the
19 services were reasonable and necessary under the
20 circumstances.  He's prepared to let the Court know that the
21 debtor does want to pay these expenses.  There's been no
22 objection by -- I mean these fees and expenses, and there's
23 been no objection by other parties in interest.  So we submit,
24 your Honor, that the fee application should be granted and the

1  City's objection be overruled.

2        THE COURT:  All right.  Before we hear from the City
3  I'd like to hear briefly from Mr. Curtin as to whether your
4  office has a position on this compensation request.

5        MR. CURTIN:  Your Honor, excuse me, William Curtin
6  for the United States Trustee.  We don't have an objection,
7  and I can confirm that I did have that conversation with the
8  debtor, that the substance -- and just so everyone's clear, I
9  did when -- after the fact, when the bill came in I did have a
10  conversation with Mr. Kleinman also and told him all this.  So
11  this was all -- obviously nothing was hidden at least from my
12  end.

13        The issue was whether did the debtor acknowledge
14  that the consent order said -- you know, it says what it says.
15  It says limit the use.  It doesn't say they can't use them.
16  It says limit the use, and I think the largely to this point
17  they have limited the use, but the argument was that it would
18  cost one amount for Bryan Cave to do it and a much smaller
19  amount for NBC to do this particular -- you know, this
20  particular action.  So I said it makes sense to me, reserving
21  all rights obviously to object to the fees, but not objecting
22  to the actual use of NBC for this action.

23        So the bottom line is we did have that conversation.
24  It was certainly not done surreptitiously or anything like

1 that, and we don't have an objection to the fee application.

2 THE COURT: I'd like to hear from the City, and I'll
3 just note at the outset that the dynamics of taking a position
4 with respect to an entity retaining counsel to be adverse to
5 your unusual dynamics, they -- and here in the structure of
6 this case.

7 MR. HORAN: Your Honor, Mr. Kushner said that the
8 issue raising the Article 78 petition was -- became moot, and
9 once NBC realized that it decided to withdraw the petition.
10 That's not really the case, or perhaps it's just a very
11 generous way of describing what happened. In fact, the
12 Article 78 petition was false, contained flat out mis-
13 statements. Paragraph 3, and this is attached as Exhibit 1 to
14 our objection, paragraph 3 states that "The stop-work order
15 had the effect of prohibiting OTR from performing work
16 necessary to replace the existing painted sign with a new
17 painted sign."

18 The next paragraph it states, "The stop-worker order
19 is causing OTR irreparable harm by preventing it from
20 discharging its obligations to its clients to post advertising
21 signage at the premises." In fact, the same day that the RJI
22 was filed along with the petition, OTR installed the sign that
23 it claimed it couldn't install.

24 So their entire predicate for the Article 78 turns

out not to be correct. The Article 78 was nothing more than
an effort by OTR to shield its violation of the stop-work
order. It wanted to put the sign up. The stop-work order it
said couldn't put the sign up, and it did so anyway, and then
sought protection in state court, and the time frame for this
is important. DOB issued the stop-work order in September
2012. OTR didn't enter the agreement to install the sign
until October, the following -- over a month later, and it
wasn't until February, four months after the issuance of the
stop-work order, that OTR in fact installed the sign and then
ran to state court and sought protection so that it could
leave the sign up without fear of being in violation of the
stop-work order or receiving notices of violation.

Indeed, the reply that the debtor submitted on this
fee application continues to make mis-statements to the Court.
The reply states that the debtor entered the agreement in
September. That's not the case. It entered into the
agreement to install the sign in October, over a month after
the stop-work order was issued.

So what we have here is another instance of OTR,
this is a year's long campaign that it's been engaged in to
shield itself from enforcement by the City. It sought this
relief in state court only after this Bankruptcy Court said
that the City could continue enforcing the sign laws. OTR had

1 entered into this agreement in October. In December it came
2 to this Court and asked for relief, asked the Court to
3 reinstitute the automatic stay. This Court denied that motion
4 in January, and then OTR installed the sign anyway and asked
5 the state court to protect it, and again, this is -- this was
6 the third order of this Court finding that the City could
7 enforce the sign laws.

8          On top of those orders finding that there was no
9 stay on the City's enforcement there's the consent order, and
10 this Article 78 petition flies in the face of the consent
11 order which set up a process whereby the debtor agreed to make
12 submissions to the Department of Buildings, have DOB render
13 determinations, and if necessary and appropriate take appeals
14 from those determinations. The second part of the consent
15 order importantly specifically reserved the City's right to
16 issue NOV's for ongoing violations, and what this Article 78
17 sought to do was not only short circuit the regulatory process
18 of normalizing the signs through DOB, but also to stay the
19 issuance of NOV's for the violation that OTR decided to create
20 when it installed the sign.

21          THE COURT: In the absence of all the other
22 agreements and proceedings and orders, would this Article 78
23 proceeding be the kind of thing that a sign enterprise like
24 OTR might bring in the ordinary course of its business?

1    MR. HORAN:  Your Honor, I can't speak to the
2 ordinary course of the typical sign business.  I'm not
3 familiar enough, but it seems to me that when a stop-work
4 order is issued within an intent to revoke a permit the
5 appropriate thing to do is to abide by the stop-work order and
6 then challenge the permit revocation.  I mean this permit has
7 been revoked.  It was revoked in February.  It was revoked
8 right around the time when this Article 78 was filed, and I
9 understand from counsel told me today that that decision by
10 DOB to revoke the permit is now on appeal at BSA.  That's the
11 appropriate process.  That's the process that was envisioned
12 in the consent order.

13    What the consent order did not envision is OTR's
14 disregarding entirely the determinations of the Department of
15 Buildings, installing an illegal sign, and then going to state
16 court, after this Court didn't give it the relief it wanted,
17 going to state court to protect that after the fact violation.

18    The City's position is not that NBC cannot be used
19 in litigation.  We certainly read the consent order.  The
20 plain language says that NBC's use should be limited.  What
21 that means to us is that OTR is not entitled to continue its
22 campaign of endless litigation using an army of law firms to
23 try to shield itself from enforcement by the City, and this
24 Article 78 is an example of just that, and that's why fees

should not be awarded because this Article 78, given that it was predicated on flat out falsehoods, had no reasonable likelihood of benefitting the debtor, the estate.

THE COURT: And what is the status of the Article 78?

MR. HORAN: It's been withdrawn. It was -- as soon as the -- as it turned out that the contract was entered into only after the stop-work order was issued, number one, and number two, that the sign had already been installed in violation of the stop-work order, the debtor's counsel voluntarily withdrew the petition.

THE COURT: Would others like to be heard on this?

MR. HORAN: Thank you, your Honor.

THE COURT: Thank you very much. No one's noted it in the record, so I will. Just for a sense of portionality, it does seem that the amount of money that we're looking at here is $5,749.73 and $70.86 in expenses, an amount that is probably already overcome by the costs the parties have incurred in filing these papers and arguing. Just a bit of a reality check, my friends.

Mr. Kushner, let me hear you in reply.

MR. KUSHNER: Well, in response to that last observation, Judge --

THE COURT: Please correct me if I'm wrong, but

1 that's basically --

2 MR. KUSHNER: -- there certainly have been time and
3 expense spent in responding to it. Certainly if Mr. Crystal
4 would have done it himself I don't think he would have sought
5 compensation, but that's not the protocol. I'm debtor's
6 counsel. I make the application. He would be a witness, but
7 honor be thy name, Judge. What's really at the root of this
8 is NBC is a well-respected, highly capable law firm dealing
9 significantly in its practice in the sign law issues. So it
10 would be a disincentive for NBC counsel, debtor's counsel of
11 choice in these matters, not to work any further. The easiest
12 way to do that is to knock them out on their face.

13 So I'm faced in a position as a reasonable lawyer
14 what they would do under the circumstances to say fight for
15 those fees. The debtor wants to pay them. The debtor wants
16 to use these lawyers. NBC will not work if it can't get paid
17 in a bankruptcy case, and the City -- the debtor would have
18 lost its counsel of choice and the City would have won a small
19 part of this ongoing battle, and that is it's knocked out a
20 competent adversary. That's what's really behind the
21 response, Judge.

22 THE COURT: And we do have the statement in the
23 Arnold declaration that NBC's experience and expertise in
24 litigation, well, reflected in her view that NBC is in the

1 best position. That language is quoted in your submission at
2 paragraph 3.2, page 7, the best position to proceed. I take
3 the point, and in all events from this seat in the courtroom
4 the dollars are not the issue. From the standpoint of good
5 case management I would be remiss if not to note them.

6 The question framed by this application is whether
7 this -- whether the applicable criteria for allowing an
8 expense have been met here, and those are not necessarily a
9 hindsight -- those do not invite necessarily a hindsight
10 measure, although hindsight, a tiny bit of hindsight may be
11 inevitable. The question really should be whether at the time
12 the expenses incurred was it reasonably likely that the
13 expense would benefit the estate, was it necessary to the
14 administration of the estate?

15 I appreciate that you have focused on the
16 reasonableness or not or the outcome, whatever of that Article
17 78 proceeding and whether it complied with, was consistent
18 with the text or the spirit of various other orders in this
19 case, including the consent order and the path we followed to
20 get to this point, a difficult to clear, but ultimately
21 productive path for all concerned I think.

22 I'd like to hear from anyone else with particular
23 focus on that question of the standard, whether these expenses
24 were reasonably likely to benefit the estate as assessed at

1 the time they were incurred.

2        Mr. Kushner, I also note that I have counsel
3 indicating an interest in speaking. I'll hear from whoever
4 would like to go first.

5        MR. KUSHNER: I would be brief, your Honor. You
6 have a full courtroom.

7        THE COURT: We do.

8        MR. KUSHNER: Your Honor has in fact put the finger
9 on the appropriate standard. What should be analyzed was what
10 was in Mr. Crystal's mind when he was asked to do these
11 things. What did he do? He was told he believed that under
12 applicable state law, after consultation with my office's
13 bankruptcy counsel, that he had the right to go ahead and a
14 duty to go ahead to file the Article 78 to challenge the
15 lawfulness of the City's work-stop order. The work-stop order
16 was challenged on the basis that at the time that the Article
17 78 was filed and prepared there had been no permit revocation,
18 which meant that the lawfulness of the sign or that the sign
19 had not been declared quote, "unlawful," and secondarily, that
20 there was no indication that whatever work was to be done in
21 terms of painting was a threat to the general welfare of the
22 citizens of New York.

23        He did not know at the time Mr. -- I'm proffering,
24 but Mr. Crystal is here. He will tell you that he did not

1 know at the time that the same day in an ordinary type of way,
2 not to cast any culpability on the debtor's actions, that the
3 sign hanger had gone through and changed the sign already.
4 Once he learned about that, that rendered one aspect of the
5 Article 78, that is the immediate request for provisional
6 relief, inappropriate to continue, and he discontinued it, and
7 he had no other basis at the time that he discontinued it to
8 go forward with the Article 78 all together because the permit
9 revocation did not follow until days later.

10        So as it stands now, the debtor does have a viable
11 claim to challenge the work-stop order or the lawfulness of
12 the permit revocation, and that's a story for the future, but
13 looking at this case in a vacuum, at the time that Mr. Crystal
14 was asked to do the work, there was a legitimate basis under
15 state law to seek the relief that the debtor required under
16 the circumstances.  The time line meant nothing.  It means
17 nothing.  It's a red herring.  I stand by my papers.  At the
18 time that Mr. Crystal put pen to paper he believed that the
19 debtor had an absolute to file the Article 78 proceeding, and
20 upon learning that what he had done really was improper under
21 the circumstances and that the relief could not be obtained,
22 he also did the reasonable thing.

23        Judging that under those conditions, those
24 undisputed facts, he deserves compensation in this case.

1      THE COURT:  Mr. Horan, would you like to respond?

2      MR. HORAN:  Yes, your Honor.  The question is not

3  what was in Mr. Crystal's head when he was preparing these

4  papers.  The question is whether this Article 78 was likely to

5  benefit the estate, and the answer to that question is that it

6  was not because, for two reasons.  First of all, and I think

7  Mr. Kushner was a little bit loose with the facts.  This sign

8  was illegal when it was installed.  It was installed in

9  violation of the stop-work order.  The debtor knew or should

10  have known that, and therefore, the debtor should never have

11  asked Mr. Crystal to bring the Article 78, and secondly, there

12  was no irreparable harm, which was the entire basis for the

13  petition.  No irreparable harm because the sign was already

14  installed, and the debtor was complying with its contractual

15  obligations, albeit in violation of the law.

16      This Article 78 was withdrawn because there was no

17  basis for it.  It should never have been filed in the first

18  place, and there should be no fees paid from the estate for

19  preparing and filing the Article 78, and just to be clear,

20  this has nothing to do -- this is not in any way a personal

21  attack on Mr. Crystal.  The City does not object to the use of

22  NBC in appropriate circumstances, but there should be no fees

23  paid for an improper factually false court filing.

24      THE COURT:  Mr. Kushner.

MR. KUSHNER:  Just to be clear, your Honor, if you look at the time records in the application for Mr. Crystal, they were performed in January, the time that the sign had not been replaced.  The sign was replaced in February.  February 1st I believe was the date that the sign was replaced.  Okay.  By that time the application had been filed and the need for it to go further was mooted.  Mr. Crystal did nothing wrong, and the suggestion by the City otherwise is alarming.

THE COURT:  All right.  Would anyone else like to be heard?

MR. NOE:  Just briefly also on the reference to the time line, the main issue that we had --

THE COURT:  Get to the microphone before you speak.  It will make a better record.

MR. NOE:  I apologize, your Honor.

THE COURT:  Thank you very much.

MR. NOE:  All right.  The main issues that we had, which generated the need for this law suit was the fact that the property owner, because of the stop-work order, did not want the sign to be replaced, and that's created -- despite the reference to a time line, that created the need for this litigation in order -- the stop-work order itself was improper in terms of -- as far as a painted sign, which caused no inherent immediate risk or danger.  This was part of the

arguments, and we went through the proper channels beforehand also, which the City left out.  Phyllis Arnold did contact the Department of Buildings and asked them to lift the stop-work order because it was improper.

Once we learned that they would not do that, that caused the need for the lawsuit, which was then mooted by the fact that the landlord relented and allowed us to place the sign there, and that's when it became moot.  That's all I have to say on the time line.

THE COURT:  All right.  Anything further from any party?

I appreciate the arguments that both sides have made.  To me it's most important to come back to consider the context and the bigger picture here, but then come back to the very specific question that is framed by this professional compensation request as opposed to the Article 78 and all of the orders that provide the context and background for the parties' arguments, also of interest to the Court, and I think that question is most importantly at the time that the work was done on two days, January 30th and January 31st, in the context that it was done was it an appropriate enterprise by this professional on behalf of the debtor?  Was there a sensible and a reasonable basis to proceed with the work, and I appreciate that from the different perspectives you reach

different conclusions in good faith, but from this perspective
I'm inclined to conclude that the answer is yes.

While I take note of the fact that the facts were
very dynamic, quite dynamic, the situation was dynamic, I
think it would be a mistake to use hindsight or even the
question of whether the matter that was brought, here the
Article 78 that was brought, turned out to be necessary to
continue to conclusion.  I would be reluctant to establish a
standard that somehow created a disincentive appropriately to
bring, but then appropriately to withdraw a case because
somehow you have to stand your ground to get paid eventually.

I'm also mindful here, as in so many other
situations, that in a reorganization professionals do take a
lot of risks, but the risks should be bounded by the framework
that does permit them to have an award of compensation and to
be paid that compensation as if it's permitted under the Code
and the rules and subject to notice and all of the proceedings
that we've had here.

So it seems to me that at least in a general way the
objections that have been made more appropriately, first of
all, are a good caution as to how decisions should be made as
to the work that is going to be in the interest of the debtor,
whether the services are necessary to the administration of or
beneficial at the time at which the service was rendered for

the completion of a case under this Title 11 and Chapter 11. I'm citing the <u>Korea Chosun Daily Times</u> case from 337 BR 758 at 765, 366, a case familiar to some in this courtroom including myself, having written that decision.

I think that the points the City has made are good reminders as to the context of how that decision should be made, but not sufficient in this case to overcome the showing that the debtor has made with respect to the time and circumstances and situation that was present when these fees were incurred. That's a separate question, and I need input from the parties on this as to when and how these fees could actually be paid, and I realize that's also a different question with an administrative cost, administrative expense.

Mr. Kushner, Mr. Curtin, can I hear from you on that?

MR. KUSHNER: Yes, your Honor. I happen to know by my own direct inquiry with Michael Eisenberg, who is the debtor's controller, that there is a reserve set aside for the payment of professionals, including the two applications that are before you on this calendar that we have yet to argue today. So the money's there. It's been budgeted all along. Again, this is a business model that relies heavily on professionals. The cash collateral orders that have been negotiated and submitted for approval on the ones that have

been approved contain what I would call hefty allowances for
professionals out of need, and the money's there.

This money certainly is not going to in any way
interfere with the operations of the debtor, and again I
didn't ask it specifically as to Mr. Crystal's application,
but more so in the context of the larger applications that are
also before you today.

THE COURT: Well, and there is a question of a
holdback that would be consistent with the terms of the
ordinary course of professionals.

MR. KUSHNER: There's an 80 percent --

THE COURT: 80 percent. I do want to note, and I've
said this from time to time in this case, and it bears
repeating. A business model founded on litigation with the
City is not a business model that seems likely to me to lead
to a successful reorganization of this enterprise, and moving
this enterprise on to a different track has been perhaps the
single most significant component of this reorganization
effort. This case was filed back in 2011. So yes,
professionals are important. Is litigation a business
strategy? I hope not, but it's not for me to set the business
strategy in a case.

MR. KUSHNER: The lion's share of the fees in this
case have been dedicated towards the need for administrative

1 compliance. Putting forth the effort through lawyers of
2 getting the signs approved, permits approved, that's certainly
3 Ms. Arnold's -- the bulk of Ms. Arnold's work, and my work is
4 done as the quarterback of the Chapter 11 case. So I don't
5 think it's as much litigation as you think, your Honor, but I
6 understand your point.

7 THE COURT: All right. I'm reminded of the need to
8 emphasize that perhaps by your observation that this is a
9 reorganization driven by the retention of professionals.

10 All right. Mr. Curtin, with respect to payment, let
11 me hear from you. Any objection to proceeding along the lines
12 set forth?

13 MR. CURTIN: Your Honor, with respect to this
14 application, it's as you mentioned I think that with the
15 holdback comes out to what, 4 --

16 THE COURT: $4,000.

17 MR. CURTIN: 4,000. They can afford it. The
18 money's there.

19 THE COURT: All right. For all the reasons
20 reflected in the record, noting the merits of the arguments
21 that have been advanced on both sides, and the lessons that I
22 trust each and all of you is drawing from all of them, the
23 motion will be granted as reflected in the record. Please
24 submit an appropriate proposed order. It's appropriate to

send it by Mr. Curtin's office for consent as to form. Since
it does concern compensation I would ask you to do that.

MR. KUSHNER: Thank you, your Honor.

THE COURT: All right. And I will say that in
deciding this matter today on this record I am motivated in
significant part by the desire to keep a -- to have a single
hearing on a matter that concerns only a few thousand dollars.
It's real money to the lawyers who would like to be paid.
I'm not saying I want bigger fee applications, but I don't
want you to assume that it's a harbinger of how we're going to
proceed with respect to the other applications.

Where would you like to go next, Mr. Curtin? Mr.
Kushner. Mr. Kushner, where would you like to go next? I
apologize for my mis-speaking again.

MR. CURTIN: Well, if you want me to answer --

THE COURT: Well, I'm always interested to hear the
position of your office. I'm wondering if it's appropriate to
give the parties --

MR. KUSHNER: I think what's left are two fee
applications, your Honor, one for Goetz Fitzpatrick and one
for Bryan Cave. Do you want to take those together or do you
want to take those separately? They essentially involve the
same issues.

MR. CURTIN: Well, I think -- if I may, I think the

1 Bryan Cave one was settled.

2       THE COURT:  Let's start with the Bryan Cave one,

3 please.  Mr. Kushner, let me -- I know there have been

4 objections and there's been a withdrawal as to counsel whose

5 application has been determined.  You're welcome to stay, but

6 you're free to go.  You may be excused.

7       Please proceed.

8       MR. KUSHNER:  Can I just consult with Ms. Arnold

9 because this is --

10      THE COURT:  Yes, you may.

11      MR. KUSHNER:  Okay.  So dealing with Bryan Cave,

12 your Honor, Bryan Cave has submitted its first interim fee

13 application seeking fees in the amount of $156,422.25 and

14 reimbursement of disbursements in the amount of $1,190.11, for

15 a total request of $157,612.36.  There was one objection filed

16 by the Office of the United States Trustee, which I understand

17 from Ms. Arnold has been now resolved with the agreement

18 between -- with the Bryan Cave law firm to accept a 60 percent

19 allowance or 40 percent holdback on fees, and a hundred

20 percent on disbursements.  I don't have the numbers because I

21 just learned about it right now.

22      THE COURT:  All right.  Mr. Curtin, let me hear from

23 you.  I have your objection, your office's objection.  It

24 identifies some important issues.  It sounds like they've been

1 resolved with a productive compromise, and I'm grateful to

2 hear that. Let me hear from you.

3 MR. CURTIN: Thank you, your Honor, and I do want to

4 put something on the record. I think both objections, the

5 objection -- the Goetz Fitzpatrick objection and the Bryan

6 Cave objections I've tried to make clear both in the papers

7 and in subsequent conversations what we're really, based upon

8 timing and economics, the timing being that we're close to

9 confirmation, and the economics being that from our point of

10 view such a large expense at this point in the case wouldn't

11 be a prudent way to proceed, but since we're on Bryan Cave, I

12 think it's clear that Bryan Cave and Ms. Arnold's services in

13 this case have brought some order to what was a rather chaotic

14 situation. So the objection really is not -- is not a

15 reflection on the services that she -- that the firm rendered.

16 It's purely an economic/timing issue.

17 So for those reasons we had a conversation before

18 the hearing and agreed that a 60 percent allowance at this

19 point with all rights reserved on both sides to the final

20 hearing to seek the rest, and then whatever else is incurred

21 between when this application ends and the confirmation. So I

22 think it makes sense. I think it's something that the debtor

23 can afford to pay out without leaving it with a very small

24 amount of money in the bank, and I think that based upon the

1  circumstances of the case and in the interest of case

2  management, it's a prudent way to proceed at this point.

3       THE COURT: All right. Would anyone else like to be

4  heard? No response.

5       I note also that the work done by Ms. Arnold and by

6  the firm has been significant in the case, and I appreciate

7  the points made to put in context the objection of the Office

8  of the United States Trustee focused on the issues as you've

9  indicated.

10      For all the reasons reflected in the record, the

11 application for compensation for Bryan Cave as modified

12 consensually on the record will be granted. I'll ask you to

13 submit a proposed order as reflected in the record, and again,

14 with review as to form by Mr. Curtin's office. All right.

15      Mr. Kushner.

16      MR. KUSHNER: Yes. That brings us to Goetz Fitz's -

17 - Goetz Fitzpatrick's rather fee application.

18      THE COURT: Yes.

19      MR. KUSHNER: This is the third interim fee

20 application of the firm as debtor's counsel. It covers the

21 period July 1st, 2012 for the seven-month period ending

22 January 31st, 2013. It seeks $164,950 in fees and $1,008.25

23 in reimbursement of disbursements, for a total request of

24 $165,958.25.

1       The debtor has had -- counsel has had one objection
2  by the Office of the United States Trustee, and there was a
3  reply filed by the applicant, and again I learned of the 60
4  percent offer this morning, and I don't think that it's unfair
5  or fair, but Goetz Fitzpatrick does have a little bit of a
6  different situation than Bryan Cave.

7       Again, this is the third application.  There are
8  prior holdbacks in this case of a substantial amount of money.
9   I believe it's about $65,000.  Even at 20 percent reduction a
10 holdback would result in a reduction of over $100,000 for
11 fees.  I do appreciate very much the role of Mr. Curtin
12 personally and the Office of the United States Trustee.  I put
13 in what I felt was a legitimate reply and dealing with the
14 law, and I do respect his point about the payment concern,
15 about the monies that are available to pay the expenses of
16 this estate at this time.

17      As I said to the Court before in response to another
18 question, those monies are set aside.  I think that a 40
19 percent reduction is extreme at this point.  I'm certainly
20 willing to listen to a more reasonable number.  There's been
21 no challenge at all to the reasonableness of our fees.  As I
22 understand the main contention of the United States Trustee is
23 that according to his analysis the estate can't pay for it.
24      Our firm has never, and I have never put a debtor in

1 a situation of making sure that our fees are paid over the --
2 at the expense of any other creditor of this case. There has
3 been not one creditor come to this Court in the course of this
4 entire Chapter 11 case that's complained that they hadn't been
5 paid. Again, these monies are set aside. The payment of
6 allowed fees at the appropriate time as cash flow permits will
7 not interfere with the operations of this debtor, and again, I
8 think that the 40 percent, given the prior holdbacks and what
9 have you, doesn't comport with the law. It doesn't comport
10 with the facts of this case. These expenses have been
11 budgeted, approved by the lender, and I submit that, your
12 Honor, that a different -- slightly different, not a greater
13 difference, I'm not asking for a hundred percent of the fees.
14 I'm certainly willing to bend, but I don't think that 40
15 percent is appropriate.

16 THE COURT: Mr. Kushner, I take all the points that
17 you make and I appreciate them. I think this is one of the
18 matters that comes rather directly within the discretion of
19 the Court within a reasonable range.

20 I'd like to hear from others. I only have
21 submissions from Office of the United States Trustee. Any
22 other responses? No response.

23 Here's my question for you. As I do my best to make
24 a sensible determination here, why isn't the percentage that

1  was appropriate in the Bryan Cave situation not appropriate
2  here?

3          MR. KUSHNER:  I guess they've made -- you'd have to
4  ask Bryan Cave why.  I think what I'm hearing is that -- from
5  Ms. Arnold was that there was no prior holdback, that this is
6  the first application, and from the fact that, you know, this
7  is something that they're prepared to do business wise, maybe
8  they have a bigger firm in terms of the numbers of revenues.
9  We have a 30-man firm.

10          If your Honor were to just award these fees at a 20
11 percent level, which has been the protocol in this case so
12 far, and again, that's not something that I said is the number
13 that needs to be paid here.  I'm still out a hundred percent -
14 - over $100,000 of having financed that work throughout a year
15 and a half worth of work.  I think that that puts us on a
16 different track than special counsel.

17          THE COURT:  All right.  How much has been paid?
18          MR. KUSHNER:  I can --
19          THE COURT:  I think the holdback has been -- how
20 much is the holdback up to at this point?
21          MR. KUSHNER:  There's been a substantial amount
22 paid.  I can read it from --
23          THE COURT:  There has been a substantial amount
24 paid, and I think those numbers are part of the equation.

1     Mr. Curtin, anything to add in reply?  I take it --
2  if memory serves, we are taking now the holdback from 20 to 40
3  percent.  What justifies that difference at this stage?
4     MR. CURTIN:  Well, there's a couple things, your
5  Honor.  One is the fact that we are very, very close to
6  confirmation, and I think that clearly that the case law and
7  the Code is consistent in the observation that the final fee
8  application is the best time to consider a fee application.
9  Certainly interims are a part of the process, and we're not
10 disputing that.  Obviously there have been several interim
11 orders already, but the bigger issue, as I mentioned in the
12 context of the Bryan Cave application, is this debtor has to
13 get to confirmation, and this debtor has to have somewhat of a
14 cushion, a cash cushion, an operational cushion in order to --
15 confirmation is not going to be easy here, and for it to be
16 possible at all we've got to do everything we can to have this
17 debtor in a sound financial position come a month and a half
18 from now.
19     So where the issue of the larger holdback comes
20 from, and I think the holdback itself is somewhat of a red
21 herring because in some cases your Honor will ask for a larger
22 holdback because say looking at the applications we anticipate
23 having objections to more than 20 percent of fees.  So we
24 don't want to get into a disgorgement situation.  That's not

the case here.  It's more a case of economically how much from our point of view, understanding it's only one point of view, but from our point of view how much prudently should go out the door at this point, and it's a balancing test.

Obviously no one's disputing that Mr. Kushner's firm has done work in this case, done a lot of work in the case, and that's got to be balanced against, you know, what the -- we're not up here saying that they shouldn't get anything. We've got to balance that against what is in, from our point of view, in the interest of this debtor at this point in time, a month and a half away from what's going to be a challenging confirmation hearing.  So that's how where -- how we arrived at the number.

THE COURT:  Close to the end of the road.

MR. CURTIN:  At this point I guess --

THE COURT:  Wise to have a reserve.

MR. CURTIN:  Right.

MR. KUSHNER:  And there is a reserve.  There still is a reserve.

THE COURT:  An incremental reserve.  I take your point, Mr. Kushner.  I take your point, Mr. Curtin.

All right.  I'm -- this is the last matter we have in this case.  Is that right?

I would like a very short break.  I'm going to think

1  about this for a moment.  I'll come back and give you a

2  ruling.  You can confer.  If you work it out, so much the

3  better.  Ms. Jackson can also use the opportunity to sequence

4  as efficiently as possible how we're going to move through the

5  next matters on the calendar to get you in and out as promptly

6  as possible.

7           All right.  Thank you very much.

8           THE CLERK:  All rise.

9                (Off the record/On the record)

10          THE COURT:  Thank you.  Please be seated.

11          Is there anything that anyone would like to add to

12 the record with respect to the compensation issue as to Goetz

13 Fitzpatrick?  I take it the request from the debtor is that

14 there be an approval at a level of a 20 percent holdback on

15 fees and none on expenses.  The request from the United States

16 Trustee is for the reasons indicated, including our proximity

17 to confirmation and the desirability of having some kind of a

18 bit of a funding reserve that that holdback be 40 percent, not

19 20 percent.  Have I correctly summarized the positions of the

20 parties?

21          MR. CURTIN:  Yes, your Honor.

22          MR. KUSHNER:  Yes, your Honor.

23          THE COURT:  Appreciating that this is a matter that

24 is committed to the Court's own discretion that a decision is

1  -- a decision that is a sensible decision is at least as
2  important as continuing this to another hearing so that I can
3  reflect further with you on the cases, I'm going to grant the
4  application and provide for a 30 percent holdback, which not
5  only is the midpoint between the two positions, but to me a
6  sensible assessment of the merits of the arguments that you
7  each make, and so that's where we're going to end up.

8          All right.  Please submit an appropriate proposed
9  order, and do we have a next date, Mr. Kushner or do we need
10 to find a next date?

11         MR. CURTIN:  Right.  We need a new confirmation
12 hearing.

13         THE COURT:  I think we do.  How far out in the
14 future shall we look?

15         MR. KUSHNER:  I think the first week in May, the
16 second week in May.

17         THE COURT:  All right.

18         MR. CURTIN:  Something between a week and two weeks
19 if you have would be perfect.

20         THE COURT:  Okay.  The first week of May, the week
21 of May 6th.  The first week of May, depending on how you
22 measure it, could be as soon as May 2nd.

23         MR. KUSHNER:  I have the 8th and 9th available.  I
24 don't know your Honor's availability, and the 14th and 15th

1  available.

2          THE COURT:  I think the morning of the 9th should
3  work.  I think the morning of the 9th should work.

4          MR. KUSHNER:  A Thursday.

5          THE COURT:  9:30 on Thursday, the 9th.

6          MR. KUSHNER:  May 9th at 9:30?

7          THE COURT:  Yes.

8          MR. KUSHNER:  Yes.  Thank you.

9          THE COURT:  Thank you.

10          MR. KUSHNER:  And your Honor should be looking for
11  the final disclosure statement and an order, so --

12          THE COURT:  We shall look with great interest for
13  those to be filed.  Thank you very much.

14          MR. KUSHNER:  Thank you.

15          THE COURT:  Anything further?  Thank you very much.
16   Thank you, all.

17

18

19          *          *          *

20                    **CERTIFICATION**

21

22  I, Catherine Aldrich, certify that the foregoing is a correct
23  transcript from the electronic sound recordings of the
24  proceedings in the above-entitled matter.

25

1 _____          June 22, 2013

2          Catherine Aldrich